IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

CHANGZHOU TRINA SOLAR ENERGY CO., LTD., *et. al.*,

Plaintiff,

and

SOLARWORLD AMERICAS, INC.,

Consolidated Plaintiff,

v.

UNITED STATES,

Defendant,

and

SOLARWORLD AMERICAS, INC.,

Defendant-Intervenor.

Consol. Court No. 17-00199

Before: Hon. Claire R. Kelly, Judge

NON-CONFIDENTIAL VERSION

Business Proprietary Information removed from pages 10-13, 23

## PLAINTIFF SOLARWORLD AMERICAS, INC. MEMORANDUM IN SUPORT OF ITS RULE 56.2 MOTION FOR JUDGEMENT UPON THE AGENCY RECORD

Timothy C. Brightbill
Laura El-Sabaawi
Usha Neelakantan

WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Americas, Inc.*

Dated February 2, 2018

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...........................................................................................................1

II.  RULE 56.2 STATEMENT ...........................................................................................1

    A.  Administrative Decision Under Review ................................................................1

    B.  Issues Presented ...................................................................................................1

III.  STATEMENT OF FACTS ...........................................................................................3

    A.  Facts Relevant to Commerce's Selection of a Surrogate Value for Aluminum Frames ...................................................................................................................5

    B.  Facts Relevant to Commerce's Valuation of Trina's Solar Glass Input ..................6

    C.  Facts Relevant to Commerce's Calculation of the Surrogate Financial Ratio .........6

IV.  STANDARD OF REVIEW ...........................................................................................7

V.  ARGUMENT ...............................................................................................................9

    A.  Commerce Erred in its Selection of Surrogate Values for Aluminum Frames and Module Glass ....................................................................................................9

        1.  Legal Standard ...........................................................................................9

        2.  Commerce's Decision to Value Aluminum Frames under HTS 7604 Was Contrary to Law and Not Supported by Substantial Evidence .................10

    B.  Commerce Erred in Valuing Trina's Solar Glass Using Thai HTS 7007.19.90000 ..............................................................................................18

    C.  Commerce Erred in Selecting Styromatic's 2015 Financial Statement to Calculate Trina's Overhead, Selling, General and Administrative Expenses, and Profit ......20

        1.  Contrary to Commerce's Finding, Evidence on the Record Demonstrates That Ekarat Does, in Fact, Produce Merchandise Identical to Subject Merchandise ..........................................................................................20

        2.  Ekarat's 2015 Consolidated Financial Statement Best Reflects the Financial Experience of Trina .................................................................23

        3.  Ekarat's, Not Styromatic's, 2015 Financial Statement Is the Best Available Information on the Record to Calculate Trina's Financial Ratios ......................................................................................................24

VI.  CONCLUSION ...........................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anshan Iron & Steel Co. v. United States,*
  27 CIT 1234 (2003) .................................................................................................................9

*Bristol Metals L.P. v. United States,*
  34 CIT 478, 703 F. Supp. 2d 1370 (2010) ............................................................................15

*Consol. Bearings Co. v. United States,*
  348 F.3d 997 (Fed. Cir. 2003)..................................................................................................8

*G.G. Marck & Associates, Inc. v. United States,* Ct. No. 08-00306, Slip Op. 15-62
  (Ct. Int'l Trade 2015). ...........................................................................................................11

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States,*
  29 CIT 288 (2005) ...................................................................................................................9

*Hebei Metals,*
  29 CIT at 300 .........................................................................................................................24

*Home Meridian Int'l, Inc. v. United States,*
  922 F. Supp. 2d 1366 (Ct. Int'l Trade 2013) ....................................................................9, 24

*Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States,*
  28 F. Supp. 3d 1317, 1336-37 (Ct. Int'l Trade 2014) ..................................................10, 15, 16

*Jinan Yipin Corp. v. United States,*
  800 F. Supp. 2d 1226 (Ct. Int'l Trade 2011) .............................................................9, 14, 24

*Jinko Solar Co. v. United States,*
  No. 15-00080, Slip Op. 17-62 at 25-34 (Ct. Int'l Trade May 18, 2018) .................................10

*MacLean-Fogg Co. v. United States,*
  100 F. Supp. 3d 1349, 1355-1356 (Ct. Int'l Trade 2015) ........................................................8

*Mid Continent Nail Corp. v. United States,*
  999 F. Supp. 2d 1307 (Ct. Int'l Trade 2014) ........................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)................................................................................................................7, 9

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006)................................................................................................8

*NMB Singapore Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009)...............................................................................................8

*SKF USA, Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001)...............................................................................................8

*SolarWorld Americas, Inc. v. United States*,
    234 F. Supp. 3d 1286 ........................................................................................................10, 11

*SolarWorld Americas, Inc. v. United States*,
    234 F. Supp. 3d 1286 ............................................................................................................10

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002)...............................................................................................7

*Wooden Bedroom Furniture from the People's Republic of China*, 73 Fed. Reg.
    49,162 (Dep't Commerce Aug. 20, 2008) (final results of antidumping admin.
    rev. and new shipper rev.)......................................................................................................22

*Zhaoqing Tifo New Fibre Co. v. United States*,
    60 F. Supp. 3d 1328, 1333 (Ct. Int'l Trade 2015) ..................................................................26

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................................................7

19 U.S.C. § 1677b(c)(1)........................................................................................................9, 15

19 U.S.C. § 1677b(c)(1)(B) ....................................................................................................24

19 U.S.C. § 1677f(i)(3)(A) ......................................................................................................8

19 U.S.C. § 3004(c) ...............................................................................................................11

Tariff Act of 1730 ..................................................................................................................24

**Administrative Proceedings**

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of
    China*, 82 Fed. Reg. 12,793 (Dep't Commerce Mar. 7, 2017) (prelim. results
    of antidumping duty admin. rev. and prelim. deter. of no shipments; 2014-
    2016) ........................................................................................................................................4

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of
    China*, 82 Fed. Reg. 32,170 (Dep't Commerce July 12, 2017) (final results of
    antidumping duty admin. rev. and deter. of no shipments; 2014-2016)............................1, 4, 5

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan,* 79 Fed. Reg. 4,661 (Dep't Commerce Jan. 29, 2014) (initiation of antidumping duty investigations)..........................................................................4

*Certain Lined Paper Products from India,* 76 Fed. Reg. 10,876 (Dep't Commerce Feb. 28, 2011) (final results of antidumpin duty admin. rev. and partial recissoin of antidumping duty admin. rev.) ............................................................24

*Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam,* 79 Fed. Reg. 41,972 (Dep't Commerce July 18, 2014) (final deter. of sales at less than fair value and final affirm. deter. of criticla circumstances)............................26

*Certain Steel Nails from the People's Republic of China,* 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014) (final results of the fourth antidumping admin. rev.) .............................................................................................................26

*Certain Steel Nails from the United Arab Emirates,* 77 Fed. Reg. 17,027 (Dep't Commerce Mar. 23, 2012) (final deter. of sales at less than fair value)..................................24

*Crystalline Silicon Photovoltaic Products From the People's Republic of China,* 80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015) (antidumping duty order; and amended final affirm. countervailing duty deter. and countervailing duty order)..........................................................................................................................4

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 81 Fed. Reg. 20,324 (Dep't Commerce Apr. 7, 2016)........................................................4

*Persulfates from the People's Republic of China,* 70 Fed. Reg. 6,836 (Dep't Commerce Feb. 9, 2005) (final results of antidumping duty admin. rev.) ..............................26

*Pure Magnesium from Israel,* 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001) (notice of final deter. of sales at less than fair value)...................................................25

**Other Authorities**

*Certain Crystalline Silicon Photovoltaic Products from China and Taiwan,* Inv. Nos. 701-TA-511, 731-TA-1246-1247, USITC Pub. 4519 (Feb. 2015) (Final) ....................27

## I.      INTRODUCTION

On behalf of SolarWorld Americas, Inc. ("SolarWorld"), we submit the following brief in

support of SolarWorld's motion for judgment on the agency record.

## II.     RULE 56.2 STATEMENT

### A.      Administrative Decision Under Review

The administrative determination challenged in this case is the U.S. Department of

Commerce's ("Commerce") final results in the first administrative review of the antidumping

duty order on *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of

China.* The contested results were signed by Commerce on July 5, 2017 and published in the

*Federal Register* on July 12, 2017.  *Certain Crystalline Silicon Photovoltaic Products from the

People's Republic of China*, 82 Fed. Reg. 32,170 (Dep't Commerce July 12, 2017) (final results

of antidumping duty admin. rev. and deter. of no shipments; 2014-2016) ("*Final Results*"), P.R.

258.[1] *See also* Issues and Decision Memorandum accompanying *Final Results* ("I&D Memo")

P.R. 259.

### B.      Issues Presented

#### 1.      Whether Commerce's determination to use HTS subheading 7604.29 to value Trina's aluminum frames was supported by substantial evidence and otherwise lawful?

No.  Commerce selected an inappropriate surrogate source to value the aluminum frames

used in the production of subject merchandise by respondent Trina.  Specifically, to value the

respondent's aluminum frames, Commerce unlawfully and unreasonably relied on a value

---

[1]      Documents on the agency record are referred to within this brief by the numbers provided
in Commerce's administrative record filed with the Court on September 20, 2017 (ECF No. 19).
Documents in the public administrative record are identified by name and date, followed by
"P.R." and the corresponding record number.  Documents in the confidential administrative
record are identified by name and date, followed by "C.R." and the corresponding record
number.

**NON-CONFIDENTIAL VERSION**

obtained from Harmonized Tariff Schedule ("HTS") category 7604.29, covering non-hollow alloyed aluminum profiles, rather than HTS category 7616.99, which covers fabricated aluminum goods, specifically including finished aluminum frames for solar panels.

Commerce unlawfully concluded that the respondent's aluminum frames were "profiles" covered under HTS heading 7604, when they did not meet the heading's definition of "profiles," as they were not of a uniform cross section along their whole length. The HTS provisions are statutory provisions of law and, as such, Commerce acted unlawfully by disregarding their clear terms and definitions.

Commerce also lacked substantial evidence for its determination, as the evidence on the record demonstrated that the aluminum frames used by the respondent in the underlying review are fabricated aluminum goods that have been further manufactured and processed into a good that assumed the character of a product that could not be classified under HTS category 7604. Commerce also erred by failing to give appropriate weight to extraordinarily relevant record evidence – a tariff classification ruling by U.S. Customs and Border Protection ("CBP") pertaining to virtually identical aluminum frames in which CBP concluded that the frames should be classified under HTS category 7616.99. Commerce also failed to appropriately consider evidence showing that HTS heading 7604 described unfinished aluminum articles, improperly finding such evidence irrelevant.

As such, Commerce's decision to use HTS category 7604.29 to value the respondent's aluminum frames was not supported by substantial evidence and was otherwise not in accordance with law.

Case 1:17-cv-00199-CRK   Document 33   Filed 02/05/18   Page 8 of 61

Consol. Ct. No. 17-00199                                    NON-CONFIDENTIAL VERSION

> **2.     Whether Commerce's decision to value Trina's solar glass input using Thai HTS 7007.19.90000 which covers tempered glass rather than Thai HTS 7007.29.90 which covers laminated glass was supported by substantial evidence and otherwise in accordance with law?**

No.   Commerce erred in selecting Thai HTS category 7007.19.90000 to value Trina's solar glass input because this HTS does not adequately reflect the type of surface treatments necessary to ensure the "extreme durability" required of solar glass.   To best capture the nature of the surface treatments necessary to ensure this "extreme durability," Commerce should have used Thai HTS category 7007.29.90, which reflects strengthened, laminated glass, other than for use in vehicles, aircraft or spacecraft.

> **3.     Whether Commerce's selection of Styromatic (Thailand) Co., Ltd.'s ("Styromatic") 2015 financial statement to calculate Trina's overhead, selling, general and administrative ("SG&A") expenses and profit in its final results was supported by substantial evidence and otherwise in accordance with law?**

No.   Commerce erred in selecting Styromatic's 2015 financial statement to calculate the respondent's overhead, SG&A expenses and profit, because Styromatic was a producer of comparable, not identical merchandise, unlike Ekarat Engineering (Public) Co., Ltd ("Ekarat"). Contrary to Commerce's claim, record evidence clearly established that Ekarat is a producer of identical merchandise.   Given this evidence, Commerce erred in not selecting Ekarat's financial statements, which were the best available information on the record with which to calculate overhead, SG&A expenses and profit.

## III.   STATEMENT OF FACTS

On December 31, 2013, Plaintiff filed a petition with Commerce and the U.S. International Trade Commission alleging that the U.S. solar industry was materially injured or threatened with material injury by reason of dumped and subsidized imports of crystalline silicon photovoltaic ("solar") products from China and dumped imports of solar products from Taiwan.

3

Case 1:17-cv-00199-CRK   Document 33   Filed 02/05/18   Page 9 of 61

Consol. Ct. No. 17-00199                                    NON-CONFIDENTIAL VERSION

*See e.g.*, *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan,* 79 Fed. Reg. 4,661 (Dep't Commerce Jan. 29, 2014) (initiation of antidumping duty investigations).   The investigation was initiated, both agencies issued affirmative final determinations, and Commerce published antidumping duty orders on February 18, 2015. *See, e.g.*, *Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015) (antidumping duty order; and amended final affirm. countervailing duty deter. and countervailing duty order).

After receiving requests from interested parties, including SolarWorld, Commerce initiated the first administrative review of the antidumping duty order on April 7, 2016, for a period of review ("POR") covering July 31, 2014 to January 31, 2016. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 20,324 (Dep't Commerce Apr. 7, 2016).   Commerce selected Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. (collectively, "Trina") as the sole mandatory respondent for individual examination.   Memorandum from Jeff Pedersen, Senior Int'l Trade Compliance Analyst, Off. IV, AD/CVD Operations, Enf't and Compliance, to Abdelali Elouaradia, Director, Off. IV, AD/CVD Operations, Enf't and Compliance, re: *2014-2016 Antidumping Duty Administrative Review of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Respondent Selection* (May 24, 2016), C.R. 31, P.R. 94.

On March 7, 2017, Commerce published the preliminary results of the administrative review. *See Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 82 Fed. Reg. 12,793 (Dep't Commerce Mar. 7, 2017) (prelim. results of antidumping duty admin. rev. and prelim. deter. of no shipments; 2014-2016). On July 12, 2017, Commerce published the final results of the antidumping duty administrative review. *See Final Results*.

Case 1:17-cv-00199-CRK   Document 33   Filed 02/05/18   Page 10 of 61

Consol. Ct. No. 17-00199                           NON-CONFIDENTIAL VERSION

Based in part on the findings described below, Commerce calculated a final antidumping duty

margin of 9.61 percent for Trina and the "separate rate" respondents. *Id.* at 32,171.

> ### A.   Facts Relevant to Commerce's Selection of a Surrogate Value for Aluminum Frames

In the preliminary results, Commerce valued Trina's aluminum frames using Thai

imports of aluminum extrusions categorized under Thai Harmonized Tariff Schedule ("HTS")

number 7604.29.90001, which pertains to "Aluminum Alloy Bars, Rods And Profiles, Other,

Other Than Hollow Profiles, Other {implying aluminum alloy}, Other Profiles." Memorandum

from Jeff Pedersen, Senior Int'l Trade Compliance Analyst, Off. IV, AD/CVD Operations, Enf't

and Compliance, through Howard Smith, Program Manager, Off. IV, AD/CVD Operations, Enf't

and Compliance, to The File, re: *2014-2016 Antidumping Duty Administrative Review of Certain*

*Crystalline Silicon Photovoltaic Products from the People's Republic of China: Factor*

*Valuation Memorandum* (Feb. 28, 2017) at Attachment II ("Prelim. Factor Valuation

Memorandum"), P.R. 224-227.

In its case brief, SolarWorld explained to Commerce that this HTS category was

inappropriate because the respondent's input did not meet the HTS' definition of aluminum

profiles, which are defined as products of a uniform cross-section along their whole length.

Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic*

*Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.* (Apr.

11, 2017) at 17-21 ("SolarWorld Case Brief"), C.R. 232, P.R. 247. Moreover, substantial

evidence on the record, including detailed production process information and pictures, as well

as tariff classification rulings from CBP showing how importers were in fact classifying

aluminum frames, demonstrated that aluminum frames used in the production of subject

merchandise are fabricated aluminum goods that have been subject to manufacturing processes

**NON-CONFIDENTIAL VERSION**

well beyond those of simple aluminum extrusions. *See id.* SolarWorld thus argued that the information on the record demonstrated that aluminum frames were properly valued under HTS category 7616.99, which was more specific to the input in question. *Id.* In the final results, however, Commerce continued to value Trina's aluminum frames using HTS category 7604.29.90001. *See* I&D Memo at 16-19.

### B.   Facts Relevant to Commerce's Valuation of Trina's Solar Glass Input

In the preliminary results, Commerce valued Trina's coated glass and tempered glass using HTS category 7007.19.90000, which includes "toughened (tempered) safety glass, not suitable for incorporation in vehicles, aircraft, spacecraft or vessels; other." I&D Memorandum at 28. In its case brief to Commerce, SolarWorld argued that HTS category 7007.19.9000 does not adequately capture glass with the extreme durability required for module glass. SolarWorld Case Brief at 21-22. Instead, SolarWorld urged Commerce to value Trina's solar glass input using Thai HTS category 7007.29.90, which reflects strengthened, laminated glass, other than for use in vehicles, aircraft, or spacecraft. *Id.* Nevertheless, in the final results, Commerce continued to value Trina's solar glass inputs using HTS category 7007.19.90000. *See* I&D Memorandum at 29. In rejecting SolarWorld's argument, Commerce explained that because the record lacked evidence indicating that Trina's solar glass contains plastic, as laminated glass does, HTS category 7007.19.90000 was inappropriate to value Trina's glass inputs. *Id.* at 29-30. Commerce thus continued to value Trina's solar glass using HTS category 7007.19.90000.

### C.   Facts Relevant to Commerce's Calculation of the Surrogate Financial Ratio

In the preliminary results, Commerce used the 2014 and 2015 financial statements of Styromatic, a manufacturer of electronic circuits, "which {Commerce} has considered to be comparable merchandise in the investigation in this proceeding," to calculate Trina's overhead,

Case 1:17-cv-00199-CRK   Document 33   Filed 02/05/18   Page 12 of 61

Consol. Ct. No. 17-00199                                    NON-CONFIDENTIAL VERSION

SG&A expenses, and profit.   Memorandum from James Maeder, Senior Director, Off. I, Antidumping and Countervailing Duty Operations, to Ronald K. Lorentzen, Acting Assistant Secretary for Enf't and Compliane, re: *Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; 2014- 2016* (Feb. 28, 2017) at 23 ("Preliminary Decision Memo") P.R. 223.   In its case brief, SolarWorld pointed out that Styromatic had benefitted from countervailable subsidies and was not a producer of identical merchandise. *See* SolarWorld Case Brief at 5-10.   SolarWorld urged the agency to instead use the financial statements of Ekarat, a producer of identical merchandise whose consolidated financial statement reflected the financial experience of Trina. *See* SolarWorld Case Brief at 10-17.   Nevertheless, in the final results, Commerce used Styromatic's 2015 financial statement.   *See* I&D Memorandum at 35. Commerce acknowledged that Styromatic received countervailable subsidies in 2015, but nevertheless determined that Styromatic's 2015 statement was the best available information. I&D Memorandum at 37-38.

## IV.   **STANDARD OF REVIEW**

The Court reviews Commerce's determinations in an antidumping duty administrative review to determine whether they are supported by substantial record evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce's determinations are not supported by substantial evidence where the agency fails to provide "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of the record, including whatever "fairly detracts from the substantiality of the evidence." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (citations omitted).   Commerce  must "articulate a satisfactory

**NON-CONFIDENTIAL VERSION**

explanation for its action including a 'rational connection between the facts found and the choice{s} made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). This requires that the Court ask whether the agency's determinations are reasonable given the record as a whole. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

Where the statute leaves the agency with a measure of discretion, the Court reviews decisions for abuse of discretion. An abuse of discretion occurs where a decision is based on an erroneous interpretation of law, on factual findings that are unsupported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors. *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355-1356 (Ct. Int'l Trade 2015).

Moreover, "an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (citation omitted). If Commerce provides "no reasonable explanation" for changing a practice that it has "consistently followed," such a change is unacceptable agency practice. *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003).

Commerce is also required by law to include in its final results "an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A). *See also NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009).

Consol. Ct. No. 17-00199                                    **NON-CONFIDENTIAL VERSION**

## V.     ARGUMENT

### A.     Commerce Erred in its Selection of Surrogate Values for Aluminum Frames and Module Glass

#### 1.     Legal Standard

Pursuant to 19 U.S.C. § 1677b(c)(1), in valuing factors of production, Commerce must use the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate." Commerce's practice when selecting surrogate values is to select, to the extent practicable, surrogate values which are publicly available, broad market averages, contemporaneous with the POR or closest in time to the POR, product-specific, and tax-exclusive. Preliminary Decision Memo at 17. While the agency enjoys broad discretion in selecting surrogate values, *Anshan Iron & Steel Co. v. United States*, 27 CIT 1234, 1246 (2003), its decision must be reasonable given the record as a whole and it must articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice{s} made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation omitted).

In addition, Commerce's selection of the best available information must conform to its mandate to calculate antidumping margins as accurately as possible. *See Home Meridian Int'l, Inc. v. United States*, 922 F. Supp. 2d 1366, 1371 (Ct. Int'l Trade 2013) (citation omitted). In this regard, selecting a surrogate value that is specific to the actual input consumed by the respondent is a key consideration in determining the "best available information." *See Jinan Yipin Corp. v. United States*, 800 F. Supp. 2d 1226, 1304 (Ct. Int'l Trade 2011) (citing *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288, 300 (2005)).

Consol. Ct. No. 17-00199                    **NON-CONFIDENTIAL VERSION**
                                            Business Proprietary Information
                                            Has Been Deleted

### 2.   Commerce's Decision to Value Aluminum Frames under HTS 7604 Was Contrary to Law and Not Supported by Substantial Evidence

In the final results of the underlying review, Commerce erred in valuing Trina's aluminum frames using the Harmonized Tariff Schedule ("HTS") category 7604.29.90001, which pertains to unfinished aluminum profiles. I&D Memo at 16-19. In doing so, Commerce relied heavily on its decisions in the original investigation, and in various segments of the *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China* ("Solar I") proceeding, some of which have been upheld by the Court. *See id.* (citing *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1336-37 (Ct. Int'l Trade 2014); *Jinko Solar Co. v. United States*, No. 15-00080, Slip Op. 17-62 at 25-34 (Ct. Int'l Trade May 18, 2018); *SolarWorld Americas, Inc. v. United States*, 234 F. Supp. 3d 1286 at 1314. However, based on the record of this underlying review, HTS subheading 7604 was unreasonable and contrary to law.[2]

First, Commerce's determination was not in accordance with law because it is inconsistent with the HTS. HTS number 7604, which Commerce selected for the surrogate value, refers to aluminum bars, rods or profiles, which the HTS defines as having "a uniform cross section along their whole length…, provided that they have not thereby assumed the character of articles or products of other headings." *See* HTS Excerpts, attached as **Exhibit 1**. The record clearly demonstrates that the aluminum solar frames in question are [

---

[2]   SolarWorld acknowledges that the Court affirmed Commerce's valuation of aluminum frames for solar modules with HTS heading 7604 in the original investigation and first administrative review of the Solar I proceeding. *See Jiangsu Jiasheng Photovoltaic Tech.*, 28 F. Supp. 3d 1317; *SolarWorld Americas, Inc.*, 234 F. Supp. 3d 1286; *Jinko Solar*, No. 15-00080, Slip. Op. 17-62. Given the different facts on the record of this review, SolarWorld continues to believe that Commerce's use of HTS heading 7604 was unsupported by substantial evidence and unlawful. The Court's decision in *SolarWorld Americas, Inc. v. United States* is currently under appeal to the Court of Appeals for the Federal Circuit as Ct. No. 18-372.

Consol. Ct. No. 17-00199                          **NON-CONFIDENTIAL VERSION**
Business Proprietary Information
Has Been Deleted

], *see* Letter from Trade Pacific PLLC to Sec'y Commerce,

re: *Crystalline Silicon Photovoltaic Products from the People's Republic of China: First*

*Supplemental Questionnaire Response* (Aug. 29, 2016) at Exhibit 19 ("Trina's First Supp.

Response"), C.R. 167-176, P.R. 159-161; Letter from Trade Pacific PLLC to Sec'y Commerce,

re: *Crystalline Silicon Photovoltaic Products from the People's Republic of China: Third*

*Supplemental Questionnaire Response* (Jan. 4, 2017) at Exhibit 6 ("Trina's Third Supp.

Response"), C.R. 182-190, P.R. 176, and thus cannot fit the definition of HTS 7604.

While SolarWorld understands that Commerce's task is not to classify the solar frame

inputs for customs purposes, *see SolarWorld Americas, Inc.*, 234 F. Supp 3d at 1305, it remains

relevant that the definitions in the HTS are not mere guidelines or suggestions, but are statutory

definitions with the force of law, which must be followed.   19 U.S.C. § 3004(c).   As a CBP

publication explains:

> In adopting and incorporating the Harmonized System, the legal text of the
> HTSUS consists of (1) the General Notes (which contain information relating to
> matters such as the territory covered by the schedule, terminology used in the
> schedule, special tariff programs, and the like); (2) the General Rules of
> Interpretation; (3) the Additional U.S. Rules of Interpretation (see discussion
> below); (4) all product categories set forth in 22 sections and 99 chapters that are
> designated by 4-digit, 6-digit, and 8-digit code numbers together with tariff rates
> and other treatment and Harmonized System section and chapter notes and
> Additional U.S. Notes (which are legal notes that provide definitions or
> information on the scope of the pertinent provisions or set additional requirements
> for classification purposes); and (5) {certain} appendices for certain chemicals,
> pharmaceuticals, and intermediate chemicals for dyes. The above-mentioned
> items are considered to be statutory provisions of law for all purposes.

U.S. Customs and Border Protection, *What Every Member of the Trade Community Should Know*

*About: Tariff Classification* (2004) at 32, excerpt attached as **Exhibit 2** (emphasis added).   *See*

*also G.G. Marck & Associates, Inc. v. United States*, Ct. No. 08-00306, Slip Op. 15-62 (Ct. Int'l

Trade 2015).   Of course, the agency   is required to abide by these statutory provisions, which

**NON-CONFIDENTIAL VERSION**

Business Proprietary Information
Has Been Deleted

provide a specific definition for "aluminum profiles" – a definition that Trina's aluminum frames

do not meet – in selecting surrogate values.   Its failure to do so in this case renders its

determination contrary to law.

Moreover, the record of this review contains detailed information from Trina itself

regarding the [

] .   *See* Trina's First Supp. Response at Exhibit 19.   Trina provided [

] .  *See id.*; Trina's Third Supp. Response at Exhibit 6.   The [

] .   That

[

] .

*See, e.g.*, Trina's First Supp. Response at Exhibit 19; Trina's Third Supp. Response at Exhibit 6.

Trina also provided the [                                    ], which shows that the

frames are subjected to [                           ], including [

], and that they have [

] .    Letter from Trade Pacific PLLC to Sec'y

Commerce, re: *Crystalline Silicon Photovoltaic Products from the People's Republic of China:*

*Section C and D Questionnaire Response* (July 19, 2016) at Exhibits D-13, D-15 ("Trina's

Section C and D Response"), C.R. 113-148, P.R. 129-131.

Case 1:17-cv-00199-CRK   Document 33   Filed 02/05/18   Page 18 of 61

Consol. Ct. No. 17-00199                                   NON-CONFIDENTIAL VERSION
                                                        Business Proprietary Information
                                                        Has Been Deleted

These [

                                    ]. They typically are [

                                                ] the completed frame is made.

These frames are "ready to be used" when they reach Trina's facilities.   Trina First Supp.

Response at SuppQ1-36.

        Because the aluminum frames have been further processed significantly beyond the

extrusion process, they have lost their character as an aluminum extrusion and have instead taken

the form of a fabricated aluminum good.   These solar panel components have been converted

from profiles of uniform cross section to an open shape with numerous mechanical features that

are added to increase reliability and longevity and ensure quick and simple assembly.   *See, e.g.,*

Letter from Wiley Rein LLP to Sec'y Commerce, re: *Crystalline Silicon Photovoltaic Products*

*from the People's Republic of China: Submission of Information to Rebut, Clarify, or Correct*

*Information Pertaining to Surrogate Values* (Aug. 22, 2016) at Exhibit 4 ("SolarWorld Rebuttal

Surrogate Value Submission"), C.R. 165-166, P.R. 157. These products are now further-

manufactured and further-processed solar aluminum frames, for which classification under HTS

category 7604.29.90001 for mere aluminum extrusions is incorrect and contrary to law.

        Thus, the evidence on the record is indisputable – Trina's aluminum frames are fabricated

products that have been further manufactured into a finished and final form.   As SolarWorld

explained to Commerce, this evidence demonstrates that the goods require no further processing

and no further manufacturing prior to use – they are ready for immediate incorporation into a

solar module.   Indeed, Commerce does not appear to dispute this fact.   Instead, the agency

continues to rely largely on its Solar I finding that "Petitioner's assertion that respondents'

aluminum frames are finished articles is not relevant to our decision." I&D Memo at 17.   In

Case 1:17-cv-00199-CRK   Document 33   Filed 02/05/18   Page 19 of 61

Consol. Ct. No. 17-00199                    **NON-CONFIDENTIAL VERSION**

other words, Commerce appears to have largely ignored this crucial evidence in its final decision.  Doing so ignores the agency's mandate to choose product-specific surrogate values and, thereby, determine dumping margins as accurately as possible.  *See Jinan Yipin*, 800 F. Supp. 2d at 1304.  Instead, Commerce chose a surrogate value that ignores the significant record evidence demonstrating that the aluminum frames used in Trina's manufacture of subject merchandise during the POR are <u>not</u> simple aluminum extrusions, and therefore are not appropriately valued under HTS 7604.

Second, Commerce's decision failed to give appropriate weight to extraordinarily relevant record evidence – namely, CBP rulings on the merchandise in question.  In 2011, CBP issued Ruling N139353 in response to a request from a Chinese solar producer, concluding that "{t}he applicable subheading for the aluminum frames for solar panels" is 7616.99.5090.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Submission of Surrogate Values* (Aug. 15, 2016) at Exhibit 13 (CBP Ruling N139353 (Jan. 13, 2011)) ("SolarWorld Surrogate Value Submission"), C.R. 151-164, P.R. 144-151.  *See also* I&D Memo at 18.  Two years later, CBP issued Ruling N238208, classifying an aluminum frame set that was a finished product and ready for use in the production of solar modules under HTS number 8541.90.0000. SolarWorld Surrogate Value Submission at Exhibit 13 (CBP Ruling N238208 (Feb. 16, 2013)).  Commerce fails to note the importance of the fact that CBP <u>twice</u> concluded that HTS heading 7604 was inappropriate for classification of the identical product at issue here – aluminum frames for solar modules – and that an HTS heading reflecting a more sophisticated product was required.

With respect to Ruling N139353, Commerce claims that it was "unable to weigh the ruling against record evidence supporting the Department's use of {HTS category 7616 rather

Case 1:17-cv-00199-CRK   Document 33   Filed 02/05/18   Page 20 of 61

Consol. Ct. No. 17-00199                                    NON-CONFIDENTIAL VERSION

than 7604}" because CBP's ruling lacked an explanation for its decision. I&D Memo at 18.

However, CBP quoted the following description of the aluminum frames in its finding:

> the frames under consideration are "punched and notched with the ends of the extrusion being mitered. Corner keys are inserted in the small frame extrusion and the ends of the large frames are opened to receive the corners keys. There is no further processing to the aluminum frames. They are just snapped together."

SolarWorld Surrogate Value Submission at Exhibit 13. CBP found important that the frames at

issue require "no further processing" and "are just snapped together" in classifying the product

under 7616.99. *See id.* But Commerce ignored this factual description and its impact on CBP's

decision.

SolarWorld acknowledges that "{t}he fact that Commerce has at times found support for

its surrogate value choices in Customs classification rulings does not lead to the conclusion that

Commerce must follow such rulings in every case." *Jiangsu Jiasheng*, 28 F. Supp. 3d at 1336.

But in this particular instance, the CBP rulings at issue are directly on point, telling the agency

how the exact products in question are in fact classified upon import. It is difficult to imagine

any more relevant and conclusive evidence, yet Commerce merely referenced it in passing in its

final results. *See* I&D Memo at cmt. 5. While Commerce may not be required to follow CBP

rulings in every case, Commerce is required to use the "best available information." *See* 19

U.S.C. § 1677b(c)(1). *See also* I&D Memo at cmt. 5. Given the uniquely dispositive nature of

the CBP rulings on the record, Commerce erred in disregarding this evidence. And while

Commerce claimed that HTS 7616.99 "includes products dissimilar to aluminum frames," I&D

Memo at 16, such a finding does not preclude the agency from relying on an HTS category that

includes the specific items at issue. *See Bristol Metals L.P. v. United States*, 34 CIT 478, 480-

481, 703 F. Supp. 2d 1370, 1374-75 (2010) (affirming Commerce's use of Indian import data

**NON-CONFIDENTIAL VERSION**

that covered a broader range of steel grades than that used by the producer because the source

covered the specific type of steel consumed).

Third, Commerce failed to appropriately consider evidence detracting from its

conclusion, including numerous CBP rulings classifying <u>unfinished</u> aluminum articles under

HTS heading 7604.  *See* SolarWorld Rebuttal Surrogate Value Submission at Exhibit 1.  While

HTS heading 7604 may not explicitly specify whether it contains "finished or unfinished

aluminum profiles," *see Jiangsu Jiasheng*, 28 F. Supp. 3d at 1337; I&D Memo at 18, the only

relevant record evidence indicated that the HTS heading refers to <u>unfinished</u> articles.

Specifically, CBP has previously found that a hollow aluminum tube and profile that is imported

and <u>subsequently fabricated and converted</u> in the United States is classifiable under HTS

headings 7604 or 7608.  SolarWorld Surrogate Value Submission at Exhibit 13 (CBP Ruling

N080920 (Nov. 6, 2009)).  Similarly, extruded aluminum profiles that have a uniform cross

section along their entire length <u>that will be manufactured into</u> window and doors in the United

States are classifiable under HTSUS number 7604.29.1000.  *Id.* (CBP Ruling NY R01215 (Jan.

5, 2005)).  Unfinished and uncoated profiles that have no finish cuts, holes, bends or other

fabricating that will be subsequently converted into storm doors are similarly classifiable under

HTSUS number 7604.29.1000.     *Id.* (CBP Ruling NY I82931 (June 25, 2002)).  While

SolarWorld provided evidence showing that unfinished articles are classified under 7604, there

was <u>no</u> record evidence to indicate that any finished articles, such as aluminum frames for solar

panels, are classified under this HTS number.  Commerce does not appear to have taken this

evidence into account in its determination.  *See* I&D Memo at cmt. 5.

Moreover, according to Note1(b) to Chapter 76 of the HTS, goods are considered to be

extrusions and profiles (which are defined as products of a uniform cross-section along their

whole length) "provided that they have not… assumed the character of articles of products of other headings." SolarWorld Rebuttal Surrogate Value Submission at Exhibit 3; HTS Excerpts, attached as **Exhibit 1**. But as noted above, the aluminum solar frames in question are <u>not</u> uniform in cross section along their entire length, *see* SolarWorld Surrogate Value Submission at Exhibit 13 (CBP Ruling NYR01215 (Jan. 5, 2005)), which Commerce appears to recognize yet disregard. *See* I&D Memo at 18. Moreover, the aluminum frames have been further manufactured and processed into a good that has assumed the character of a product of a different heading. SolarWorld Surrogate Value Submission at Exhibit 13 (CBP Ruling N139353 (Jan. 13, 2011)). Classifying solar frames as goods under HTS heading 7604 is improper – these goods are <u>not</u> simple extrusions. Commerce should have evaluated the substantial evidence showing that Trina's aluminum frames were finished articles, which demonstrated that classification of the frames under HTS heading 7604, for unfinished articles, was improper. *See id.* at Exhibit 13 (noting CBP's finding that "{t}here is no further processing to the aluminum frames. They are just snapped together").

Fourth, Commerce concluded, contrary to law, that Trina's aluminum frames were "profiles" covered under HTS heading 7604. *See* I&D Memo at 16. As SolarWorld argued, Trina's aluminum frames did not meet the statutory definition of the heading's aluminum "profiles." *See* SolarWorld Case Brief at 17-19. Indeed, the explanatory notes to Chapter 76 define "profiles," such as the profiles included under 7604, as "{r}olled, extruded, drawn, forged or formed products, coiled or not, of a <u>uniform cross section along their whole length</u> . . . ." HTS Excerpts, attached as **Exhibit 1** (emphasis added). *See also* SolarWorld Rebuttal Surrogate Value Submission at Exhibit 3 (emphasis added). As noted above, aluminum frames for solar modules are <u>not</u> of a uniform cross section along their whole length. *See, e.g.*, Trina's First

17

**NON-CONFIDENTIAL VERSION**

Supp. Response at Exhibit 19; Trina's Third Supp. Response at Exhibit 6. Commerce essentially ignored this key fact, repeating that "while certain aluminum frames purchased by respondents contain corners, the Department does not believe that this would necessarily change their classification as aluminum profiles." I&D Memo at 17. This is incorrect. The statutory definition in the HTS itself clearly <u>requires</u> "profiles" to have a uniform cross section, rendering Commerce's unsupported "belief" contrary to law.

In sum, Commerce's valuation of aluminum frames using HTS heading 7604 failed to adequately evaluate highly relevant evidence on the record regarding the significant production processes involved in converting a simple aluminum extrusion into an aluminum frame. Commerce based its determination on unreasonable factual conclusions, and failed to rely on the "best available information" on the record or choose the most product-specific surrogate value, rendering its determination unsupported by substantial evidence and unlawful.

## B.    Commerce Erred in Valuing Trina's Solar Glass Using Thai HTS 7007.19.90000

In the final results, Commerce valued Trina's solar glass, *i.e.*, both coated and tempered glass, using Thai imports of tempered glass classified under HTS category 7007.19.9000. I&D Memorandum at 28-29. However, this HTS category, which covers tempered glass, does not account for the additional surface treatments imparted to the glass used in Trina's modules and thus cannot be the "best available information" to value Trina's input.

That Trina uses tempered glass is not in dispute. However, evidence on the record demonstrates that the glass Trina uses is tempered glass that is further worked to ensure that it is durable, safe, and able to withstand the elements. Specifically, the datasheet for glass on Trina's website refers to the glass as "3.2 mm (0.13 inches), High Transmission, AR *Coated* Tempered Glass." *See* Trina's Third Supp. Response at SuppQ3-2 (emphasis added). In addition,

Commerce also placed on the record information from other module suppliers, indicating that their glass is "high-transparency tempered glass with an *antireflection surface treatment*. . . Modules are strenuously tested for weight loading and impact resistance, and the *front glazing* of a module is extremely durable." *Id.* at SuppQ3-2 (emphasis added). Trina confirmed that there is "no significant difference" between the glass listed in Trina's specification sheet, that used in the production of subject merchandise, and the glass specifications from other module suppliers. *Id.* at SuppQ3-3. Record evidence thus makes clear that in addition to being tempered, Trina's solar module glass also undergoes additional processing with respect to glazing and/or anti-reflective surface treatments that are intended to impart extreme durability to the glass.

While Commerce's use of Thai HTS number 7007.19.90 captures the nature of Trina's glass inputs as tempered, it does not adequately reflect the type of surface treatments imparted to Trina's solar glass that is necessary to ensure its "extreme durability," and it thus significantly undervalued this key input. Thai HTS number 7007.29.90 is the only HTS number that reflects such strengthened, laminated glass other than for use in vehicles, aircraft, or spacecraft. While Commerce relies on an explanatory note regarding the inclusion of plastics in laminated glass as justification for its refusal to use HTS number 7007.29.90 to value Trina's coated glass, the fact remains that by valuing this coated glass using 7007.19.90 rather than the HTS number that takes into account the additional processing involved in surface treatments, Commerce has substantially undervalued this input, resulting in an inaccurate margin. Commerce's valuation of Trina's coated glass was thus unreasonable, and should be remanded by the Court.

Case 1:17-cv-00199-CRK   Document 33   Filed 02/05/18   Page 25 of 61

Consol. Ct. No. 17-00199                                    NON-CONFIDENTIAL VERSION

**C.**   **Commerce Erred in Selecting Styromatic's 2015 Financial Statement to Calculate Trina's Overhead, Selling, General and Administrative Expenses, and Profit**

In the final results, Commerce used Styromatic's 2015 financial statement to calculate Trina's overhead, SG&A expenses, and profit. I&D Memo at 35-39. Record evidence indicates, however, that this decision was in error – as "best available information," Commerce should have instead selected the financial statement of Ekarat, a producer of *identical* merchandise. For the reasons described below, this decision should be remanded to the agency for reconsideration.

**1.**   **Contrary to Commerce's Finding, Evidence on the Record Demonstrates That Ekarat Does, in Fact, Produce Merchandise Identical to Subject Merchandise**

In the final results, Commerce rejected Ekarat's financial statements claiming that the record lacked evidence that Ekarat produced subject merchandise. *Id.* at 36-37. This is factually incorrect, and there is substantial evidence on the record supporting Ekarat's solar production. First, page 11 of Ekarat's financial statement states:

> The Company is the manufacturer of Solar Module with the capacity of 12 Megawatt per year. The Company can also produce Solar Cell with the capacity of 30 Megawatt per year for the usage as raw material for Solar Module assembly and for sell as the merchandise both local market and foreign market.

*See* SolarWorld Surrogate Values Submission at Exhibit 10 (emphasis added). Second, on page 13, Ekarat's financial statement further describes its solar cell and module manufacturing capabilities:

> Ekarat Engineering Public Company Limited is a manufacturer and distributor of Solar Module (Crystalline Silicon). The capacity of the module we can produce is from 30 Watts to 200 Watts depend on customer demand. The Company's Solar Module has the efficiency about 12%-15% for changing the solar energy to electric energy. The module can be use for 20-25 years and we test the module before deliver to the customers. The price of the module has direct variation to the price of raw materials likes Solar cell because the solar cell is the main raw material and the cell has the highest price. The Company has the customer in both

20

local and overseas that operated the business by distributing the solar module or solar module installation.

*Id.*  Third, on page 88, the financial statement describes cash flows information related to solar cell manufacturing:

> In the separate financial statements as at December 31, 2015 and 2014, the Company transferred other raw materials and solar cell to be construction in progress amount of Baht 2.12 million and Baht 1.61 million respectively.  In 2014, transferred construction in progress to be inventories amount of Baht 1.05 million.

*Id.*  And fourth, Ekarat's assets for cell manufacturing in 2015, which totaled 646.31 million Baht, were significantly higher than its assets for transformer sales and services (284.73 million Baht), and electricity (122.59 million Baht).  *Id.* at Exhibit 10, p. 113.

Commerce ignores this substantial evidence, and claims instead that "Ekarat's financial statements support that more than 99 percent of its revenue came from sales of distribution transformers and services, and the remaining revenue came from sales of electricity."  I&D Memo at 36-37.  As support for this assertion, the agency cites to page 113 of Ekarat's financial statement, but that page in no way supports the assertion.  The "Goods production and distribution" column on this page, which would include the production of solar cells and modules, reports revenue of 1,807.32 million Baht in 2015.  *See* SolarWorld Surrogate Values Submission at Exhibit 10, p. 113.  Nothing on this page indicates that 99 percent of Ekarat's revenue came from transformer distribution and services.  The agency's conclusion is in error.

Commerce also claims that "any production of solar modules by Ekarat appear to be related to its solar farm operations . . ."  I&D Memo at 37.  But again, the agency is mistaken.  As mentioned previously, Ekarat's financial statement indicates that the company has solar cell and module customers both within Thailand and abroad: "The Company has the customer in both

**NON-CONFIDENTIAL VERSION**

local and overseas that operated the business by distributing the solar module or solar module installation." SolarWorld Surrogate Values Submission at Exhibit 10, p. 13.

Next, Commerce erroneously claims, without support, that Ekarat Solar Co. Ltd. "had an operating loss in 2015."[3] I&D Memorandum at 37. But nowhere does the financial statement support this statement. Ekarat Solar is referenced separately on pages 16-17, 93, 110, and 111, and none of these pages indicate that the subsidiary was operating at a loss. Moreover, in determining a company's operating status, Commerce normally relies on the profit before tax figure in the income statement. *See* Issued and Decision Memorandum accompanying *Wooden Bedroom Furniture from the People's Republic of China*, 73 Fed. Reg. 49,162 (Dep't Commerce Aug. 20, 2008) (final results of antidumping admin. rev. and new shipper rev.) at 14 (explaining that "it is {Commerce's} practice to use only financial statements from surrogate companies that have a profit before tax."). Here, both the consolidated financial statement and the separate financial statement show sizable profits in 2015 of more than 155 million Baht. SolarWorld Surrogate Values Submission at Exhibit 10, p. 66. Commerce's claim that the Ekarat Solar was operating at a loss, therefore, is wholly unsupported and contradicted by other record evidence.

Moreover, as SolarWorld explained to the agency, the *National Survey Report of PV Power Applications in Thailand* for 2014 specifically identifies Ekarat as a producer of photovoltaic cells and modules, as does the *Amata Times*. *See* SolarWorld Surrogate Values Submission at Exhibit 11. And Ekarat's website clearly demonstrates that the company operates modern, state-of-the-art solar production facilities in Amata, Thailand. *Id.* Commerce ignored this addition information.

---

[3]     In addition, while Commerce seems to imply that Ekarat Solar is the entity engaged in solar cell and module manufacturing, *see* I&D Memorandum at 37, the record does not support this assertion. The financial statement clearly identifies Ekarat Solar Co. Ltd. as a "Distributor of solar cell." SolarWorld Surrogate Values Submission at Exhibit 10, p. 109.

NON-CONFIDENTIAL VERSION
Business Proprietary Information
Has Been Deleted

Thus, Commerce's claim that the record demonstrates that Ekarat is not a producer of identical or comparable merchandise is incorrect; instead, Commerce simply ignored clear record evidence of Ekarat's production of subject merchandise.   Commerce's decision, therefore, is erroneous and should be remanded to the agency for reconsideration.

### 2.   Ekarat's 2015 Consolidated Financial Statement Best Reflects the Financial Experience of Trina

In addition to being a producer of identical merchandise as explained above, Ekarat's business structure and profit experience as reflected in its 2015 consolidated financial statement best correlate to the structure and financial experience of the respondent in the underlying review.   As SolarWorld explained to Commerce, respondent Trina is composed of several affiliated entities that produced subject merchandise during the period of review, one of which had subject sales to the United States - Changzhou Trina Solar Energy Co., Ltd. ("TCZ") – as well as a U.S. affiliate, Trina Solar (U.S.), Inc. ("TUS").   *See* Letter from Trade Pacific PLLC to Sec'y Commerce re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Section A Questionnaire Response* (June 24, 2016) at A-1, A-21 ("Trina's June 24, 2016 AQR") C.R. 34-111, P.R. 107-121; Trina's Section C and D Response at D-13 – D-14.   These entities are [

].   Trina's June 24, 2016 AQR at Exhibit A-4.   Within the [

].

*Id.* at A-2  - A-4, A-13, and Exhibits A-3 – A-4, A-9.   In addition, as evidenced by TCZ and Trina Solar (Changzhou) Science & Technology Co., Ltd.'s ("TST") financial statements, [

].   *Id.* at Exhibit A-17.   Given the nature of respondent's business

**NON-CONFIDENTIAL VERSION**

operations, the profit and financial experience is clearly best captured at the consolidated level –

as reflected in Ekarat's 2015 consolidated financial statement.

> **3.    Ekarat's, Not Styromatic's, 2015 Financial Statement Is the Best Available Information on the Record to Calculate Trina's Financial Ratios**

The Tariff Act requires Commerce to value factors of production ("FOPs") on the basis

of "the best available information regarding the values of such factors in a market economy

country." 19 U.S.C. § 1677b(c)(1)(B).  Commerce's selection of the best available information

must conform to its mandate to calculate antidumping margins as accurately as possible.  *See*

*Home Meridian*, 922 F. Supp. 2d at 1371.  In this regard, selecting a surrogate value that is as

specific to the actual input consumed by the respondent is a key consideration in determining the

"best available information." *See Jinan*, 800 F. Supp. 2d at 1304 (citing *Hebei Metals*, 29 CIT at

300).

In addition, when selecting a source to use for surrogate financial ratios, Commerce

applies a set of criteria to choose between such available statements, including: (1) similarity of

the potential surrogate company's business operations and products to the respondent; (2) the

extent to which the financial data of the surrogate company reflects sales in the United States as

well as the home market; (3) the contemporaneity of the surrogate data to the period of review;

and, (4) the similarity of the customer base.  *See, e.g.*, Issues and Decision Memorandum

accompanying *Certain Steel Nails from the United Arab Emirates*, 77 Fed. Reg. 17,027 (Dep't

Commerce Mar. 23, 2012) (final deter. of sales at less than fair value) at 26-27 ("Steel Nails I&D

Memo"); Issues and Decision Memorandum accompanying *Certain Lined Paper Products from*

*India*, 76 Fed. Reg. 10,876 (Dep't Commerce Feb. 28, 2011) (final results of antidumping duty

admin. rev. and partial rescission of antidumping duty admin. rev.) at cmt. 3; Issues and Decision

**NON-CONFIDENTIAL VERSION**

Memorandum accompanying *Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001) (notice of final deter. of sales at less than fair value) at cmt. 8. *See also Mid Continent Nail Corp. v. United States*, 999 F. Supp. 2d 1307, 1324-1326 (Ct. Int'l Trade 2014).   In applying this test, Commerce has taken the position that "{t}he greater the similarity in business operations and products, the more likely that there is a greater correlation in the profit experience of the companies." Steel Nails I&D Memo at 27.

The record of the underlying review contained four Thai financial statements, *all* of which reflected the receipt of countervailable subsidies. *See* I&D Memorandum at 35-38.   Of those four companies, and contrary to Commerce's findings, evidence established that only Ekarat was a producer of identical merchandise, which the agency acknowledged in the preliminary results. *See supra* section C; Preliminary Decision Memorandum at 23 ("Ekarat is a manufacturer of solar cells and modules, we well as a distributor and servicer of electrical transformers.").   The other three Thai companies, including Styromatic, produced only comparable merchandise. *See* Preliminary Decision Memorandum at 23; I&D Memorandum at 39 (explaining that Styromatic's statement "reflect a producer of merchandise comparable to the subject merchandise in the primary surrogate country.").   After eliminating the other Thai financial statements, the agency was left with two financial statements that both reflected the receipt of countervailable subsidies – Ekarat and Styromatic.   Ekarat, however, was the only producer of identical merchandise.   Thus, in order to comply with the Tariff Act's requirement that Commerce choose the "best available information" and to remain consistent with its past practice, Commerce was left with little choice but to use the financial statement of Ekarat, *i.e.*,

Case 1:17-cv-00199-CRK   Document 33   Filed 02/05/18   Page 31 of 61

Consol. Ct. No. 17-00199                                   NON-CONFIDENTIAL VERSION

the producer of identical merchandise.[4] Indeed, a producer of <u>identical</u> merchandise, like Ekarat, is more similar to Trina in business operations and products than a producer of *comparable* merchandise, as explained above.  As Commerce itself has stated: "<u>there is no need to consider using a company that makes only comparable merchandise when there are usable financial statements on the record from companies that produce identical merchandise.</u>"  Issues and Decision Memorandum accompanying *Certain Steel Nails from the People's Republic of China*, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014) (final results of the fourth antidumping duty admin. rev.) at 9-10 (emphasis added). *See also* Issues and Decision Memorandum accompanying *Persulfates from the People's Republic of China*, 70 Fed. Reg. 6,836 (Dep't Commerce Feb. 9, 2005) (final results of antidumping duty admin. rev.) at 4-6.  Commerce's decision to use Styromatic's financial statement rather than that of Ekarat, a producer of solar cells and modules, therefore, cannot be sustained.

Finally, using the financial ratios of a producer of identical merchandise is particularly important given the highly complicated nature of the subject merchandise at issue.  *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam*, 79 Fed. Reg. 41,972 (Dep't Commerce July 18, 2014) (final deter. of sales at less than fair value and final affirm. deter. of critical circumstances) at 17-20 ("the Department's preference for using the financial statements of producers of identical merchandise is especially strong here because of the unique nature of OCTG among the wide range of pipe

---

[4]    The Court of International Trade appears to have acknowledged the preference for using financial statements of a producer of identical merchandise as the source of surrogate financial ratios. *See, e.g.*, *Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1333 (Ct. Int'l Trade 2015) ("Commerce calculates those surrogate values using ratios — known as 'surrogate financial ratios' — that the agency derives from the financial statements of one or more companies that produce identical (<u>or at least comparable</u>) merchandise in the relevant surrogate market economy country") (emphasis added).

**NON-CONFIDENTIAL VERSION**

products"). Solar cells and modules must be produced from a polysilicon crystal, cropped and wafered, converted in a clean room environment into a photovoltaic cell, and then assembled into a finished module. *See Certain Crystalline Silicon Photovoltaic Products from China and Taiwan*, Inv. Nos. 701-TA-511, 731-TA-1246-1247, USITC Pub. 4519 (Feb. 2015) (Final) at I-25 – I-30. The production process (and associate costs) for subject merchandise is complex, high-tech, and involves multiple steps. *See* SolarWorld Case Brief at 13. While Commerce may consider electronic components and circuit boards to be "comparable" to the subject merchandise, and perhaps appropriate for use as a surrogate if no usable data for identical merchandise was available, the financial statement of a producer of electronic components and circuit boards cannot be the "best information available" when information reflecting production of the exact same product as subject merchandise – solar cells and modules – is available. And as explained to the agency, the omission of Ekarat's financial results from the calculation clearly understates the total cost of production for Trina's highly sophisticated solar manufacturing operations. Such a result cannot be countenanced and should be remanded to the agency for reconsideration.

Consol. Ct. No. 17-00199                        **NON-CONFIDENTIAL VERSION**

## VI.   <u>CONCLUSION</u>

SolarWorld respectfully requests that the Court find that the portions of Commerce's final results described above are unsupported by substantial evidence and inconsistent with law and should be remanded for redetermination consistent with the Court's opinion.

Respectfully submitted,

<u>/s/ Timothy C. Brightbill</u>
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Usha Neelakantan, Esq.

**WILEY REIN LLP**

1776 K Street, NW
Washington, DC 20006
(202) 719-7000

February 2, 2017                 *Counsel to SolarWorld Americas, Inc.*

28

**NON-CONFIDENTIAL VERSION**

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedures 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Plaintiff SolarWorld Americas, Inc.'s Memorandum in Support of its Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2010), is 8,066 words.

/s/ Timothy C. Brightbill
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

SolarWorld Americas, Inc.
(Representative Of)

February 2, 2018
(Date)

# EXHIBIT 1

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

CHAPTER 76

ALUMINUM AND ARTICLES THEREOF

XV
76-1

<u>Note</u>

1.   In this chapter the following expressions have the meanings hereby assigned to them:

(a)  <u>Bars and rods</u>

Rolled, extruded, drawn or forged products, not in coils, which have a uniform solid cross section along their whole length in the shape of circles, ovals, rectangles (including squares), equilateral triangles or regular convex polygons (including "flattened circles" and "modified rectangles", of which two opposite sides are convex arcs, the other two sides being straight, of equal length and parallel). Products with a rectangular (including square), triangular or polygonal cross section may have corners rounded along their whole length. The thickness of such products which have a rectangular (including "modified rectangular") cross section exceeds one-tenth of the width. The expression also covers cast or sintered products, of the same forms and dimensions, which have been subsequently worked after production (otherwise than by simple trimming or descaling), provided that they have not thereby assumed the character of articles or products of other headings.

(b)  <u>Profiles</u>

Rolled, extruded, drawn, forged or formed products, coiled or not, of a uniform cross section along their whole length, which do not conform to any of the definitions of bars, rods, wire, plates, sheets, strip, foil, tubes or pipes. The expression also covers cast or sintered products, of the same forms, which have been subsequently worked after production (otherwise than by simple trimming or descaling), provided that they have not thereby assumed the character of articles or products of other headings.

(c)  <u>Wire</u>

Rolled, extruded or drawn products, in coils, which have a uniform solid cross section along their whole length in the shape of circles, ovals, rectangles (including squares), equilateral triangles or regular convex polygons (including "flattened circles" and "modified rectangles", of which two opposite sides are convex arcs, the other two sides being straight, of equal length and parallel). Products with a rectangular (including square), triangular or polygonal cross section may have corners rounded along their whole length. The thickness of such products which have a rectangular (including "modified rectangular") cross section exceeds one-tenth of the width.

(d)  <u>Plates, sheets, strip and foil</u>

Flat-surfaced products (other than the unwrought products of heading 7601), coiled or not, of solid rectangular (other than square) cross section with or without rounded corners (including "modified rectangles" of which two opposite sides are convex arcs, the other two sides being straight, of equal length and parallel) of a uniform thickness, which are:

- of rectangular (including square) shape with a thickness not exceeding one-tenth of the width,

- of a shape other than rectangular or square, of any size, provided that they do not assume the character of articles or products of other headings.

Headings 7606 and 7607 apply, <u>inter alia</u> , to plates, sheets, strip and foil with patterns (for example, grooves, ribs, checkers, tears, buttons, lozenges) and to such products which have been perforated, corrugated, polished or coated, provided that they do not thereby assume the character of articles or products of other headings.

(e)  <u>Tubes and pipes</u>

Hollow products, coiled or not, which have a uniform cross section with only one enclosed void along their whole length in the shape of circles, ovals, rectangles (including squares), equilateral triangles or regular convex polygons, and which have a uniform wall thickness. Products with a rectangular (including square), equilateral triangular or regular convex polygonal cross section, which may have corners rounded along their whole length, are also to be considered as tubes and pipes provided the inner and outer cross sections are concentric and have the same form and orientation. Tubes and pipes of the foregoing cross sections may be polished, coated, bent, threaded, drilled, waisted, expanded, cone-shaped or fitted with flanges, collars or rings.

<u>Subheading Notes</u>

1.   In this chapter the following expressions have the meanings hereby assigned to them:

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

Subheading Notes (con.)

(a) Aluminum, not alloyed

Metal containing by weight at least 99 percent of aluminum, provided that the content by weight of any other element does not exceed the limit specified in the following table:

TABLE - Other elements

| Element | Limiting content percent by weight |
|---|---|
| Fe + Si (iron plus silicon) | 1 |
| Other elements [1], each | 0.1 [2] |

[1] Other elements are, for example, Cr, Cu, Mg, Mn, Ni, Zn.

[2] Copper is permitted in a proportion greater than 0.1 percent but not more than 0.2 percent, provided that neither the chromium nor manganese content exceeds 0.05 percent.

(b) Aluminum alloys

Metallic substances in which aluminum predominates by weight over each of the other elements, provided that:

(i) The content by weight of at least one of the other elements or of iron plus silicon taken together is greater than the limit specified in the foregoing table; or

(ii) The total content by weight of such other elements exceeds 1 percent.

2. Notwithstanding the provisions of chapter note 1(c), for the purposes of subheading 7616.91 the term "wire" applies only to products, whether or not in coils, of any cross-sectional shape, of which no cross-sectional dimension exceeds 6 mm.

Additional U.S. Note

1. For the purposes of heading 7608, the rate of duty "Free (C)" appearing in the "Special" subcolumn applies only to tubes and pipes with attached fittings, suitable for conducting gases or liquids.

Statistical Notes

1. For the purposes of this chapter, the term "aluminum vanadium master alloy" refers to aluminum alloys which contain by weight 20 percent or more of vanadium.

2. For the purposes of this chapter, the term "aluminum can stock" refers to sheets and strip in coils, of alloys of aluminum in which either manganese or magnesium is the predominant alloying element, not painted, over 0.175 mm but not over 0.432 mm in thickness, and over 254 mm in width, comprising "body stock and "lid stock" as specified below:

(a) The term "body stock" refers to aluminum can stock having manganese as the predominant alloying element and having a minimum tensile strength of 262 MPa; and

(b) The term "lid stock" refers to aluminum can stock having magnesium as the predominant alloying element and having a minimum tensile strength of 345 MPa.

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

XV
76-3

| Heading/<br>Subheading | Stat.<br>Suf-<br>fix | Article Description | Unit<br>of<br>Quantity | Rates of Duty | | 2 |
|---|---|---|---|---|---|---|
| | | | | General | 1 Special | |
| 7601<br>7601.10<br>7601.10.30 | 00 | Unwrought aluminum:<br>Aluminum, not alloyed:<br>Of uniform cross section throughout its length, the least<br>cross-sectional dimension of which is not greater than<br>9.5 mm, in coils.................................................. | kg............ | 2.6% | Free (A, AU, BH,<br>CA, CL, CO, D, E,<br>IL, JO, KR, MA,<br>MX, OM, P, PA,<br>PE, SG) | 18.5% |
| 7601.10.60<br>7601.20<br>7601.20.30 | 00<br><br>00 | Other............................................................ | kg............ | Free | | 11% |
| | | Aluminum alloys:<br>Of uniform cross section throughout its length, the least<br>cross-sectional dimension of which is not greater than<br>9.5 mm, in coils.................................................. | kg............ | 2.6% | Free (A, AU, BH,<br>CA, CL, CO, D, E,<br>IL, JO, KR, MA,<br>MX, OM, P, PA,<br>PE, SG) | 18.5% |
| 7601.20.60 | 00 | Other:<br>Containing 25 percent or more by weight of<br>silicon....................................................... | kg............ | 2.1% | Free (A+, AU, BH,<br>CA, CL, CO, D, E,<br>IL, JO, KR, MA,<br>MX, OM, P, PA,<br>PE, SG) | 25% |
| 7601.20.90 | <br>30 | Other............................................................<br>Aluminum vanadium master alloy.................. | ...........<br>kg | Free | | 10.5% |
| | 45 | Other:<br>Of uniform circular cross section<br>throughout its length, not in coils............... | kg | | | |
| | 60 | Other, containing 0.03 percent or more by<br>weight of lead (secondary aluminum)....... | kg | | | |
| | 75 | Other:<br>Remelt scrap ingot.............................. | kg | | | |
| | 90 | Other....................................................... | kg | | | |
| 7602.00.00 | <br>30 | Aluminum waste and scrap.....................................<br>Used beverage container scrap............................ | ...........<br>kg | Free | | Free |
| | 90 | Other....................................................... | kg | | | |
| 7603<br>7603.10.00 | 00 | Aluminum powders and flakes:<br>Powders of non-lamellar structure........................ | kg............ | 5% | Free (A, AU, BH,<br>CA, CL, CO, D, E,<br>IL, JO, MA, MX,<br>OM, P, PA, PE,<br>SG)<br>2% (KR) | 45% |
| 7603.20.00 | 00 | Powders of lamellar structure; flakes.................... | kg............ | 3.9% | Free (A, AU, BH,<br>CA, CL, CO, D, E,<br>IL, JO, MA, MX,<br>OM, P, PA, PE,<br>SG)<br>1.5% (KR) | 11% |

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

XV
76-4

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| 7604 | | Aluminum bars, rods and profiles: | | | | |
| 7604.10 | | Of aluminum, not alloyed: | | | | |
| 7604.10.10 | 00 | Profiles............................................ | kg........... | 5% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2% (KR) | 45% |
| | | Bars and rods: | | | | |
| 7604.10.30 | | Having a round cross section................ | ............. | 2.6% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 11% |
| | 10 | With an outside diameter of less than 10 mm................................................ | kg | | | |
| | 50 | With an outside diameter of 10 mm or more.... | kg | | | |
| 7604.10.50 | | Other............................................... | ............. | 3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 1.2% (KR) | 13.5% |
| | 30 | With a maximum cross-sectional dimension of less than 10 mm................................ | kg | | | |
| | 60 | With a maximum cross-sectional dimension of 10 mm or more................................ | kg | | | |
| | | Of aluminum alloys: | | | | |
| 7604.21.00 | 00 | Hollow profiles.................................. | kg........... | 1.5% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 15.5% |
| 7604.29 | | Other: | | | | |
| 7604.29.10 | 00 | Other profiles................................... | kg........... | 5% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2% (KR) | 45% |
| | | Bars and rods: | | | | |
| 7604.29.30 | | Having a round cross section................ | ............. | 2.6% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 11% |
| | 10 | With an outside diameter of less than 10 mm................................................ | kg | | | |
| | 50 | With an outside diameter of 10 mm or more................................................ | kg | | | |
| 7604.29.50 | | Other............................................... | ............. | 3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 13.5% |
| | 30 | With a maximum cross-sectional dimension of less than 10 mm................... | kg | | | |
| | 60 | With a maximum cross-sectional dimension of 10 mm or more................... | kg | | | |

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

XV
76-5

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | 2 |
|---|---|---|---|---|---|---|
| | | | | General | Special | |
| 7605 | | Aluminum wire: | | | | |
| | | Of aluminum, not alloyed: | | | | |
| 7605.11.00 | | Of which the maximum cross-sectional dimension exceeds 7 mm........................................... | .............. | 2.6% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 11% |
| | 30 | Of which the maximum cross-sectional dimension exceeds 9.5 mm...................................... | kg | | | |
| | 90 | Other................................................ | kg | | | |
| 7605.19.00 | 00 | Other................................................ | kg | 4.2% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 1.6% (KR) | 25% |
| | | Of aluminum alloys: | | | | |
| 7605.21.00 | | Of which the maximum cross-sectional dimension exceeds 7 mm........................................... | .............. | 2.6% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 11% |
| | 30 | Of which the maximum cross-sectional dimension exceeds 9.5 mm...................................... | kg | | | |
| | 90 | Other................................................ | kg | | | |
| 7605.29.00 | 00 | Other................................................ | kg | 4.2% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 1.6% (KR) | 25% |

## Harmonized Tariff Schedule of the United States (2017)
Annotated for Statistical Reporting Purposes

XV
76-6

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| 7606 | | Aluminum plates, sheets and strip, of a thickness exceeding 0.2 mm: | | | | |
| 7606.11 | | Rectangular (including square): | | | | |
| | | Of aluminum, not alloyed: | | | | |
| 7606.11.30 | | Not clad.......................................... | ................ | 3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 13.5% |
| | 30 | With a thickness of more than 6.3 mm........ | kg | | | |
| | 60 | With a thickness of 6.3 mm or less................ | kg | | | |
| 7606.11.60 | 00 | Clad.......................................................... | kg........... | 2.7% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 9.5% |
| 7606.12 | | Of aluminum alloys: | | | | |
| 7606.12.30 | | Not clad.......................................... | ................ | 3% | Free (A*, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 13.5% |
| | 30 | With a thickness of more than 6.3 mm........... | kg | | | |
| | | With a thickness of 6.3 mm or less: Aluminum can stock: | | | | |
| | 45 | Body stock.......................................... | kg | | | |
| | 55 | Lid stock................................................ | kg | | | |
| | 90 | Other.................................................... | kg | | | |
| 7606.12.60 | 00 | Clad.......................................................... | kg........... | 6.5% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2.6% (KR) | 30% |
| | | Other: | | | | |
| 7606.91 | | Of aluminum, not alloyed: | | | | |
| 7606.91.30 | | Not clad.......................................... | ................ | 3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 13.5% |
| | | With a thickness of more than 6.3 mm: | | | | |
| | 30 | Circles and discs.......................................... | kg | | | |
| | 60 | Other........................................... | kg | | | |
| | | With a thickness of 6.3 mm or less: | | | | |
| | 75 | Circles and discs.......................................... | kg | | | |
| | 90 | Other........................................... | kg | | | |
| 7606.91.60 | | Clad.......................................................... | ................ | 2.7% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 9.5% |
| | | With a thickness of more than 6.3 mm: | | | | |
| | 20 | Circles and discs.......................................... | kg | | | |
| | 40 | Other........................................... | kg | | | |
| | | With a thickness of 6.3 mm or less: | | | | |
| | 60 | Circles and discs.......................................... | kg | | | |
| | 80 | Other........................................... | kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | 1 Special | 2 |
| 7606 (con.) | | Aluminum plates, sheets and strip, of a thickness exceeding 0.2 mm: (con.) | | | | |
| 7606.11 (con.) | | Rectangular (including square): (con.) | | | | |
| 7606.92 | | Of aluminum alloys: | | | | |
| 7606.92.30 | | Not clad........................................................ | ................ | 3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 1.2% (KR) | 13.5% |
| | | With a thickness of more than 6.3 mm: | | | | |
| | 30 | Circles and discs............................... | kg | | | |
| | 60 | Other.................................................... | kg | | | |
| | | With a thickness of 6.3 mm or less: | | | | |
| | 75 | Circles and discs............................... | kg | | | |
| | 90 | Other.................................................... | kg | | | |
| 7606.92.60 | | Clad............................................................. | ................ | 6.5% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2.6% (KR) | 30% |
| | | With a thickness of more than 6.3 mm: | | | | |
| | 20 | Circles and discs............................... | kg | | | |
| | 40 | Other.................................................... | kg | | | |
| | | With a thickness of 6.3 mm or less: | | | | |
| | 60 | Circles and discs............................... | kg | | | |
| | 80 | Other.................................................... | kg | | | |

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

XV
76-8

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| 7607 | | Aluminum foil (whether or not printed, or backed with paper, paperboard, plastics or similar backing materials) of a thickness (excluding any backing) not exceeding 0.2 mm: | | | | |
| 7607.11 | | Not backed: Rolled but not further worked: Of a thickness not exceeding 0.15 mm: | | | | |
| 7607.11.30 | 00 | Of a thickness not exceeding 0.01 mm.......... | kg.............. | 5.8% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 40% |
| 7607.11.60 | 00 | Of a thickness exceeding 0.01 mm................ | kg.............. | 5.3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2.1% (KR) | 40% |
| 7607.11.90 | | Other........................................................ | .................. | 3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 1.2% (KR) | 13.5% |
| | 30 | Aluminum can stock: Body stock............... | kg | | | |
| | 60 | Lid stock.................. | kg | | | |
| | 90 | Other...................... | kg | | | |
| 7607.19 | | Other: | | | | |
| 7607.19.10 | 00 | Etched capacitor foil................................ | kg.............. | 5.3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2.1% (KR) | 40% |
| 7607.19.30 | 00 | Other: Cut to shape, of a thickness not exceeding 0.15 mm................................................. | kg.............. | 5.7% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2.2% (KR) | 45% |
| 7607.19.60 | 00 | Other........................................................ | kg.............. | 3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 1.2% (KR) | 13.5% |
| 7607.20 | | Backed: | | | | |
| 7607.20.10 | 00 | Covered or decorated with a character, design, fancy effect or pattern................................... | kg.............. | 3.7% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 1.4% (KR) | 22.5% |
| 7607.20.50 | 00 | Other........................................................ | kg.............. | Free | | 23% |

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

XV
76-9

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7608 7608.10.00 | | Aluminum tubes and pipes: Of aluminum, not alloyed........................................... | ................ | 5.7% | Free (A, AU, B, BH, C, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2.2% (KR) 1/ | 45% |
| | 30 | Seamless................................................................ | kg | | | |
| | 90 | Other...................................................................... | kg | | | |
| 7608.20.00 | | Of aluminum alloys............................................... | ................ | 5.7% | Free (A, AU, B, BH, C, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2.2% (KR) 1/ | 45% |
| | 30 | Seamless................................................................ | kg | | | |
| | 90 | Other...................................................................... | kg | | | |
| 7609.00.00 | 00 | Aluminum tube or pipe fittings (for example, couplings, elbows, sleeves)................................................................. | kg............ | 5.7% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2.2% (KR) | 45% |
| 7610 | | Aluminum structures (excluding prefabricated buildings of heading 9406) and parts of structures (for example, bridges and bridge-sections, towers, lattice masts, roofs, roofing frameworks, doors and windows and their frames and thresholds for doors, balustrades, pillars and columns); aluminum plates, rods, profiles, tubes and the like, prepared for use in structures: | | | | |
| 7610.10.00 | | Doors, windows and their frames and thresholds for doors............................................................................ | ................ | 5.7% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| | 10 | Windows and their frames..................................... | kg | | | |
| | 20 | Thresholds for doors............................................. | kg | | | |
| | 30 | Other...................................................................... | kg | | | |
| 7610.90.00 | | Other............................................................................. | ................ | 5.7% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| | 20 | Sheet-metal roofing, siding, flooring, and roof guttering and drainage equipment..................................... | kg | | | |
| | 40 | Architectural and ornamental work........................ | kg | | | |
| | | Other: | | | | |
| | 60 | Mobile homes.................................................. | kg | | | |
| | 80 | Other................................................................ | kg | | | |
| 7611.00.00 | | Aluminum reservoirs, tanks, vats and similar containers, for any material (other than compressed or liquefied gas), of a capacity exceeding 300 liters, whether or not lined or heat insulated, but not fitted with mechanical or thermal equipment..................................................................... | ................ | 2.6% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |

1/ See additional U.S. note 1 to this chapter.

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

XV
76-10

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| 7611.00.00 (con.) | | Aluminum reservoirs, tanks, vats and similar containers, for any material (other than compressed or liquefied gas), of a capacity exceeding 300 liters, whether or not lined or heat insulated, but not fitted with mechanical or thermal equipment (con.) | | | | |
| | 30 | Tanks................................................................................. | No. | | | |
| | 90 | Other.................................................................................. | No. | | | |

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

XV
76-11

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | 2 |
|---|---|---|---|---|---|---|
| 7612 | | Aluminum casks, drums, cans, boxes and similar containers (including rigid or collapsible tubular containers), for any material (other than compressed or liquefied gas), of a capacity not exceeding 300 liters, whether or not lined or heat insulated, but not fitted with mechanical or thermal equipment: | | | | |
| 7612.10.00 | 00 | Collapsible tubular containers............................. | No............. | 2.4% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| 7612.90 | | Other: | | | | |
| 7612.90.10 | | Of a capacity not exceeding 20 liters.................... | ................. | 5.7% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| | 30 | Cans of a capacity not exceeding 355 ml.............. | No. | | | |
| | 60 | Cans of a capacity exceeding 355 ml but less than 3.8 liters................................. | No. | | | |
| | 90 | Other.................................. | No. | | | |
| 7612.90.50 | 00 | Other.................................. | No............. | Free | | 25% |
| 7613.00.00 | 00 | Aluminum containers for compressed or liquefied gas............ | No............. | 5% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 25% |
| 7614 | | Stranded wire, cables, plaited bands and the like, including slings and similar articles, of aluminum, not electrically insulated: | | | | |
| 7614.10 | | With steel core: | | | | |
| 7614.10.10 | 00 | Not fitted with fittings and not made up into articles..... | kg............. | 4.9% | Free (A+, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 35% |
| 7614.10.50 | 00 | Fitted with fittings or made up into articles................... | kg............. | 4.9% | Free (A*, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 35% |
| 7614.90 | | Other: | | | | |
| | | Not fitted with fittings and not made up into articles: | | | | |
| 7614.90.20 | 00 | Electrical conductors................................. | kg............. | 4.9% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 35% |
| 7614.90.40 | 00 | Other.................................. | kg............. | 4.9% | Free (A+, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 35% |
| 7614.90.50 | 00 | Fitted with fittings or made up into articles................... | kg............. | 5.7% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |

## Harmonized Tariff Schedule of the United States (2017)
Annotated for Statistical Reporting Purposes

XV
76-12

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | 2 |
|---|---|---|---|---|---|---|
| | | | | General | Special | |
| 7615 | | Table, kitchen or other household articles and parts thereof, of aluminum; pot scourers and scouring or polishing pads, gloves and the like, of aluminum; sanitary ware and parts thereof, of aluminum: | | | | |
| 7615.10 | | Table, kitchen or other household articles and parts thereof; pot scourers and scouring or polishing pads, gloves and the like: | | | | |
| 7615.10.11 | 00 | Pot scourers and scouring or polishing pads, gloves and the like........................................................ | kg.............. | 3.1% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45.5% |
| | | Other: Cooking and kitchen ware: Enameled or glazed or containing nonstick interior finishes: | | | | |
| 7615.10.20 | | Cast................................................ | .................. | 3.1% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45.5% |
| | 15 | Bakeware (cookware not suitable for stove top use)......................................... | No. kg | | | |
| | 25 | Other........................................................ | No. kg | | | |
| 7615.10.30 | | Other........................................................ | .................. | 3.1% | Free (A*, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45.5% |
| | 15 | Bakeware (cookware not suitable for stove top use)......................................... | No. kg | | | |
| | 25 | Other........................................................ | No. kg | | | |

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

XV
76-13

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| 7615 (con.) | | Table, kitchen or other household articles and parts thereof, of aluminum; pot scourers and scouring or polishing pads, gloves and the like, of aluminum; sanitary ware and parts thereof, of aluminum: (con.) | | | | |
| 7615.10 (con.) | | Table, kitchen or other household articles and parts thereof; pot scourers and scouring or polishing pads, gloves and the like: (con.) | | | | |
| | | Other: (con.) | | | | |
| | | Cooking and kitchen ware: (con.) | | | | |
| | | Not enameled or glazed and not containing nonstick interior finishes: | | | | |
| 7615.10.50 | | Cast................................................................. | ............... | 3.1% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45.5% |
| | 20 | Bakeware (cookware not suitable for stove top use)....................................... | No. kg | | | |
| | 40 | Other................................................... | No. kg | | | |
| 7615.10.71 | | Other................................................................. | ............... | 3.1% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45.5% |
| | 25 | Containers suitable for food preparation, baking, reheating or storage, 0.04 mm or more but not over 0.22 mm in thickness........................... | No. kg | | | |
| | | Other cookware: | | | | |
| | 30 | Bakeware (cookware not suitable for stovetop use)........................... | No. kg | | | |
| | 55 | Other.............................................. | No. kg | | | |
| | 80 | Other........................................................ | No. kg | | | |
| 7615.10.91 | 00 | Other............................................................. | kg............... | 3.1% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45.5% |
| 7615.20.00 | 00 | Sanitary ware and parts thereof............................... | kg............... | 3.8% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45.5% |

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

XV
76-14

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| 7616 7616.10 | | Other articles of aluminum: Nails, tacks, staples (other than those of heading 8305), screws, bolts, nuts, screw hooks, rivets, cotters, cotter pins, washers and similar articles: | | | | |
| 7616.10.10 | 00 | Nails, tacks and staples.............................................. | kg............. | 5.7% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| 7616.10.30 | 00 | Rivets........................................................................ | kg............. | 4.7% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| 7616.10.50 | 00 | Cotters and cotter pins............................................... | kg............. | 5.7% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| 7616.10.70 | | Other: Having shanks, threads or holes over 6 mm in diameter....................................................................... | ................. | 5.5% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| | 30 | Threaded fasteners............................................ | kg | | | |
| | 90 | Other.................................................................. | kg | | | |
| 7616.10.90 | | Other............................................................................ | ................. | 6% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| | 30 | Threaded fasteners............................................ | kg | | | |
| | 90 | Other.................................................................. | kg | | | |

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | 2 |
|---|---|---|---|---|---|---|
| | | | | General | Special | |
| 7616 (con.) | | Other articles of aluminum: (con.) | | | | |
| | | Other: | | | | |
| 7616.91.00 | 00 | Cloth, grill, netting and fencing, of aluminum wire | kg | 2.5% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| 7616.99 | | Other: | | | | |
| 7616.99.10 | 00 | Luggage frames | kg | Free | | 45% |
| 7616.99.51 | | Other | | 2.5% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| | 20 | Laminated goods consisting of 2 or more flat-rolled sheets of aluminum held together with an adhesive or having a core of non-metallic material | kg | | | |
| | 30 | Ladders | No. | | | |
| | 40 | Venetian blinds and parts thereof | X | | | |
| | 50 | Hangers and supports for pipes and tubes | kg | | | |
| | | Other: | | | | |
| | 60 | Castings | kg | | | |
| | 70 | Forgings | kg | | | |
| | | Other: | | | | |
| | 75 | Articles of wire | kg | | | |
| | 90 | Other | kg | | | |

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

CHAPTER 85

ELECTRICAL MACHINERY AND EQUIPMENT AND PARTS THEREOF; SOUND RECORDERS
AND REPRODUCERS, TELEVISION IMAGE AND SOUND RECORDERS AND REPRODUCERS,
AND PARTS AND ACCESSORIES OF SUCH ARTICLES

XVI
85-1

Notes

1.  This chapter does not cover:

    (a) Electrically warmed blankets, bed pads, foot-muffs or the like; electrically warmed clothing, footwear or ear pads or other
        electrically warmed articles worn on or about the person;

    (b) Articles of glass of heading 7011;

    (c) Machines and apparatus of heading 8486;

    (d) Vacuum apparatus of a kind used in medical, surgical, dental or veterinary sciences (heading 9018); or

    (e) Electrically heated furniture of chapter 94.

2.  Headings 8501 to 8504 do not apply to goods described in heading 8511, 8512, 8540, 8541 or 8542.

    However, metal tank mercury arc rectifiers remain classified in heading 8504.

3.  For the purposes of heading 8507, the expression "electric accumulators" includes those presented with ancillary components
    which contribute to the accumulator's function of storing and supplying energy or protect it from damage, such as electrical
    connectors, temperature control devices (for example, thermistors) and circuit protection devices. They may also include a portion
    of the protective housing of the goods in which they are to be used.

4.  Heading 8509 covers only the following electromechanical machines of the kind commonly used for domestic purposes:

    (a) Floor polishers, food grinders and mixers, and fruit or vegetable juice extractors, of any weight;

    (b) Other machines provided the weight of such machines does not exceed 20 kg, exclusive of extra interchangeable parts or
        detachable auxiliary devices.

    The heading does not, however, apply to fans or ventilating or recycling hoods incorporating a fan, whether or not fitted with filters
    (heading 8414), centrifugal clothes dryers (heading 8421), dishwashing machines (heading 8422), household washing machines
    (heading 8450), roller or other ironing machines (heading 8420 or 8451), sewing machines (heading 8452), electric scissors
    (heading 8467) or to electrothermic appliances (heading 8516).

5.  For the purposes of heading 8523 :

    (a) "Solid-state non-volatile storage devices "(for example,"flash memory cards" or "flash electronic storage cards") are storage
        devices with a connecting socket, comprising in the same housing one or more flash memories (for example, "FLASH
        E²PROM") in the form of integrated circuits mounted on a printed circuit board. They may include a controller in the form of
        an integrated circuit and discrete passive components, such as capacitors and resistors;

    (b) The term "smart cards" means cards which have embedded in them one or more electronic integrated circuits (a
        microprocessor, random access memory (RAM) or read-only memory (ROM)) in the form of chips. These cards may contain
        contacts, a magnetic stripe or an embedded antenna but do not contain any other active or passive circuit elements.

6.  For the purposes of heading 8534 "printed circuits" are circuits obtained by forming on an insulating base, by any printing process
    (for example, embossing, plating-up, etching) or by the "film circuit" technique, conductor elements, contacts or other printed
    components (for example, inductances, resistors, capacitors) alone or interconnected according to a pre-established pattern,
    other than elements which can produce, rectify, modulate or amplify an electrical signal (for example, semiconductor elements).

    The term "printed circuits" does not cover circuits combined with elements other than those obtained during the printing process,
    nor does it cover individual, discrete resistors, capacitors or inductances. Printed circuits may, however, be fitted with non-printed
    connecting elements.

    Thin- or thick-film circuits comprising passive and active elements obtained during the same technological process are to be
    classified in heading 8542.

## Harmonized Tariff Schedule of the United States (2017)
Annotated for Statistical Reporting Purposes

XVI
85-2
Notes (con.)

7.  For the purpose of heading 8536, "connectors for optical fibres, optical fibre bundles or cables" means connectors that simply mechanically align optical fibres end to end in a digital line system. They perform no other function, such as the amplification, regeneration or modification of a signal.

8.  Heading 8537 does not include cordless infrared devices for the remote control of television receivers or other electrical equipment (heading 8543).

9.  For the purposes of headings 8541 and 8542:

    (a) "Diodes, transistors and similar semiconductor devices" are semiconductor devices the operation of which depends on variations in resistivity on the application of an electric field;

    (b) "Electronic integrated circuits" are:

        (i)   Monolithic integrated circuits in which the circuit elements (diodes, transistors, resistors, capacitors, inductances, etc.) are created in the mass (essentially) and on the surface of a semiconductor or compound semiconductor material (for example, doped silicon, gallium arsenide, silicon germanium, iridium phosphide) and are inseparably associated;

        (ii)  Hybrid integrated circuits in which passive elements (resistors, capacitors, inductances, etc.), obtained by thin- or thick-film technology, and active elements (diodes, transistors, monolithic integrated circuits, etc.), obtained by semiconductor technology, are combined to all intents and purposes indivisibly, by interconnections or interconnecting cables, on a single insulating substrate (glass, ceramic, etc.). These circuits may also include discrete components;

        (iii) Multichip integrated circuits consisting of two or more interconnected monolithic integrated circuits combined to all intents and purposes indivisibly, whether or not on one or more insulating substrates, with or without leadframes, but with no other active or passive circuit elements.

        (iv)  Multi-component integrated circuits (MCOs): a combination of one or more monolithic, hybrid, or multi-chip integrated circuits with at least one of the following components: silicon-based sensors, actuators, oscillators, resonators or combinations thereof, or components performing the functions of articles classifiable under heading 8532, 8533, 8541, or inductors classifiable under heading 8504, formed to all intents and purposes indivisibly into a single body like an integrated circuit, as a component of a kind used for assembly onto a printed circuit board (PCB) or other carrier, through the connecting of pins, leads, balls, lands, bumps, or pads.

            For the purpose of this definition:

            1.  "Components" may be discrete, manufactured independently then assembled onto the rest of the MCO, or integrated into other components.

            2.  "Silicon-based" means built on a silicon substrate, or made of silicon materials, or manufactured onto integrated circuit die.

            3.  (a) "Silicon-based sensors" consist of microelectronic or mechanical structures that are created in the mass or on the surface of a semiconductor and that have the function of detecting physical or chemical quantities and transducing these into electric signals, caused by resulting variations in electric properties or displacement of a mechanical structure. "Physical or chemical quantities" relates to real world phenomena, such as pressure, acoustic waves, acceleration, vibration, movement, orientation, strain, magnetic field strength, electric field strength, light, radioactivity, humidity, flow, chemicals concentration, etc.

                (b) "Silicon-based actuators" consist of microelectronic and mechanical structures that are created in the mass or on the surface of a semiconductor and that have the function of converting electrical signals into physical movement.

                (c) "Silicon-based resonators" are components that consist of microelectronic or mechanical structures that are created in the mass or on the surface of a semiconductor and have the function of generating a mechanical or electrical oscillation of a predefined frequency that depends on the physical geometry of these structures in response to an external input.

                (d) "Silicon-based oscillators" are active components that consist of microelectronic or mechanical structures that are created in the mass or on the surface of a semiconductor and that have the function of generating a mechanical or electrical oscillation of a predefined frequency that depends on the physical geometry of these structures.

    For the classification of the articles defined in this note, headings 8541 and 8542 shall take precedence over any other heading in the Nomenclature, except in the case of heading 8523, which might cover them by reference to, in particular, their function.

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

Notes (con.)

10. For the purposes of heading 8548, "spent primary cells, spent primary batteries and spent electric storage batteries" are those which are neither usable as such because of breakage, cutting up, wear or other reasons, nor capable of being recharged.

Subheading Note

1. Subheading 8527.12 covers only cassette players with built-in amplifier, without built-in loudspeaker, capable of operating without an external source of electric power and the dimensions of which do not exceed 170 mm x 100 mm x 45 mm.

Additional U.S. Notes

1. For the purposes of headings 8501 and 8503, 746 watts (W) is taken to be equivalent to 1 horsepower (hp).

2. For the purposes of subheading 8516.72, the term "toasters" includes toaster-ovens which are designed essentially for toasting bread but can also bake small items, such as potatoes.

3. For the purposes of headings 8517 and 8525 the term "transceivers" refers to combinations of radio transmitting and receiving equipment in a common housing, employing common circuit components for both transmitting and receiving, and which are not capable of simultaneously receiving and transmitting.

4. For the purposes of 8529.90.05, 8529.90.06, 8529.90.33, 8529.90.36, 8529.90.43, 8529.90.46, 8529.90.88 and 8529.90.89:

    (a) Each subassembly that contains as a component, or is covered in the same entry with, one or more of the following television components, viz.,

    tuner, channel selector assembly, antenna, deflection yoke, degaussing coil, picture tube mounting bracket, grounding assembly, parts necessary for fixing the picture tube or tuner in place, consumer-operated controls or speaker,

    shall be classified in subheading 8529.90.05, 8529.90.33, 8529.90.43 or 8529.90.88, as appropriate; and

    (b) Each subassembly shall be counted as a single unit, except that two or more different printed circuit boards or ceramic substrates covered by the same entry and designed for assembly into the same television models shall be counted as one unit.

5. Picture tubes imported in combination with, or incorporated into, other articles are to be classified in subheadings 8540.11 through 8540.12, inclusive, unless they are--

    (a) incorporated into complete television receivers, as defined in additional U.S. note 6 below;

    (b) incorporated into fully assembled units such as word processors, ADP terminals, or similar articles;

    (c) put up in kits containing all the parts necessary for assembly into complete television receivers, as defined in additional U.S. note 6 below; or

    (d) put up in kits containing all the parts necessary for assembly into fully assembled units such as word processors, ADP terminals, or similar articles.

6. For the purposes of additional U.S. note 5 above the term "complete television receivers" means television receivers, fully assembled in their cabinets, whether or not packaged or tested for distribution to the ultimate purchaser(s).

7. For the purposes of this chapter, references to "high definition" as it applies to television receivers and cathode-ray tubes refer to articles having:

    (a) a screen aspect ratio equal to or greater than 16:9; and

    (b) a viewing screen capable of displaying more than 700 scanning lines.

8. For the purposes of this chapter, the video display diagonal is determined by measuring the maximum straight line dimension across the visible portion of the faceplate used for displaying video.

9. Subheadings 8529.90.29, 8529.90.33, 8529.90.36 and 8529.90.39 cover the following parts of television receivers (including video monitors and video projectors):

    (a) Video intermediate (IF) amplifying and detecting systems;

    (b) Video processing and amplification systems;

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

Additional U.S. Notes (con.)

    (c)  Synchronizing and deflection circuitry;

    (d)  Tuners and tuner control systems; and

    (e)  Audio detection and amplification systems.

10.  For the purposes of subheading 8540.91.15, the term "front panel assembly" refers to:

    (a)  with respect to a color cathode-ray television picture tube, an assembly which consists of a glass panel and a shadow mask or aperture grille, attached for ultimate use, which is suitable for incorporation into a color cathode-ray television picture tube (including video monitor cathode-ray tube), and which has undergone the necessary chemical and physical processes for imprinting phosphors on the glass panel with sufficient precision to render a video image when excited by a stream of electrons; or

    (b)  with respect to a monochrome cathode-ray picture tube, an assembly which consists of either a glass panel or a glass envelope, which is suitable for incorporation into a monochrome cathode-ray television picture tube (including video monitor or video projector cathode-rate tube), and which has undergone the necessary chemical and physical processes for imprinting phosphors on the glass panel or glass envelope with sufficient precision to render a video image when excited by a stream of electrons.

11.  For the purposes of subheading 8538.90.10, the expression "articles described in additional U.S. note 11 to chapter 85" means any of the following goods: photocopying apparatus of subheading 8443.32.30, 8443.32.50, 8443.39.20 or 8443.39.40; word processing machines of heading 8469; articles of heading 8470 or heading 8471; automatic teller machines of subheading 8472.90.10; articles of subheadings 8486.10 through 8486.40; articles of heading 8517; articles of subheading 8519.50; transmission apparatus of subheading 8525.50.10; articles of subheading 8525.60; digital still image cameras of subheading 8525.80.40; articles of subheading 8543.70.93; plotters of subheading 9017.10.40 or 9017.20.70; instruments and apparatus of heading 9026; instruments and apparatus of heading 9027 except of subheading 9027.10 or 9027.90.20; instruments and apparatus of subheading 9030.40; instruments and apparatus of subheading 9030.82; optical instruments and appliances of subheading 9031.41; optical instruments and appliances of subheading 9031.49.70; articles of subheading 9031.80.40.

12.  For the purposes of subheading 8517.69.00, the term "paging receivers" includes paging alert devices designed merely to emit a sound or visual signal (e.g., flashing light) upon the reception of a pre-set radio signal.

Statistical Notes

1.  For the purposes of this chapter the terms "AM" and "FM" refer to the entertainment broadcast bands of 550-1650 kHz and 88-108MHz, respectively.

2.  For statistical reporting purposes under subheading 8539.10, the size of a sealed beam lamp unit is determined by measuring the largest diagonal dimension across the faceplate.

3.  For statistical reporting purposes under subheading 8544.70, the unit of quantity "fiber m", as it pertains to optical fiber cables, is determined by multiplying the number of individual fibers contained therein by the length in meters.

4.  For statistical reporting purposes in heading 8542 the following definitions will apply:

    (a)  The term "static read-write random access (SRAM)" refers to integrated circuit memory devices in which the memory cells may be addressed in any sequence, randomly, for the storage or retrieval of data and in which in which the stored information is retained without further intervention as long as electric power is supplied to the device.

    (b)  The term "volatile memory" refers to integrated circuit memory devices which lose all stored information in the absence of electric power.

    (c)  The term "dynamic read-write random access (DRAM)" refers to integrated circuit memory devices in which the memory cells may be addressed in any sequence, randomly, for the storage or retrieval of data and in which the stored information must continually be refreshed in order to hold the information in memory.

    (d)  The term "electrically erasable programmable read-only memory (EEPROM)" refers to user programmable integrated circuit memory devices which retain the stored information in the absence of electric power and in which the stored information may be altered electrically.

    (e)  The term "erasable (except electrically) programmable read-only memory (EPROM)" refers to user programmable integrated circuit memory devices which retain the stored information in the absence of electric power and from which the stored information may be removed (except electrically). Such devices are usually erased by exposure to ultraviolet light after which they may be rewritten with new information.

**Harmonized Tariff Schedule of the United States (2017)**
Annotated for Statistical Reporting Purposes

Statistical Notes (con.)

    (f)   The term "microprocessor" refers to a central processing unit (CPU) fabricated as a monolithic integrated circuit.

    (g)   The term "kilobit" refers to 1,024 bits of data storage capacity, the term "megabit" refers to 1,024 kilobits of data storage capacity, and the term "gigabit" refers to 1,024 megabits of data storage capacity.

5.    For statistical reporting purposes under subheading 8532.22, the diameter of aluminum electrolytic capacitors not having a circular cross-section shall be the maximum dimension measured through the center.

6.    For the purposes of statistical reporting number 8544.42.9010, "Extension cords" is defined as a flexible cord assembly incorporating an electrical plug conforming to types 1-15P, 5-15P or 5-20P of the National Electrical Manufacturers Association (NEMA) and one or more receptacles conforming to NEMA type 1-15R, 5-15R or 56-20R.

7.    For the purposes of statistical reporting numbers 8543.70.9930, 8543.70.9940, 8543.90.8850, and 8543.90.8860, the term "personal electric or electronic vaporizing devices" are devices that electrically heat or atomize liquids or other substances, whether or not containing nicotine, producing a vapor to be inhaled through the mouthpiece. These devices are commonly known as electronic cigarettes, "e-cigarettes", "e-hookahs", "e-pipes", vaporizers or "vaping" systems." A unit consists of all the parts necessary to vaporize, either assembled or in a kit or set, including battery, tank, and atomizer.

8.    For statistical reporting purposes under subheading 8539.50.00, the types of light-emitting (LED) lamps are defined by the National Electrical Manufacturers Association (NEMA) as follows:

    (a)   NEMA types A, BT, P, PS or T described under 8539.50.0010;

    (b)   NEMA types B, BA, C, CA, DC, F, G or ST described under 8539.50.0020;

    (c)   NEMA types R, BR or PAR described under 8539.50.0030; or

    (d)   NEMA types MR11, MR16 or MRX16 described under 8539.50.0040.

[**Compiler's note:** All provisions of subchapter II of chapter 99 have expired; footnote references are shown for reference only.]

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | 2 |
|---|---|---|---|---|---|---|
| | | | | General | Special | |
| 8547 | | Insulating fittings for electrical machines, appliances or equipment, being fittings wholly of insulating material apart from any minor components of metal (for example, threaded sockets) incorporated during molding solely for the purposes of assembly, other than insulators of heading 8546; electrical conduit tubing and joints therefor, of base metal lined with insulating material: | | | | |
| 8547.10 | | Insulating fittings of ceramics: | | | | |
| 8547.10.40 | 00 | Ceramic insulators to be used in the production of spark plugs for natural gas-fueled, stationary, internal combustion engines.................................... | No.............. | 3% | Free (A, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 60% |
| 8547.10.80 | 00 | Other............................................................................. | No.............. | 3% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 60% |
| 8547.20.00 | 00 | Insulating fittings of plastics............................... | No............. | Free | | 30% |
| 8547.90.00 | | Other............................................................................. | | 4.6% | Free (A, AU, B, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| | 10 | Other insulating fittings.......................................... | No. | | | |
| | | Electrical conduit tubing and joints therefor, of base metal lined with insulating material: | | | | |
| | 20 | Conduit tubing............................................... | kg | | | |
| | | Joints: | | | | |
| | 30 | Threaded............................................... | kg | | | |
| | 40 | Other...................................................... | kg | | | |
| 8548 | | Waste and scrap of primary cells, primary batteries and electric storage batteries; spent primary cells, spent primary batteries and spent electric storage batteries; electrical parts of machinery or apparatus, not specified or included elsewhere in this chapter: | | | | |
| 8548.10 | | Waste and scrap of primary cells, primary batteries and electric storage batteries; spent primary cells, spent primary batteries and spent electric storage batteries: Spent primary cells, spent primary batteries and spent electric storage batteries: | | | | |
| 8548.10.05 | | For recovery of lead....................................... | | Free | | 11.5% |
| | 40 | Lead-acid storage batteries, of a kind used for starting engines.............................. | No. kg | | | |
| | 80 | Other.............................................................. | No. kg | | | |
| 8548.10.15 | 00 | Other................................................................. | kg............. | Free | | Free |
| | | Other: | | | | |
| 8548.10.25 | 00 | For recovery of lead....................................... | No............. kg | Free | | 11.5% |
| 8548.10.35 | 00 | Other................................................................. | kg............. | Free | | Free |
| 8548.90.01 | 00 | Other............................................................................. | X................. | Free | | 35% |
| 8590.80.90 | 31 | Horns.......................................................................... | X | | | |

# EXHIBIT 2

*What Every Member of the*
*Trade Community Should Know About:*

# Tariff Classification



**AN INFORMED COMPLIANCE PUBLICATION**

**MAY 2004**

U.S. CUSTOMS and BORDER PROTECTION

**GENERAL BACKGROUND** ................................................................................................ 8

**HARMONIZED COMMODITY DESCRIPTION AND CODING SYSTEM (HARMONIZED SYSTEM)** ........ 9

History and Development ................................................................................................. 9
Harmonized System Structure ....................................................................................... 10
Harmonized System Convention Obligations ................................................................. 10
Legal Text of the Harmonized System .......................................................................... 11
Heading and Subheading Provisions ............................................................................. 11
Rates of Duty ................................................................................................................. 13
INTERPRETATION OF THE HARMONIZED SYSTEM ..................................................... 13
    General Rules of Interpretation ................................................................................... 13
        General Rule of Interpretation No. 1 ...................................................................... 14
        General Rule of Interpretation No. 2 ...................................................................... 14
        General Rule of Interpretation No. 3 ...................................................................... 17
        General Rule of Interpretation No. 4 ...................................................................... 20
        General Rule of Interpretation No. 5 ...................................................................... 21
        General Rule of Interpretation No. 6 ...................................................................... 22
    Extrinsic Interpretative Aids ....................................................................................... 24
        (1) Explanatory Notes .......................................................................................... 24
        (2) Compendium of Classification Opinions ......................................................... 26
        Availability of the Explanatory Notes & the Compendium of Classification Opinions ..... 26
    AMENDMENT AND MAINTENANCE PROCEDURES AND DISPUTE SETTLEMENT ................. 26
        Amendment and Maintenance Procedures ........................................................... 26
            Harmonized System Committee ...................................................................... 26
            Harmonized System Review Subcommittee ..................................................... 27
            Scientific Subcommittee .................................................................................. 28
            Secretariat and Nomenclature & Classification Sub-Directorate ....................... 28
        Dispute Settlement ............................................................................................... 29

**LIST OF COUNTRIES, TERRITORIES AND CUSTOMS OR ECONOMIC UNIONS USING THE HARMONIZED SYSTEM** ....................................................................................... 30

**HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTSUS)** ......................... 32

HTSUS Structure .......................................................................................................... 32
Interpretation of the HTSUS .......................................................................................... 35
Rates of Duty ................................................................................................................. 36
Maintenance of the HTSUS ........................................................................................... 36

**AVAILABILITY OF THE HTSUS IN PAPERBACK AND CD-ROM** ..................................... 36

**AVAILABILITY OF THE HTSUS ON THE INTERNET** ...................................................... 37

**AVAILABILITY OF CLASSIFICATION RULINGS ISSUED BY THE CBP** ............................ 37

**PRE-IMPORTATION (ADVANCE) CLASSIFICATION RULINGS** ....................................... 37

**FOIA AND INFORMATION SUBMITTED FOR A RULING REQUEST** .................................. 38

**ADMINISTRATIVE REVIEW OF PRE-IMPORTATION RULINGS** ........................................ 39

**POST-IMPORTATION REVIEW PROCEDURES** ............................................................. 39

**ADDITIONAL INFORMATION** ....................................................................................... 40

The Internet .................................................................................................................. 40

CUSTOMS REGULATIONS ..................................................................................... 40
CUSTOMS BULLETIN ......................................................................................... 40
IMPORTING INTO THE UNITED STATES ................................................................... 41
INFORMED COMPLIANCE PUBLICATIONS .................................................................. 41
VALUE PUBLICATIONS........................................................................................ 42
"YOUR COMMENTS ARE IMPORTANT"..................................................................... 43

# HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTSUS)

The United States, in implementing its obligations under the Harmonized System Convention, adopted and incorporated into its national customs tariff system the "core" Harmonized System.  As indicated above, the U.S. customs tariff system is known as the Harmonized Tariff Schedule of the United States ("HTSUS").  The HTSUS went into effect on January 1, 1989, pursuant to section 1204 of the Omnibus Trade and Competitiveness Act of 1988 (Public Law 100-418, August 23, 1988) (19 U.S.C.§ 3004) and Presidential Proclamation 5911 (November 19, 1988) (53 Fed. Reg. 47413, November 22, 1988).  It replaced the Tariff Schedules of the United States (which had been in effect since August 31, 1963).  Merchandise imported into the United States is classified under the HTSUS.  The HTSUS is administered by the CBP.

# HTSUS Structure

In adopting and incorporating the Harmonized System, the legal text of the HTSUS consists of (1) the General Notes (which contain information relating to matters such as the territory covered by the schedule, terminology used in the schedule, special tariff programs, and the like); (2) the General Rules of Interpretation; (3) the Additional U.S. Rules of Interpretation (see discussion below); (4) all product categories set forth in 22 sections and 99 chapters that are designated by 4-digit, 6-digit, and 8-digit code numbers together with tariff rates and other treatment and Harmonized System section and chapter notes and Additional U.S. Notes (which are legal notes that provide definitions or information on the scope of the pertinent provisions or set additional requirements for classification purposes); and (5) appendices for certain chemicals, pharmaceuticals, and intermediate chemicals for dyes.  The above-mentioned items are considered to be statutory provisions of law for all purposes.  *See* Sections 1204(a) and 1204(c) of the Omnibus Trade and Competitiveness Act of 1988 (19 U.S.C. § 3004).

In addition to the above-mentioned items, also included in the HTSUS, but not part of the legal text, are the statistical annotations, notes, annexes, suffixes, units of quantity, and other material formulated under section 484(f) of the Tariff Act of 1930 (19 U.S.C. § 1484 (f)) as well as the table of contents, footnotes, index, and other matters inserted for ease of reference.

As discussed above, chapters 98 and 99 were reserved in the Harmonized System, at the international level, for national use by individual countries in the coding of provisions other than according to the terms of the Harmonized System legal text (or nomenclature).  Section XXII of the HTSUS consists of those two chapters.  Chapter 98 contains special classification provisions permitting, in special circumstances, the duty free entry or partial duty free entry of goods that would otherwise be subject to duty.  On the other hand, chapter 99 contains provisions that reflect legislation and executive and administrative actions pursuant to duly constituted authority under which (1) one or more of the provisions of chapters 1 through 98 are temporarily amended or modified or