UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE
_____

| | |
|---|---|
| CHANGZHOU TRINA SOLAR ENERGY CO., LTD., *ET AL.*, | ) ) ) |
| Plaintiff and Consolidated Plaintiffs | ) ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) )   Consol. Court No. 17-00199 |
| Defendant, | ) ) |
| and | ) ) |
| SOLARWORLD AMERICAS, INC., | ) ) |
| Defendant-Intervenors. | ) ) |
_____)

## ORDER

Upon consideration of plaintiffs' motions for judgment upon the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are denied, and it is further

ORDERED that judgment is entered in favor of the United States.


_____
JUDGE


Dated: _____
        New York, NY

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| CHANGZHOU TRINA SOLAR ENERGY CO., LTD., *ET AL.*, | ) ) ) |
| Plaintiff and Consolidated Plaintiffs | ) ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| SOLARWORLD AMERICAS, INC., | ) ) |
| Defendant-Intervenors. | ) ) ) |

Consol. Court No. 17-00199

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

CHAD A. READLER
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
JAMES HENRY AHRENS II
Attorney
Office of the Chief Counsel
    for Trade Enforcement and Compliance
U.S. Department of Commerce

JUSTIN R. MILLER
Senior Trial Counsel
U.S. Dept. of Justice, Civil Division
International Trade Field Office
26 Federal Plaza, Rm. 346
New York, NY 10278
Tel. (212) 264-9241
Fax (212) 264-1916
Attorneys for Defendant

June 7, 2018

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ...................................................................2

    I.  Administrative Determination Under Review ....................................................2

    II.  Issues Presented For Review ...........................................................................2

STATEMENT OF FACTS ...........................................................................................3

SUMMARY OF ARGUMENT ......................................................................................5

ARGUMENT ..............................................................................................................7

    I.  Standard Of Review.......................................................................................7

    II.  Commerce Reasonably Valued Trina's Aluminum Frames, Glass, And Financial
        Ratios ...........................................................................................................8

        A. Commerce's Surrogate Value Methodology................................................9

        B. Commerce Reasonably Valued Trina's Aluminum Frames .........................12

        C. Commerce Reasonably Valued Trina's Glass.............................................18

        D. Commerce Reasonably Relied On Styromatic's Financial Statement
           To Determine Trina's Financial Ratios.......................................................20

    III.  Commerce Reasonably Determined Not To Adjust Trina's U.S. Price By
        Countervailing Duties Determined for the Export Buyer's Credit Program ....................23

    IV.  Commerce Reasonably Determined Not To Exclude Zero-Quantity Import Data
        From Its Surrogate Value Calculations...............................................................27

    V.  Commerce Properly Determined Not To Offset Trina's Net U.S. Selling Expenses
        By Certain Debt Restructuring Income In Calculating Trina's Indirect Selling
        Expense Ratio ............................................................................................29

CONCLUSION...........................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

Ad Hoc Shrimp Trade Action Comm. v. United States,
  618 F.3d 1316 (Fed. Cir. 2010) .......................................................... 11

Am. Lamb Co. v. United States,
  785 F.2d 994 (Fed. Cir. 1986) ............................................................. 8

Atl. Sugar, Ltd. v. United States,
  744 F.2d 1556 (Fed. Cir. 1984) ........................................................... 8

Bristol Metals L.P. v. United States,
  703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ........................................ 10

Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States,
  929 F. Supp. 2d 1352 (Ct. Int'l Trade 2013) ........................................ 10

Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,
  467 U.S. 837 (1984)............................................................................ 8

Consol. Edison Co. of New York v. NLRB,
  305 U.S. 197 (1938)............................................................................ 7

Consolo v. Fed. Mar. Comm'n,
  383 U.S. 607 (1966)............................................................................ 7

Dorbest Ltd. v. United States,
  604 F.3d 1363 (Fed. Cir. 2010) *aff'd*, 619 Fed. Appx. 992 (Fed. Cir. 2015) ..................... 10, 11

Goldlink Indus. Co. v. United States,
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................ 11

Jacobi Carbons AB v. United States,
  992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014) ........................................ 10

Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,
  28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) .................................... 13, 14, 15, 16, 17

Jinko Solar Co. v. United States,
  229 F. Supp. 3d 1333 (Ct. Int'l Trade 2017) ............................................. 11, *passim*

Nation Ford Chem. Co. v. United States,
  166 F.3d 1373 (Fed. Cir. 1999) ........................................................... 9

Nippon Steel Corp. v. United States,
    458 F.3d 1345 (Fed. Cir. 2006) ........................................................................ 7

NMB Singapore Ltd. v. United States,
    557 F.3d 1316 (Fed. Cir. 2009) ...................................................................... 26

NSK Ltd. v. United States,
    919 F. Supp. 442 (Ct. Int'l Trade 1996) ........................................................ 30

Polyethylene Retail Carrier Bag Comm. v. United States,
    29 C.I.T. 1418 (Ct. Int'l Trade 2005) ............................................................ 10

QVD Food Co. v. United States,
    658 F.3d 1318 (Fed. Cir. 2011) ...................................................................... 28

SKF USA Inc. v. United States,
    630 F.3d 1365 (Fed. Cir. 2011) ...................................................................... 26

SolarWorld Americas, Inc. v. United States,
    234 F. Supp. 3d 1286 (Ct. Int'l Trade 2017)
    *appeal pending*, Fed. Cir. 2018-1372, -1373 ............................................ 13, 14, 15

SolarWorld Americas, Inc. v. United States,
    273 F. Supp. 3d 1254 (Ct. Int'l Trade 2017) .................................... 13, 14, 27, 28, 29

Taian Ziyang Food Co., Ltd. v. United States,
    918 F. Supp. 2d 1345 (Ct. Int'l Trade 2013) .................................................. 9

Tianjin Mach. Imp. & Exp. Corp. v. United States,
    806 F. Supp. 1008 (Ct. Int'l Trade 1992) ...................................................... 30

Timken Co. v. United States,
    354 F.3d 1334 (Fed. Cir. 2004) ........................................................................ 8

Train v. Nat. Res. Def. Council, Inc.,
    421 U.S. 60 (1975) ............................................................................................ 8

Tri Union Frozen Prods., Inc. v. United States,
    163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016)
    *appeal pending*, Fed. Cir. Appeal No. 2017-2523 .................................... 9

United States v. Eurodif S. A.,
    555 U.S. 305 (2009) ..................................................................................... 8, 26

Yantai Xinke Steel Structure Co. v. United States,
    2014 WL 1387529 (Ct. Int'l Trade Apr. 9, 2014) ........................................ 11

Zenith Radio Corp. v. United States,
    437 U.S. 443 (1978) ................................................................................................ 8

Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,
    652 F.3d 1333 (Fed. Cir. 2011) ........................................................................... 11

## **Statutes**

Harmonized Tariff Schedule

Note 1(b) to Chapter 76 ................................................................................ 14, 15, 16

7005.29 ......................................................................................................................... 2

7007.19.90000 ......................................................................................... 2, 4, 5, 18, 19

7007.29.90 ................................................................................................................... 19

7604 ..................................................................................................................... 5, 14, 15, 16

7604.29 ......................................................................................................................... 15

7604.29.90001 ................................................................................................... 2, *passim*

7616.99 ............................................................................................... 2, 5, 12, 17, 18

Harmonized Tariff Schedule of the United States

Note 1(b) to Chapter 76 ............................................................................................. 14

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................................... 7

19 U.S.C. § 1675(a)(2)(A) ............................................................................................ 9

19 U.S.C. § 1677(5)(A) ............................................................................................... 24

19 U.S.C. § 1677(5A) .................................................................................................. 24

19 U.S.C. § 1677(5A)(B) ................................................................................... 6, 24, 25

19 U.S.C. § 1677b(a)(1) ................................................................................................ 9

19 U.S.C. § 1677b(a)(4) ................................................................................................ 9

19 U.S.C. § 1677b(c)(1) ................................................................................................ 9

19 U.S.C § 1677a(c)(1)(C)............................................................................... 6, 24

19 U.S.C § 1677m(d) ....................................................................................... 32

**Regulations**

19 C.F.R. § 351.401(g)(2)............................................................................ 29, 32

19 C.F.R. § 351.408(c)(2) .............................................................................. 10

**Administrative Determinations**

*Ball Bearings and Parts Thereof from France, Germany Italy, Japan, and the United
    Kingdom*, 67 Fed. Reg. 55,780 (Dep't Commerce Aug. 30, 2002) (2000-2001 admin.
    reviews)......................................................................................................30

*Certain Crystalline Silicon Photovoltaic Products from China*, 79 Fed. Reg. 76, 962
    (Dep't Commerce Dec. 23, 2014) (final CVD determ.) ........................................25

*Certain Crystalline Silicon Photovoltaic Products from China*, 80 Fed. Reg. 8,592
    (Dep't Commerce Feb. 18, 2015) (antidumping duty order)................................3, 13

*Certain Crystalline Silicon Photovoltaic Products from China*, 82 Fed. Reg. 12,793
    (Dep't Commerce Mar. 7, 2017) (prelim. results antidumping admin. review)......................4

*Certain Crystalline Silicon Photovoltaic Products from China*, 82 Fed. Reg. 32,170
    (Dep't Commerce July 12, 2017) (final results antidumping admin. review)............2, 4, 5, 25

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of
    China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 76,970
    (Dep't Commerce Dec. 23, 2014) ..........................................................................13

*Circular Welded Pipe from Pakistan*, 81 Fed. Reg. 36,867 (Dep't Commerce June 8,
    2016) (prelim. dumping determ.), *unchanged in Circular Welded Pipe from Pakistan*,
    81 Fed. Reg. 75,028 (Dep't Commerce Oct. 28, 2016) (final dumping determ.)...................26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From
    the People's Republic of China: Final Determination of Sales at Less Than Fair Value,
    and Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg.
    63,791 (Dep't Commerce Oct. 17, 2012) ....................................................12, 27

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From
    the People's Republic of China: Final Results of Antidumping Duty Administrative
    Review and Final Determination of No Shipments; 2012-2013*, 80 Fed. Reg. 40,998
    (Dep't Commerce July 14, 2015)..........................................................................13

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments: 2013-2014*, 80 Fed. Reg. 39,905 (Dep't Commerce June 20, 2016) ............................................................................13, 17, 27

*Frontseating Service Values from China*, 76 Fed. Reg. 70,706 (Dep't Commerce Nov. 15, 2011) (2008-2010 admin. review) ....................................................................30

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 20,324 (Apr. 7, 2016) ....................................................................3, 4

*Light-Walled Rectangular Pipe and Tube from Mexico*, 69 Fed. Reg. 53,677 (Dep't Commerce Sept. 2, 2004) .........................................................................31

*Off-the-Road Tires from China*, 78 Fed. Reg. 22,513 (Dep't Commerce Apr. 16, 2013) (final results 2010-2011 admin. review)...............................................................21

*Off-The-Road Tires from China*, 78 Fed. Reg. 33,341 (Dep't of Commerce June 4, 2013) (new shipper review; 2011-2012) .....................................................................30

*Polyester Staple Fiber From the People's Republic of China*, 75 Fed. Reg. 1,336 (Dep't Commerce Jan. 11, 2010) (final results admin. review)........................................10

*Preserved Mushrooms from India*, 68 Fed. Reg. 41,303 (Dep't Commerce July 11, 2003).........31

*Stainless Steel Sheet and Strip from China*, 81 Fed. Reg. 64,135 (Dep't Commerce Sept. 19, 2016) (prelim. dumping determ.), *unchanged in Stainless Steel Sheet and Strip from China*, 82 Fed. Reg. 9,716 (Dep't Commerce Feb. 8, 2017) (final dumping determ.).................................................................................................26

*Steel Threaded Rod from China*, 76 Fed. Reg. 68,400 (Dep't Commerce Nov. 4, 2011) (final results 1st admin. review).........................................................................11

*Structural Steel Beams from South Korea*, 65 Fed. Reg. 41,437 (Dep't Commerce July 5, 2000).....................................................................................................31

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
                                                        )
CHANGZHOU TRINA SOLAR ENERGY CO.,      )
LTD., *ET AL.*,                                    )
                                                        )
                    Plaintiff and Consolidated    )
                    Plaintiffs                        )
                                                        )
          v.                                          )
                                                        )
UNITED STATES,                               )          Consol. Court No. 17-00199
                                                        )
                    Defendant,                    )
                                                        )
          and                                        )
                                                        )
SOLARWORLD AMERICAS, INC.,              )
                                                        )
                    Defendant-Intervenors.    )
_____)

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response to the Rule 56.2 motions

for judgment upon the agency record submitted by plaintiff Changzhou Trina Solar Energy Co.,

Ltd. (Trina) and consolidated plaintiff SolarWorld Americas, Inc. (SolarWorld).  Plaintiff and

consolidated plaintiff challenge the final results of the first administrative review of the

antidumping duty order on certain crystalline silicon photovoltaic products (solar products) from

the People's Republic of China (China) issued by the United States Department of Commerce

(Commerce).  Specifically, SolarWorld challenges Commerce's surrogate value determinations

for aluminum frames and glass and the financial statement selected to determine Trina's

financial ratios, and Trina argues that Commerce should have adjusted Trina's net U.S. selling

price to account for export subsidies, excluded zero-quantity import data from its surrogate value

calculations, and included certain debt-restructuring income in calculating Trina's U.S. indirect selling expense ratio as an offset to its indirect selling expenses.  We demonstrate below that Commerce's decisions on these issues are supported by substantial evidence and are otherwise lawful.  Therefore, plaintiffs' and consolidated plaintiffs' motions should be denied and judgment should be entered for the Government.

<b><u>STATEMENT PURSUANT TO RULE 56.2</u></b>

**I.**     **<u>Administrative Determination Under Review</u>**

The administrative determination under review is *Certain Crystalline Silicon Photovoltaic Products from China*, 82 Fed. Reg. 32,170 (Dep't Commerce July 12, 2017) (final results antidumping admin. review) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM), P.R. 259.[1]  The period of review covers July 31, 2014, through January 31, 2016.

**II.**    **<u>Issues Presented For Review</u>**

1. Whether Commerce's decision to value Trina's aluminum frames using Harmonized Tariff Schedule (HTS) category 7604.29.90001, which covers non-hollow aluminum profiles, rather than HTS category 7616.99, which covers fabricated aluminum goods not covered elsewhere, is supported by substantial evidence and otherwise in accordance with law.

2. Whether Commerce's decision to value Trina's glass using HTS category 7007.19.90000, which covers tempered glass, rather than HTS 7005.29, which covers laminated glass, is supported by substantial evidence and otherwise in accordance with law.

3. Whether Commerce's decision to calculate Trina's financial ratios using a financial

---

[1] Citations to documents from the public portion of the administrative record are cited as "P.R."

statement from Styromatic (Thailand) Co., Ltd. (Styromatic), rather than a financial

statement from Ekarat Engineering Public Company Limited (Ekarat), is supported by

substantial evidence and otherwise in accordance with law.

4. Whether Commerce's decision not to offset Trina's U.S. price by countervailing duties

determined on the basis of adverse facts available (AFA) in the companion countervailing

duty (CVD) proceeding for the Export Buyer's Credit Program is supported by

substantial evidence and in accordance with law.

5. Whether Commerce's decision not to exclude zero-quantity import data from its

surrogate value calculations is supported by substantial evidence and otherwise in

accordance with law.

6. Whether Commerce's decision to exclude a debt-restructuring line item from the

calculation of Trina's U.S. indirect selling expense ratio is supported by substantial

evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

This case arises out of the antidumping duty order on certain crystalline silicon

photovoltaic products from China.  *See generally Certain Crystalline Silicon Photovoltaic*

*Products from China*, 80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015) (antidumping duty

order) (*Order*).  During the period of July 31, 2014 through January 31, 2016, Trina and other

Chinese producers and exporters of merchandise subject to the *Order* made sales of subject

merchandise to the United States.  In March 2016, Commerce initiated an administrative review

of the *Order* covering the period of July 31, 2014 through January 31, 2016, to determine

antidumping duty assessment rates for the sales of subject merchandise to the United States made

by Trina and others during this period.  *Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews*, 81 Fed. Reg. 20,324 (Apr. 7, 2016).  In May 2016, Commerce selected

Trina as the sole mandatory respondent for individual examination.  P.R. 94.

China is a nonmarket economy country.  *Certain Crystalline Silicon Photovoltaic*

*Products from China*, 82 Fed. Reg. 12,793 (Dep't Commerce Mar. 7, 2017) (prelim. results

antidumping admin. review) (*Preliminary Results*), and accompanying Preliminary Decision

Memorandum at 7 (P.R. 223).  As a result, Commerce does not use prices in China to determine

normal value, but instead determines normal value based on surrogate values from economically

comparable market economy countries that are significant producers of comparable merchandise.

*Id.*  Thus, between June 2017 and August 2017, Commerce sought, and interested parties

provided, comments on surrogate country and surrogate value selection.  *See* P.R. 132-134.

In March 2017, Commerce published its *Preliminary Results*.  82 Fed. Reg. 12,793; P.R.

222, 223.  In its *Preliminary Results*, Commerce selected Thailand as the primary surrogate

country and selected surrogate values for Trina's factors of production, which included decisions

to value Trina's aluminum frames using Thai import data under HTS category 7604.29.90001,

which covers non-hollow aluminum profiles, and Trina's glass using Thai import data under

HTS category 7007.19.90000, which covers tempered glass.  P.R. 224, 226, 227 (Factor

Valuation Memorandum at Attachments II, VI).  Commerce also decided to value Trina's

surrogate financial ratios using financial statements from Styromatic, a Thai producer of

comparable merchandise.  *Id.*

In July 2017, Commerce published the *Final Results*.  *See Final Results*, 82 Fed. Reg. at

32,170; P.R. 259.  In its final determination, Commerce maintained its surrogate value

determinations for aluminum frames and glass and continued to calculate Trina's financial ratios

using Styromatic's data.  IDM at 16-19, 28-30, 35-39.  In addition, in response to claims made

by Trina, Commerce determined not to adjust Trina's U.S prices to offset countervailing duties determined on the basis of AFA in the companion CVD proceeding for the Export Buyer's Credit Program, did not remove certain zero-quantity import data from its calculations, and declined to include a debt-restructuring item in the calculation of Trina's U.S. indirect selling expense ratio.  *Id*. at 9-10, 12, 26-27.

## SUMMARY OF ARGUMENT

Commerce's *Final Results* should be sustained because they are supported by substantial evidence and are otherwise in accordance with law.  First, Commerce properly valued Trina's aluminum frames using HTS category 7604.29.90001.  This issue is not novel to the various segments examining solar cells and solar panels from China.  Commerce has determined, on multiple occasions, that HTS category 7604 constitutes the best available information to value aluminum solar frames because alloyed aluminum profiles are identified under HTS 7604, while the proposed alternative, HTS 7616.99, is an "other" category that includes products dissimilar to aluminum frames.  The Court, in turn, has held, on multiple occasions, that this determination is reasonable.  The record evidence in this proceeding regarding this issue is not substantially different from the prior segments, and SolarWorld fails to demonstrate a basis to depart from the prior determinations.

Second, Commerce properly valued Trina's glass using HTS category 7007.19.90000. This provision covers, in relevant part, tempered glass, and the record reflects that Trina's module glass is described repeatedly as tempered.  SolarWorld's arguments, which claim that

other characteristics of Trina's glass place it within a HTS category covering laminated safety glass, fail to demonstrate that Commerce's determination is unreasonable.

Third, Commerce properly selected the 2015 financial statement of Styromatic to calculate Trina's financial ratio. In calculating surrogate financial ratios, Commerce uses nonproprietary information gathered from producers of identical or comparable merchandise in the surrogate country. Commerce also considers the quality and specificity of the financial statements, as well as whether the financial statements are contemporaneous with the data used to calculate production factors. Commerce appropriately determined that Styromatic's 2015 financial statements constitute the best available information on the record for calculating surrogate financial ratios because these statements are contemporaneous, audited, and reflect a producer of merchandise comparable to the subject merchandise in the primary surrogate country. Therefore, Commerce's determination is reasonable and in accordance with its regulations, and SolarWorld's arguments do not prove otherwise.

Fourth, concerning the Export Buyer's Credit Program in the companion CVD proceeding, Commerce appropriately determined that, because it determined specificity on the basis of AFA and not on a finding of export contingency, it would not be appropriate to offset Trina's U.S. price by the amount of countervailing duties pertaining to that program. Commerce made this determination based upon a reasonable interpretation of 19 U.S.C §§ 1677a(c)(1)(C), 1677(5A)(B). Although this interpretation is a departure from Commerce's prior practice, Commerce notified the parties of this change in practice, and Commerce's explanation in its final determination is straightforward and well-reasoned. Therefore, Trina's arguments challenging Commerce's interpretation are unavailing.

Finally, for the fifth and sixth issues, Commerce properly decided not to remove certain zero-quantity import data from its surrogate value calculations, and not to include a debt-restructuring item in the calculation of Trina's U.S. indirect selling expense ratio.  Trina challenges both determinations on the basis that they are not supported by the record evidence.  These arguments are misguided because Trina overlooks its burden in developing an adequate record to demonstrate its positions.  In both circumstances—the zero-quantity import data and the debt-restructuring item—Trina failed to place evidence on the record that would support the preferred outcome advocated by Trina.  Accordingly, Trina's arguments fail under well-established principles of administrative law, and Commerce's determinations should be sustained.

## ARGUMENT

### I.    Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted).  Substantial evidence may also be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence" upon the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains

Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

In reviewing Commerce's construction of the statute, the Court relies on the two-step test articulated by the Supreme Court in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). In the first step, the Court determines "whether Congress has directly spoken to the precise question at issue" and clearly expressed its purpose and intent in the statute. *Chevron*, 467 U.S. at 842-43. If Congress has not directly spoken to the precise question at issue, the Court moves to the second step to determine whether Commerce's interpretation achieves a "sufficiently reasonable" interpretation of the statute. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450-51 (1978) (citing *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 75 (1975)); *accord Am. Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986); *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) ("{A}ny reasonable construction of the statute is a permissible construction.") (citation omitted). "{Commerce's} interpretation governs in the absence of unambiguous statutory language to the contrary or {an} unreasonable resolution of language that is ambiguous." *United States v. Eurodif S. A.*, 555 U.S. 305, 316 (2009) (citations omitted).

## II.     Commerce Reasonably Valued Trina's Aluminum Frames, Glass, And Financial Ratios

As we demonstrate below, Commerce's determinations regarding the valuation of Trina's aluminum frames, glass, and financial ratios are supported by substantial evidence and otherwise in accordance with law. SolarWorld argues that, in reaching these determinations, Commerce ignored relevant evidence, was unreasonable with respect to other evidence, and reached conclusions that are unsupported by record evidence. SolarWorld Br. 10-27. Each of these

claims is misplaced and asks the Court to reweigh the evidence.  Because Commerce in each

instance reached a reasonable result that is supported by substantial record evidence, the Court

should affirm these determinations.  "In reviewing Commerce's determination of what

constitutes the best available information with respect to a particular {factor of production}, it is

not for the court to reweigh the evidence, . . . but rather, to determine if the evidence relied upon

by Commerce was sufficient to support its determination while considering detracting evidence."

*Tri Union Frozen Prods., Inc. v. United States*, 163 F. Supp. 3d 1255, 1269 (Ct. Int'l Trade

2016) (citations omitted), *appeal pending*, Fed. Cir. Appeal No. 2017-2523.

## A.    Commerce's Surrogate Value Methodology

In an antidumping proceeding, the statute directs Commerce to determine whether subject

merchandise is being, or is likely to be, sold at less than fair value in the United States by

comparing the export price (*i.e.*, the price of the goods sold in the United States) and the normal

value of merchandise.  19 U.S.C. § 1675(a)(2)(A).  Normal value is usually determined by

reference to sales of merchandise in the home market, sales of merchandise in a third country, or

a constructed value of the merchandise.  *See* 19 U.S.C. § 1677b(a)(1), (4).  However, in cases

involving nonmarket economy countries, such as China, Commerce must determine normal

value by using the "best available information" from market economy countries to value the

factors of production of the subject merchandise.  19 U.S.C. § 1677b(c)(1).  The statute gives

Commerce broad discretion in selecting this information.  *See Nation Ford Chem. Co. v. United

States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("While {section} 1677b(c) provides guidelines to

assist Commerce in this process, this section also accords Commerce wide discretion in the

valuation of factors of production in the application of those guidelines.") (citations omitted);

*Taian Ziyang Food Co., Ltd. v. United States*, 918 F. Supp. 2d 1345, 1355 (Ct. Int'l Trade 2013).

Commerce's regulatory preference is to value all factors of production using data from a single surrogate country wherever possible.  19 C.F.R. § 351.408(c)(2).  "This Court and the U.S. Court of Appeals for the Federal Circuit have repeatedly confirmed the reasonableness of the preference to restrict selections for surrogate values to a single surrogate country." *Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1376 (Ct. Int'l Trade 2014) (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1367-68 (Fed. Cir. 2010), among others, *aff'd*, 619 Fed. Appx. 992 (Fed. Cir. 2015)).  Moreover, "Commerce's single surrogate country preference is strong and must be given significant weight."  *Id.*  "Case law repeatedly emphasizes that 'use of a single surrogate country is justified when . . . all other factors are fairly equal . . . .'" *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 929 F. Supp. 2d 1352, 1355-56 (Ct. Int'l Trade 2013) (citations omitted).

Commerce's practice when selecting the best available information is to select, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and free of any taxes or duties.  *See, e.g.*, *Polyester Staple Fiber From the People's Republic of China*, 75 Fed. Reg. 1,336 (Dep't Commerce Jan. 11, 2010) (final results admin. review), and accompanying Issues and Decision Memorandum at 4.  When Commerce provides a reasoned basis for finding that the chosen data satisfy its criteria and constitute better data than the alternatives, the Court should be "reluctant to 'substitute its own evidentiary evaluation for Commerce's,' …, and to substitute its own judgment for the agency's in considering and weighing the relative importance of the various criteria applied."  *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010) (quoting *Polyethylene Retail Carrier Bag Comm. v. United States*, 29 C.I.T. 1418, 1445 (Ct. Int'l Trade 2005)).  "This {C}ourt's duty is 'not to evaluate whether the

information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006)).

In addition to using surrogate values to value factors of production, "Commerce values certain factors of production, such as selling, general, and administrative expenses, factory overhead, and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319 (Fed. Cir. 2010) (citation omitted). "Commerce considers the quality and specificity of the statements, as well as whether the statements are contemporaneous with the data used to calculate production factors." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1374 (Fed. Cir. 2010). Although the term "comparable merchandise" is not defined by statute or regulation, Commerce's practice, when determining comparability, is to consider the physical characteristics, end uses, and production processes of the surrogate producers' merchandise. *Yantai Xinke Steel Structure Co. v. United States*, 2014 WL 1387529, *18 (Ct. Int'l Trade Apr. 9, 2014).  In addition, Commerce's practice is to avoid financial statements from companies that do not reflect profitability.  *See, e.g.*, *Steel Threaded Rod from China*, 76 Fed. Reg. 68,400 (Dep't Commerce Nov. 4, 2011) (final results 1st admin. review), and accompanying Issues and Decision Memorandum at cmt. 5.  Further, Commerce does not rely on financial statements that contain references to programs previously found to be countervailable by Commerce when there are other sufficiently reliable and representative data on the record.  *See, e.g.*, *Jinko Solar Co. v. United States*, 229 F. Supp. 3d 1333, 1348-51 & n.19 (Ct. Int'l Trade 2017) (*Jinko Solar*) (noting Commerce's practice not to rely on financial statements when evidence of receipt of

11

countervailable subsidies is present).

B.    **Commerce Reasonably Valued Trina's Aluminum Frames**

Commerce valued Trina's aluminum frames using HTS category 7604.29.90001, which covers non-hollow aluminum profiles.  IDM at 16-19.  SolarWorld challenges this decision, arguing that Commerce should have used HTS category 7616.99, which covers fabricated aluminum goods not provided elsewhere.  SolarWorld Br. at 1-2, 10-18.  SolarWorld claims that Trina's aluminum frames do "not meet {the HTS's} definition of 'profiles,' because they were not of a uniform cross section along their whole length."  *Id*. at 2.  SolarWorld argues that the "HTS provisions are statutory provisions of law and, as such, Commerce acted unlawfully by disregarding their clear terms and definitions."  *Id*.  SolarWorld also argues that the decision was not supported by substantial evidence and inconsistent with prior tariff classification rulings by United States Customs and Border Protection (CBP).  *Id*. at 2, 10, 12-14.

SolarWorld, however, fails to demonstrate that Commerce's determination is unreasonable or not in accordance with law.  This issue is not novel to the various segments examining solar cells and solar panels from China.  In the antidumping investigation for certain crystalline silicon photovoltaic cells from China, Commerce concluded that "HTS 7604 constitutes the best available information to value the respondents' aluminum solar frames because alloyed aluminum profiles are identified under HTS 7604, while the petitioner's suggested HTS 7616.99 is an 'other' category that includes products dissimilar to aluminum frames."  IDM at 16 (citing *Solar Cells Investigation*[2] Issues and Decision Memorandum at cmt.

_____

[2] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (*Solar Cells Investigation*).

16).  The Court sustained this determination.  *See Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317, 1336-38 (Ct. Int'l Trade 2014) (*Jiangsu Jiasheng*).

Commerce reached the same conclusion in the investigation for the solar products *Order* and in the first and second administrative reviews of the antidumping duty order covering certain crystalline silicon photovoltaic cells from China.  IDM at 16 (citing *Solar Products Investigation*[3] Issues and Decision Memorandum at cmt. 9, *Solar Cells AR1*[4] Issues and Decision Memorandum at cmt. 36, and *Solar Cells AR2*[5] Issues and Decision Memorandum at cmt. 8).[6] "Just as in the segments of the proceedings noted above, the input in question is described by Trina as non-hollow, aluminum profiles."  *Id.* at 16 (citing P.R. 250, 160-161 (Trina's Supp. Resp. at 37 and Ex. 19)).  Because no party provided evidence challenging this description and Commerce itself found no information on the record indicating otherwise, Commerce determined that Trina's non-hollow aluminum profiles are best valued under the HTS category *that expressly*

---

[3] *See Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (*Solar Products Investigation*).

[4] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2012-2013*, 80 Fed. Reg. 40,998 (Dep't Commerce July 14, 2015) (*Solar Cells AR1*).

[5] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments: 2013-2014*, 81 Fed. Reg. 39,905 (Dep't Commerce June 20, 2016) (*Solar Cells AR2*).

[6] *See also Jinko Solar*, 229 F. Supp. 3d at 1351-53; *SolarWorld Americas, Inc. v. United States*, 234 F. Supp. 3d 1286, 1303-05 (Ct. Int'l Trade 2017) (*SolarWorld I*), *appeal pending*, Fed. Cir. 2018-1372, -1373; *SolarWorld Americas, Inc. v. United States*, 273 F. Supp. 3d 1254, 1265-67 (Ct. Int'l Trade 2017) (*SolarWorld II*).

*covers* non-hollow aluminum profiles. *Id.* at 16-19. SolarWorld fails to demonstrate that this determination is unreasonable.

SolarWorld argues that Commerce's determination is in error because HTS number 7604 covers aluminum bars, rods, or profiles having "a uniform cross section along their whole length," and in comparison, Trina's aluminum frames include certain corner workings, such as notches and drillings, that preclude total uniformity. SolarWorld Br. at 10-11, 16-18 (quoting Note 1(b) to HTS Chapter 76).[7] This is not so. As Commerce explained, it has "previously addressed this argument in the *Solar Products Investigation*, *Solar Cells Investigation*, *Solar Cells AR1*, and *Solar Cells AR{2}*, noting that while certain aluminum frames purchased by the respondents contain corners, {Commerce} does not believe that this would *necessarily* change their classification as aluminum profiles." IDM at 17 (emphasis added, citations omitted). More important, the Court has upheld this finding repeatedly, underscoring that "Note 1(b) to Chapter 76 . . . provides that aluminum profiles . . . includes products that 'have been subsequently worked after production (otherwise than by simple trimming or descaling), *provided that* they have not thereby assumed the character of articles or products of other headings.'" *Jiangsu Jiasheng*, 28 F. Supp. 3d at 1337 (emphasis added) (citations omitted).[8] Thus, SolarWorld's claims are misplaced. *See* SolarWorld Br. at 10-12, 16-18.

SolarWorld also argues that Commerce failed to adequately consider record evidence

---

[7] Note 1(b) to Chapter 76 of the Harmonized Tariff Schedule of the United States (HTSUS) ("Aluminum and Articles Thereof") describes "profiles" as "{r}olled, extruded, drawn, forged or formed products, coiled or not, of a uniform cross section along their whole length, which do not conform to any of the definitions of bars, rods, wire, plates, sheets, strip, foil, tubes or pipes." *See also Jiangsu Jiasheng*, 28 F. Supp. 3d at 1337 n.93 (discussing Note 1(b)).

[8] *See also Jinko Solar*, 229 F. Supp. 3d at 1352-53; *SolarWorld I*, 234 F. Supp. 3d at 1303-05, *appeal pending*, Fed. Cir. 2018-1372, -1373; *SolarWorld II*, 273 F. Supp. 3d at 1265-67.

indicating that Trina's aluminum frames have been further processed so as to take the form of a fabricated aluminum good.  *See* SolarWorld Br. at 13-14.  SolarWorld is mistaken.  Commerce explained that "{w}hile {SolarWorld} has claimed the products in question cannot be defined as 'aluminum profiles' based on the degree to which the product is supposedly processed, Trina correctly points out that, according to the HTS nomenclature, the word 'profile' can be applied to goods 'which have been subsequently worked after production.'"  IDM at 16 (citing P.R. 250 at 16; and HTS Chapter 76 Note 1(b)).  In other words, Commerce found that further processing, by itself, does not foreclose using HTS category 7604.29.90001, which is consistent with the parameters for Note 1(b) to HTS Chapter 76.  *See id.*; HTSUS Ch. 76 Note 1(b) ("The expression {*i.e.*, "profiles"} also covers cast or sintered products, of the same forms, which have been subsequently worked after production (otherwise than by simple trimming or descaling), provided that they have not thereby assumed the character of articles or products of other headings.").

Commerce reasonably determined that "the product coverage" of HTS category 7604.29 "is unchanged and continues to pertain to non-hollow aluminum profiles such as those consumed by Trina in this review period," IDM at 16, and there is no record evidence demonstrating that the further processing identified by SolarWorld *requires* the inference that Trina's aluminum frames have assumed the character of articles or products of another heading.

As SolarWorld acknowledges, the Court has previously affirmed Commerce's valuation of aluminum frames for solar modules using HTS heading 7604.  SolarWorld Br. at 10 n.2 (citing *Jiangsu Jiasheng*, 28 F. Supp. 3d 1317; *SolarWorld I*, 234 F. Supp. 3d 1286; and *Jinko Solar*, 229 F. Supp. 3d 1333); *see also Jiangsu Jiasheng*, 28 F. Supp. 3d at 1337-38 ("This description reasonably supports Commerce's decision that Thai HTS category 7604 covers

15

products most similar in nature and value to the aluminum solar panel frames in question, despite the fact that such frames have been mitered, drilled, and notched in the ways described in the record evidence cited by SolarWorld.").

SolarWorld claims that the record for this proceeding requires the Court to depart from its prior holdings involving the other administrative segments.  SolarWorld Br. at 10 ("{g}iven the different facts on the record of this review, SolarWorld continues to believe that Commerce's use of HTS heading 7604 was unsupported by substantial evidence and unlawful.").  It does not.  None of the processes identified by SolarWorld are materially different from those identified by this Court in its previous decisions.  *Compare* SolarWorld Br. at 12-14 (discussing further processing of Trina's aluminum frames), *with Jiangsu Jiasheng*, 28 F. Supp. 3d at 1337-38 (holding that Note 1(b) reasonably supports Commerce's decision "despite the fact that such frames have been mitered, drilled, and notched in the ways described in the record evidence cited by SolarWorld").  SolarWorld thus fails to meaningfully distinguish the facts underlying its claim in this case from those on which the Court sustained Commerce's prior decisions.

Finally, SolarWorld claims that Commerce failed to give appropriate weight to certain CBP rulings indicating that CBP classified aluminum frames for solar panels under HTS provisions other than HTS category 7604.29.90001 and, comparatively, classified certain unfinished aluminum articles under subheadings within HTS heading 7604.  SolarWorld Br. at 14-17.  SolarWorld suggests that the reasoning underlying each of these decisions is that aluminum frames for solar panels, which SolarWorld claims have the character of finished, fabricated aluminum goods, cannot be classified under HTS heading 7604 given the further processing it has identified.  *See id.*  This claim, too, fails.

As Commerce appropriately explained in its final determination, Commerce "is not

bound by CBP rulings for U.S. imports when selecting import values from surrogate countries, but instead must select the best available information on the record." IDM at 18 (citing *Solar Cells AR2* Issues and Decision Memorandum at 19). For this reason, this Court repeatedly has rejected SolarWorld's reliance on CBP rulings regarding this very issue. *See*, *e.g.*, *Jiangsu Jiasheng*, 28 F. Supp. 3d at 1336; *Jinko Solar*, 229 F. Supp. 3d at 1352. As the Court explained, "{t}he fact that Commerce has at times found support for its surrogate value choices in Customs classification rulings does not lead to the conclusion that Commerce must follow such rulings in every case." *See Jiangsu Jiasheng*, 28 F. Supp. 3d at 1336. "On the contrary," the Court has held, "{t}he statute's silence regarding the definition of best available information provides Commerce with broad discretion to determine the best available information in a reasonable manner on a case-by-case basis." *Id.* (internal quotation marks and citations omitted). SolarWorld cannot compel a decision from Commerce by reference to these rulings.

SolarWorld claims that Commerce failed to give appropriate weight to the CBP rulings. *See* SolarWorld Br. at 14-16. Commerce's weighing of the evidence is reasonable, however. Commerce explained why, notwithstanding the CBP rulings relied upon by SolarWorld, other considerations weighed in favor of using HTS category 7604.29.90001 to value Trina's aluminum frames. IDM at 16-19. Specifically, Commerce explained that SolarWorld's preferred HTS category, 7616.99, "is an 'other' category, which would only contain articles of aluminum not already identified elsewhere in the HTS" and that "alloyed aluminum profiles are identified under HTS 7604." *Id.* at 18. Additionally, Commerce explained that "HTS 7616 covers a number of inputs which are dissimilar to the aluminum frames used by Trina." *Id.* Commerce thus reasonably determined that the articles or products covered by HTS category 7604.29.90001 are more similar on balance to Trina's solar frames than the articles or products

covered by HTS category 7616.99, notwithstanding the conclusions reached by CBP in the classification rulings identified by SolarWorld.[9]  This determination is reasonable and should be affirmed.

  **C.** **Commerce Reasonably Valued Trina's Glass**

  Commerce valued Trina's glass using HTS category 7007.19.90000, which covers tempered glass.  IDM at 28-30.  SolarWorld argues that Commerce erred in this selection because this HTS category "does not adequately reflect the type of surface treatments necessary to ensure the 'extreme durability' required of solar glass."  SolarWorld Br. at 3, 18-19. SolarWorld claims that "Commerce should have used Thai HTS category 7007.29.90, which reflects strengthened, laminated glass, other than for use in vehicles, aircraft or spacecraft."  *Id*. However, SolarWorld fails to demonstrate that Commerce's determination is unreasonable, and therefore Commerce's determination should be sustained.

  As Commerce explained in its final determination, HTS category 7007.19.90000, which covers safety glass, consisting of toughened (tempered) or laminated glass, not suitable for incorporation in vehicles, aircraft, spacecraft or vessels: other, appropriately values Trina's glass insofar as "an examination of record information and Trina's own descriptions indicate that Trina's module glass is frequently described as tempered."  IDM at 29.  Specifically, "{i}n its December 12, 2016, questionnaire response, Trina confirmed that both its coated glass and

---

[9] SolarWorld also claims that Commerce erred when it determined that it was unable to evaluate the basis for one of the CBP rulings (N139353) that classified aluminum frames under subheading 7616.99.  SolarWorld Br. at 14-15.  SolarWorld argues that the reasoning for CBP's decision was reflected in the ruling letter.  *Id*.  This characterization is in error.  Although the CBP ruling quotes the description of the product at issue in the ruling request, the ruling is perfunctory and does not set out any reasoning.  *See* IDM at 18.  Presented with only this information, Commerce reasonably determined that it was unable to weigh that ruling against other record evidence for *its own* determination of which HTS category provided the best available information for Commerce's valuation of Trina's aluminum frames.  *Id*.

tempered glass are tempered{, and} Trina also provided data sheets for its solar modules which describe the front glass as '3.2 mm (0.13 inches), High Transmission, AR Coated *Tempered Glass'* and 'High Transmission, Low Iron, Heat Strengthened Glass, 2.5 mm,' for example." *Id.* (emphasis added) (citing P.R. 176 (Trina's Third Supplemental Questionnaire Response at 2); and P.R. 117-121 (Trina's Section A Questionnaire Response at Ex. A-20)).  Thus, Commerce found that HTS category 7007.19.90000 to be the appropriate category for valuing Trina's module glass in terms of capturing durability treatment.  *Id.*

Commerce also considered, but ultimately rejected, SolarWorld's claim that further surface treatments to the glass required that Commerce value Trina's module glass using HTS category 7007.29.90, which covers "Laminated safety glass: Other; Other."  Commerce acknowledged SolarWorld's claim, *see* IDM at 30, but found that additional characteristics specific to laminated glass detracted from this HTS category.  Specifically, Commerce explained that "{a}n explanatory note from the World Customs Organization explains that laminated glass is 'made in sandwich form, with one or more interlayers of plastics between two or more sheets of glass," *id.* at 29 (citing P.R. 207 (Trina's Information for Commerce's Consideration in the Preliminary Results at Ex. C-2)), and that the record fails to "indicate that Trina's module glass is laminated glass that is composed of multiple layers of plastic and glass."  *Id.* at 29-30; *see also id.* at 30 ("{T}here is no record evidence of additional working that would result in glass comparable to laminated glass, which is made of multiple layers of plastic and glass.").  Commerce thus determined that, on balance, HTS category 7007.19.90000 is more specific to Trina's solar glass.  This determination is reasonable and should be affirmed.

### D.    Commerce Reasonably Relied On Styromatic's Financial Statement To Determine Trina's Financial Ratios

"In calculating surrogate financial ratios, it is {Commerce's} practice, in accordance with

19 C.F.R. {§} 351.408(c)(4), to use nonproprietary information gathered from producers of

identical or comparable merchandise in the surrogate country."  IDM at 35.  "In doing so,

{Commerce} narrows the list of financial statements meeting this criterion by considering the

quality and specificity of the statements, as well as whether the statements are contemporaneous

with the data used to calculate production factors."  *Id*. (citations omitted).

For the final determination, Commerce considered "four Thai financial statements for

calendar year 2015: (1) Hana Microelectronics Public Co., Ltd. (Hana); (2) KCE Electronics

Public Company Limited (KCE); (3) Ekarat, and (4) Styromatic, and one Thai financial

statement for calendar year 2014 from Styromatic."  IDM at 35-36.  Commerce also considered

the 2015 financial statements of SolarPro, a Bulgarian company.  *Id*.

Commerce reviewed each financial statement and ultimately selected Styromatic's 2015

financial statement to determine Trina's financial ratios.  IDM at 35-39.  SolarWorld challenges

this determination, arguing that the Ekarat financial statement better satisfies Commerce's

criteria for determining respondents' financial ratios and because Commerce erred in its

interpretation of certain evidence.  SolarWorld Br. at 20-27.  However, as we demonstrate below,

SolarWorld fails to demonstrate that Commerce's reliance on the Styromatic financial statement

amounts to an unreasonable determination.

Commerce determined that "Styromatic's 2015 financial statements constitute the best

available information on the record for calculating surrogate financial ratios because these

statements are contemporaneous, audited, and reflect a producer of merchandise comparable to

the subject merchandise in the primary surrogate country."  IDM at 39.  Commerce

acknowledged that "Styromatic's 2015 financial statements indicate that Styromatic benefited from countervailable subsidies." *Id.* However, Commerce weighed this consideration against other record evidence (*e.g.*, the financial statement from Ekarat), which showed that SolarWorld's preferred alternative (Ekarat) is not a significant producer of comparable merchandise. *Id.* at 36-37, 39. As Commerce explained, the Ekarat financial statement indicated that "more than 99 percent of its revenue came from sales of distribution transformers and services, {which are not comparable merchandise,} and the remaining revenue came from sales of electricity." *Id.* at 36-37 (citing P.R. 146-147 at Ex. 10). Styromatic, on the other hand, is a producer of comparable merchandise. *Id.* at 36. Thus, consistent with its practice of selecting financial statements from producers that primarily produce comparable or identical merchandise, Commerce relied on the Styromatic financial statement. *See id.* at 37 (citing *Off-the-Road Tires from China*, 78 Fed. Reg. 22,513 (Dep't Commerce Apr. 16, 2013) (final results 2010-2011 admin. review), and accompanying Issues and Decision Memorandum at cmt. 6). This determination is reasonable and should be affirmed.

SolarWorld argues that Commerce erred when it determined that Ekarat does not primarily produce comparable or identical merchandise and identified multiple statements in the Ekarat financial statement indicating that Ekarat is a manufacturer of solar cells and modules. *See* SolarWorld Br. at 20-23. This claim misses the point. Commerce did not find that Ekarat has not manufactured solar cells or modules or that Ekarat did not have the capacity to do so during 2015. *See* IDM at 36-37. Rather, Commerce found that Ekarat did not substantially do so during the time period for which the financial statement under consideration pertains. *Id.* That Ekarat has in the past produced solar cells or modules or may do so in the future is not contested, but it is also irrelevant. Because the vast majority of Ekarat's revenue in 2015 came from sales

21

of non-comparable merchandise, Commerce found that Ekarat was not primarily a producer of comparable merchandise for purposes of this analysis. *Id.*

SolarWorld claims that Commerce's finding that 99 percent of Ekarat's revenue came from sales of distribution transformers and services is not supported by the record. *See* SolarWorld Br. at 21. SolarWorld states that, "the agency cites to page 113 of Ekarat's financial statement, but that page in no way supports {Commerce's} assertion." *Id.* Although the citation to page 113 of Ekarat's financial statement was an inadvertent error by Commerce,[10] SolarWorld is mistaken as to the substance of the finding. Ekarat's financial statement explains that "{m}ost of the company's revenue came from the sale of Distribution Transformer." P.R. 146 (Ekarat's 2015 financial statement at 18). The statement further explains that,

> {i}n year …, and 2015, the company had the sale revenue from sales of Distribution Transformer to the Metropolitan Electric Authority and the Provincial Electric Authority in the amount of … Baht 267.60 million or … 12.92 {percent} . . . of the Transformer revenue and Services revenue of the company. However, considering in the total revenue of every customer sector in year 2015 of Baht 2,092.12 million . . . .

*Id.* (the information removed from the quote pertains to years 2013 and 2014). Dividing Baht 267.60 million by 0.1292 results in Baht 2,071.21 million, which represents total sales revenue from transformation. Dividing Baht 2,071.21 by Baht 2,091.12 million, which was Ekarat's total revenue, results in a figure greater than 99 percent. Thus, Commerce is correct in its determination, notwithstanding the incorrect record citation, and SolarWorld is mistaken in their claim.

SolarWorld also argues that Commerce's finding that the Ekarat subsidiary responsible

---

[10] At page 37 of Commerce's IDM, Commerce inadvertently cites to page 113 of the Ekarat financial statement.

for the production of identical merchandise during 2015, Ekarat Solar Co. Ltd. (Ekarat Solar),

had an operating loss in 2015 is unsupported by record evidence.  SolarWorld Br. at 22.  Again,

although Commerce erred in its citation with respect to this finding,[11] SolarWorld is mistaken as

to the substance of Commerce's analysis.  Specifically, the profit and loss statement from Ekarat

Solar's unconsolidated financial statements indicates that Ekarat Solar experienced pre-tax losses

in 2014 and 2015.  P.R. 146-147 (SolarWorld's submission of surrogate values at Ex. 10).

Further, the notes make clear that operations in solar cell and module sales were temporarily

suspended in 2015.  *Id.*

In short, Commerce properly determined that the Styromatic financial statement provided

the best available information by which to value Trina's financial ratios.  SolarWorld fails to

demonstrate that Commerce's determination is unreasonable, and the determination should be

affirmed.

### III.    Commerce Reasonably Determined Not To Adjust Trina's U.S. Price By Countervailing Duties Determined for the Export Buyer's Credit Program

Commerce properly determined not to offset Trina's U.S. price by the amount of

countervailing duties determined on the basis of AFA in the companion countervailing duty

proceeding for the Export Buyer's Credit Program.  IDM at 9-10.  Trina argues that Commerce's

determination is inconsistent with the statute, Commerce's practice, and this Court's decision in

*Jinko Solar*.  Trina Br. at 4-9.  Trina's position, however, ignores the deference afforded to

Commerce in administering ambiguous statutory language and fails to acknowledge Commerce's

prerogative to change a practice upon further reflection.  Because Commerce's decision

implicates a reasonable interpretation of the statute and is adequately explained, its decision

---

[11] At page 37 of Commerce's IDM, Commerce inadvertently cites to page 113 of the Ekarat financial statement for this finding.

should be affirmed.

The statute provides that "{t}he price used to establish export price and constructed export price shall be . . . increased by . . . the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset *an export subsidy* . . . ." 19 U.S.C § 1677a(c)(1)(C) (emphasis added). The statute defines an "export subsidy" as "a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions." 19 U.S.C. § 1677(5A)(B).[12] Thus, when Commerce determines, in accordance with 19 U.S.C. § 1677(5A)(B), that a subsidy under investigation is contingent upon export performance and therefore, countervailable, Commerce must then adjust the U.S. price determined in the companion antidumping proceeding by the amount of any countervailing duty ultimately imposed on subject merchandise as a result of this finding. *See* 19 U.S.C § 1677a(c)(1)(C). In past proceedings, Commerce has determined that the term "export subsidy" within the meaning of 19 U.S.C. § 1677(5A)(B) encompasses certain subsidy programs for which specificity was determined on the basis of AFA. *See Jinko Solar*, 229 F. Supp. 3d at 1358-61 (discussing and affirming Commerce's prior practice).

In this case, Commerce took a different position that was consistent with its more recent practice. IDM at 9-10. Specifically, concerning the Export Buyer's Credit Program in the companion CVD proceeding, Commerce explained its view that, because Commerce determined specificity on the basis of AFA and not on a finding of export contingency, it would not be appropriate to offset Trina's U.S. price by the amount of countervailing duties pertaining to that

---

[12] To find a subsidy countervailable under the statute, Commerce must determine that the subsidy at issue is "specific" within the meaning of 19 U.S.C. § 1677(5A). 19 U.S.C. § 1677(5)(A) ("Except as provided in paragraph (5B), a countervailable subsidy is a subsidy described in this paragraph which is specific as described in paragraph (5A)."). Paragraph (5A) provides several bases for the determining that a subsidy is specific. *Id.* § 1677(5A).

program:

> Pursuant to {19 U.S.C. § 1677a(c)(1)(C)}, {Commerce} increases the U.S. price by the amount of any countervailing duty imposed to offset an export subsidy.  However, {Commerce} did not make a determination in the CVD investigation of certain solar products from {China} that the Export Buyer's Credits Program was an export subsidy.[ ]  Rather, {Commerce's} determination to countervail the program was based on facts otherwise available with an adverse inference, as a result of non-cooperation by the Government of China, and {Commerce} did not make a determination that the program in question was contingent on export performance. [ ]  In other words, {Commerce} did not determine that the subsidies in question were export subsidies, as required for an offset under {19 U.S.C. § 1677a(c)(1)(C)}.[ ]

IDM at 9-10 (citations omitted).  Thus, Commerce determined that, because it had not determined that the Export Buyer's Credit Program is an export subsidy within the meaning of 19 U.S.C. § 1677(5A)(B), the statutory provision at issue does not require that Trina's U.S. price be adjusted by the amount of countervailing duties pertaining to this program.

This interpretation is reasonable and should be affirmed.  Because the Government of China did not cooperate in the companion countervailing duty proceeding, Commerce resorted to adverse facts available to determine whether this program provides a countervailable subsidy. *Certain Crystalline Silicon Photovoltaic Products from China*, 79 Fed. Reg. 76, 962 (Dep't Commerce Dec. 23, 2014) (final CVD determ.), and accompanying Issues and Decision Memorandum at cmt. 16.  Commerce did not reach a specificity finding based on export contingency because Commerce was deprived by the Government of China of the facts necessary to reach that determination.

Trina characterizes this determination as a departure from Commerce's prior practice not adequately explained in the decision memorandum. Trina Br. at 4-9.  This is not so.  Commerce had changed its practice nearly a year prior to the issuance of the *Final Results*, as Commerce

indicated in its decision.  IDM at 10 (citing *Stainless Steel Sheet and Strip from China*, 81 Fed.

Reg. 64,135 (Dep't Commerce Sept. 19, 2016) (prelim. dumping determ.), and accompanying

Preliminary Decision Memorandum at 13, *unchanged in Stainless Steel Sheet and Strip from*

*China*, 82 Fed. Reg. 9,716 (Dep't Commerce Feb. 8, 2017) (final dumping determ.); *Circular*

*Welded Pipe from Pakistan*, 81 Fed. Reg. 36,876 (Dep't Commerce June 8, 2016) (prelim.

dumping determ.), and accompanying Preliminary Decision Memorandum at 13, *unchanged in*

*Circular Welded Pipe from Pakistan*, 81 Fed. Reg. 75,028 (Dep't Commerce Oct. 28, 2016)

(final dumping determ.).  Trina has been on notice of Commerce's recent practice, and

Commerce's explanation for the basis of its determination in the Issues and Decision

Memorandum is straightforward.  The statute does not require the outcome Trina favors.

 Trina's reliance on *Jinko Solar* is similarly misguided.  *See* Trina Br. at 4-9.  The

standard of review is whether Commerce's determination implicates a permissible interpretation

of the statute, and whether Commerce has adequately explained a change involving its prior

practice.  "{Commerce's} interpretation governs in the absence of unambiguous statutory

language to the contrary or {an} unreasonable resolution of language that is ambiguous."

*Eurodif S. A.*, 555 U.S. at 316 (citations omitted).  "When an agency changes its practice, it is

obligated to provide an adequate explanation for the change."  *SKF USA Inc. v. United States*,

630 F.3d 1365, 1373 (Fed. Cir. 2011) (citation omitted).  "Commerce must explain the basis for

its decisions; while its explanations do not have to be perfect, the path of Commerce's decision

must be reasonably discernable to a reviewing court."  *NMB Singapore Ltd. v. United States*, 557

F.3d 1316, 1319-20 (Fed. Cir. 2009) (citations omitted).

 Although the Court affirmed Commerce's prior practice of applying an offset, *see Jinko*

*Solar*, 229 F. Supp. 3d at 1358-1361, Commerce has subsequently changed its practice, Trina

26

was aware of this change, and in the decision memorandum, Commerce has provided a proper explanation for the change.  Consistent with its recent practice, Commerce declined to adjust Trina's U.S. price by the amount of the countervailing duties when its specificity finding in the companion CVD proceeding was based on AFA, and not export contingency.  The basis of Commerce's determination is plain and reasonable and should be affirmed.

## IV.   Commerce Reasonably Determined Not To Exclude Zero-Quantity Import Data From Its Surrogate Value Calculations

In the final determination, Commerce determined not to exclude zero-quantity import data from its surrogate value calculations.  IDM at 12.  Specifically, Commerce found "no basis to conclude that the zero quantity import data included in our SV calculations are errors or that these zero quantity imports result in unreliable and distortive SVs."  *Id*.  Commerce credited its prior analysis reflected in the *Solar Cells Investigation* and *Solar Cells AR2* in support of its determination.  *Id*.

Trina argues that Commerce's determination is unsupported by substantial record evidence and suggests that this case presents the same issue that was before the Court in *SolarWorld II*, 273 F. Supp. 3d 1254.  Trina Br. at 9-11.  However, as we demonstrate below, it is Trina's position that is not supported by the record, and because Commerce reasonably determined not to exclude the data at issue, the Court should affirm the determination.

During the administrative proceeding, Commerce reviewed the data at issue and explained that it found "the zero quantity imports attributable to rounding small import quantities to zero."  IDM at 12 (citing *Solar Cells AR2* and accompanying Issues and Decision Memorandum at cmt. 22).  To the extent that "the zero quantities {may be} the result of errors," Commerce explained that it "would expect such errors to also occur with respect to the reported *value* in at least some instances," but that "there are no imports in the data with a zero value."

27

*Id.* (emphasis in original).  Commerce further explained that if the data were in fact erroneous, as

Trina has argued, this would imply that 8.7 percent of data at issue are useable, notwithstanding

that no party had suggested that the GTA data are unreliable.  *Id.*  Rather than reach this

determination, Commerce decided, based on the limited record before it, that the zero-quantity

values are the result of simple rounding.  *Id.*  This determination is reasonable and should be

affirmed.

Trina claims that this conclusion is not based on substantial evidence.  Trina Br. at 10.

Trina argues that "{t}here is no information on the record showing that shipments of 'small

quantities' or even just shipments of only less than 0.49 kilograms were rounded down to zero."

*Id*.  Trina states that "it is anyone's guess as to whether the zero quantities represent mistakes,

omissions, rounding down of quantities, or something else entirely."  *Id.*

Trina's argument, however, overlooks its burden in placing evidence on the record to

demonstrate its position.  Although Commerce's determinations must be supported by substantial

evidence, "the burden of creating an adequate record lies with {the interested parties} and not

with Commerce."  *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)

(internal quotation marks and citations omitted).  Trina failed to develop a record that would

support Commerce excluding a specific portion of the data used to determine one of its surrogate

values.  Therefore, Trina's argument is speculative, and on this basis, it should be rejected.

In similar fashion, Trina errs by relying upon *SolarWorld II*.  In that case, the Court

distinguished the record of the proceeding under review from the record of the original

investigation, explaining that "the facts of {the} review are distinguishable in that the majority of

the values with reported quantities of zero are not within range of other low-quantity values on

the record, as they were in the investigation."  *SolarWorld II*, 273 F. Supp. 3d at 1274 (citing

Final Decision Memorandum at 64).  The Court further explained that, "{i}n light of the evidence on the record that the values are not within range of other low-quantity imports and the lack of an alternate reasonable explanation as to why these values are reliable, Commerce's conclusory statement that it finds no basis for determining the values are unreliable is insufficient."  *Id.* at 1275 (citation omitted).  Comparatively, in this case, the record provides no evidence that the values associated with these zero-quantity data are aberrant.  Indeed, in its determination, Commerce *specifically examined* the value data, explaining in dismissing Trina's argument that "if the zero quantities were the result of errors, we would expect such errors to also occur with respect to the reported *value* in at least some instances; however, there are no imports in the data with a zero value."  IDM at 12 (emphasis in original).  Thus, Trina's reliance on *SolarWorld II* is misplaced.

**V.  Commerce Properly Determined Not To Offset Trina's Net U.S. Selling Expenses By Certain Debt Restructuring Income In Calculating Trina's Indirect Selling Expense Ratio**

Commerce properly excluded certain unsubstantiated debt restructuring gains from its calculation of Trina's indirect selling expense ratio.  IDM at 26-27.  Pursuant to Commerce's regulations, "{a}ny party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to the Secretary's satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions."  19 C.F.R. § 351.401(g)(2).  Further, "when a respondent makes a claim for a favorable adjustment, it must demonstrate that it is entitled to that adjustment."  IDM at 26 (citation omitted).  In this case, Commerce found that "Trina did not provide sufficient information and the record is unclear regarding its debt restructuring agreement, such as explanations or terms of the agreement, to allow {Commerce} to determine the current portion of

the gain{.}"  IDM at 26-27.  On this basis, Commerce "disallowed the debt restructuring income

offset to U.S. indirect selling expenses{.}"  *Id*.

Trina argues that this determination is contrary to Commerce's practice with respect to

such gains and that, insofar as Commerce's decision turns on Trina's failure to demonstrate that

these gains pertained to the period of review, Commerce's determination is speculative.  Trina

Br. at 11-14.  This argument fails because it, again, overlooks Trina's burden in creating an

adequate administrative record.  Because Commerce reasonably determined that the record did

not support Trina's claimed adjustment, Commerce properly rejected Trina's claim.

It is well understood that the burden for establishing entitlement to an expense adjustment

rests with the interested party, not with Commerce.  *See* IDM at 26 (citing *Frontseating Service

Values from China*, 76 Fed. Reg. 70,706 (Dep't Commerce Nov. 15, 2011) (2008-2010 admin.

review), and accompanying Issues and Decision Memorandum at cmt. 15; *Off-The-Road Tires

from China*, 78 Fed. Reg. 33,341 (Dep't of Commerce June 4, 2013) (new shipper review; 2011-

2012), and accompanying Issues and Decision Memorandum at cmt. 3; *Ball Bearings and Parts

Thereof from France, Germany Italy, Japan, and the United Kingdom*, 67 Fed. Reg. 55,780

(Dep't Commerce Aug. 30, 2002) (2000-2001 admin. reviews), and accompanying Issues and

Decision Memorandum at cmt. 4A); *see also NSK Ltd. v. United States*, 919 F. Supp. 442, 449

(Ct. Int'l Trade 1996); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008,

1015 (Ct. Int'l Trade 1992).

As Commerce explained in its decision, its "practice is to allow an offset only for the

current portion of the debt restructuring gain."  IDM at 26 (citation omitted); *see also id.* at 27

("{a}lthough Trina U.S. . . . recognizes its debt restructuring income on its income statement, it

is {Commerce's} practice to *only include the current portion* of debt restructure as an offset."

(emphasis added) (citing *Structural Steel Beams from South Korea*, 65 Fed. Reg. 41,437 (Dep't Commerce July 5, 2000), and accompanying Issues and Decision Memorandum at cmt. 26; *Preserved Mushrooms from India*, 68 Fed. Reg. 41,303 (Dep't Commerce July 11, 2003), and accompanying Issues and Decision Memorandum at cmt. 13; *Light-Walled Rectangular Pipe and Tube from Mexico*, 69 Fed. Reg. 53,677 (Dep't Commerce Sept. 2, 2004), and accompanying Issues and Decision Memorandum at cmt. 28)).

In this case, Commerce explained that "Trina provided Trina U.S.' 2015 income statements listing the amount of the debt restructuring income,[1] but did not provide the terms of the debt restructuring agreement, an explanation of the agreement, or the maturity of the related loan(s)." IDM at 27 (citations omitted). Commerce further explained that, "{w}hile we agree{d} with Trina that debt restructuring income could be considered an offset to indirect selling expenses because Trina U.S. is a sales affiliate (all of its operations relate to selling), it is not possible to determine the current portion of the debt restructuring income covering only the {period of review}." *Id.* This determination is proper and should be affirmed.

Trina argues that, "{f}or more than 25 years, Commerce consistently has held that all activities of an entity that functions solely as a selling entity are related to sales" such that "all G&A expenses, as well as interest {and debt restructuring} income and expenses, of a U.S. sale's arm" are included in the calculation of the indirect selling expense ratio. Trina Br. at 12. As explained, however, Commerce *expressly agreed* with Trina as to this point, *see* IDM at 27, but further explained that, consistent with the regulations, the party seeking any such adjustment has the burden of developing a record to substantiate the allocation set out or implied in the claimed adjustment. *Id.* at 26. Trina's argument fails because it overlooks its burden in developing the record.

31

Similarly, Trina faults Commerce for not inquiring in its first supplemental questionnaire the extent to which the debt-restructuring income was attributable to the period of review.  Trina Br. at 13-14.  Again, Trina's argument is inapposite.  Trina's failure to establish its entitlement to a claimed adjustment is not a deficiency requiring an opportunity for remedy.  *Cf.* 19 U.S.C. § 1677m(d).  That Commerce requires a respondent claiming a favorable expense adjustment to substantiate its allocation decisions, both in general and with respect to specific debt restructuring income, is well established.  *See* 19 C.F.R § 351.401(g)(2); IDM at 26.  Trina failed to satisfy its burden, and therefore Commerce's determination should be sustained.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' and consolidated plaintiffs' motions for judgment and sustain Commerce's final results in their entirety.

Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Reginald T. Blades, Jr.
By:   REGINALD T. BLADES, JR.
Assistant Director

| | |
|---|---|
| OF COUNSEL | /s/ Justin R. Miller |
| JAMES HENRY AHRENS II | JUSTIN R. MILLER |
| Attorney | Senior Trial Counsel |
| Office of the Chief Counsel | Department of Justice, Civil Division |
|   For Trade Enforcement & Compliance | Commercial Litigation Branch |
| United States Department of Commerce | 26 Federal Plaza – Suite 346 |
| | New York, New York 10278 |
| June 7, 2018 | Attorneys for Defendant |

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Justin Miller, an attorney in the Office of the Assistant Attorney General, Civil

Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for

the Government's response to plaintiffs' motions for judgment on the administrative record,

relying upon the word count feature of the word processing program used to prepare the

memorandum, certify that this memorandum complies with the word count limitation under the

Court's chambers procedures, and contains 9,301 words.

<u>/s/ Justin R. Miller</u>