## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| CHANGZHOU TRINA SOLAR ENERGY CO. LTD., ET AL., | ) ) ) |
| Plaintiffs and Consolidated Plaintiff, | ) ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) ) |
| and | ) ) |
| SOLARWORLD AMERICAS, INC. and CHANGZHOU TRINA SOLAR ENERGY CO., LTD., | ) ) ) |
| Defendant-Intervenor and Consolidated Defendant-Intervenor. | ) ) ) ) |

Before: Claire R. Kelly, Judge
Consol. Court No. 17-00199

## DEFENDANT-INTERVENOR TRINA'S RESPONSE TO PLAINTIFF SOLARWORLD AMERICAS, INC.'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Robert G. Gosselink
Jonathan M. Freed
**TRADE PACIFIC PLLC**
660 Pennsylvania Avenue, SE, Suite 401
Washington, D.C.  20002
(202) 223-3760

Counsel to Defendant-Intervenor
Changzhou Trina Solar Energy Co., Ltd.

Dated:  June 7, 2018

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES……………………………………………………………...ii

I.     STATEMENT PURSUANT TO RULE 56.2(c) ............................................................ 1

II.    ARGUMENT ................................................................................................................. 2

       A.     Commerce's Surrogate Value Selection for Aluminum Frames Is Supported by
              Substantial Evidence and In Accordance with Law ............................................. 2

       B.     Commerce's Decision Not to Value Trina's Solar Glass Using Thai HTS
              7007.29.90 Was Supported by Substantial Evidence ............................................ 4

       C.     Commerce's Decision Not to Rely on the Financial Statements of Ekarat
              Engineering to Calculate Surrogate Financial Ratios Is Supported by Substantial
              Evidence……………………………………………………………………………...5

III.   CONCLUSION............................................................................................................ 12

# TABLE OF AUTHORITIES

**Judicial Decisions**

Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States, 28 F. Supp. 3d 1317, 1335-1338 (CIT 2014)……………………………………………………………………………..…2, 4

Jinko Solar Co., Ltd. et al, v. United States, 229 F.Supp.3d 1333, 1359 (CIT May 2017)….…2, 4

SolarWorld Americas, Inc v. United States, 271 F.Supp.3d 1254, 1265-1266 (CIT October 2017)………2

SolarWorld Americas, Inc v. United States, 234 F.Supp.3d 1286, 1303-1305 (CIT June 2017)…….…….2

**Administrative Determinations**

Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2016, 82 Fed. Reg. 32.170 (Dep't Commerce, July 12, 2017) .................................... *passim*

Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 79 Fed. Reg. 76970 (Dec. 23, 2014) ("Solar2-LTFV-Final") ..............................................................................................................................2

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2012–2013, 80 Fed. Reg. 40,998 (July 14, 2015) ("Solar1-AR1-Final")…………………………………………………………………………..2

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013–2014, 81 Fed. Reg. 39905 (Dep't Commerce, June 20, 2016) ("Solar1-AR2-Final") ............................................................2

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part, 77 Fed. Reg. 63791 (Oct. 17, 2012), ("Solar1-LTFV-Final")…………………………………………………..…………..2

Consol. Court No. 17-00199

## DEFENDANT-INTERVENOR TRINA'S RESPONSE
## TO PLAINTIFF SOLARWORLD AMERICAS, INC.'S MOTION
## FOR JUDGMENT ON THE AGENCY RECORD

**I.      STATEMENT PURSUANT TO RULE 56.2(c)**

Defendant-Intervenor Changzhou Trina Solar Energy Co., Ltd. submits this response in opposition to the motion for judgment upon the agency record submitted by Plaintiff SolarWorld Americas, Inc., ("Plaintiff" or "SolarWorld").  SolarWorld contests various aspects of the Commerce Department's final results of the first administrative review of the antidumping duty order placed on crystalline silicon photovoltaic products in Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2016, 82 Fed. Reg. 32.170 (Dep't Commerce, July 12, 2017) ("Final Results"), PD 266, and accompanying Issues and Decision Memorandum for Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China (July 5, 2017), available at

https://enforcement.trade.gov/frn/summary/prc/2017-14611-1.pdf   ("Decision Memorandum"), PD 259.  The Final Results cover U.S. entries made from July 31, 2014 through January 31, 2016.

In particular, SolarWorld asks the Court to consider whether substantial evidence supports Commerce's selection and calculation of the surrogate values for:

a.  aluminum frames;

b.  solar glass; and

c.  overhead, SG&A, and profit.

SolarWorld invites the court to reweigh record evidence and to ignore determinations already sustained by this Court.  Because the administrative record supports the particular determinations challenged by SolarWorld, the Court should affirm the decisions challenged by SolarWorld as supported by substantial evidence and in accordance with law.

## II.   ARGUMENT

### A.   Commerce's Surrogate Value Selection for Aluminum Frames Is Supported by Substantial Evidence and In Accordance with Law

In the <u>Final Results</u>, Commerce valued Trina's aluminum frames using HTS classification 7604.29.90001.[1]  SolarWorld contends that Commerce should have valued aluminum frames using HTS 7616.99.[2]

As an initial matter, Petitioner's argument regarding the valuation of aluminum frames is not new and has been repeatedly rejected by Commerce.  In addition, the U.S. Court of International Trade ("CIT") has rejected SolarWorld's arguments and sustained Commerce's selection of the surrogate value for aluminum frames four times.[3]

Commerce's Decision Memorandum explained that HTS category 7604.29.90001 constitutes the best available information for valuing aluminum frames and that it was rejecting Petitioner's arguments as it had in <u>Solar1-LTFV-Final</u>, <u>Solar2-LTFV-Final</u>, <u>Solar1-AR2-Final</u>, and <u>Solar1-AR1-Final</u>.[4]  Since those decisions, <u>nothing</u> has changed that would warrant a

---

[1] <u>See</u> <u>Decision Memorandum</u>, at 19, (Comment 5) PD 259.

[2] SolarWorld's Brief, at 2.

[3] <u>SolarWorld Americas, Inc v. United States</u>, 271 F.Supp.3d 1254, 1265-1266 (CIT October 2017), <u>SolarWorld Americas, Inc v. United States</u>, 234 F.Supp.3d 1286, 1303-1305 (CIT June 2017); <u>Jinko Solar Co., Ltd v. United States</u>, 229 F.Supp.3d 1333, 1351-1353 (CIT 2017); <u>Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States</u>, 28 F. Supp. 3d 1317, 1335-1338 (CIT 2014) ("<u>Jiangsu</u>");

[4] Decision Memorandum, at 16, (Comment 5) PD 259.citing, <u>Solar1-AR2-Final</u>, Comment 8, <u>citing</u>, <u>Solar1-AR1-Final</u>, Comment 36, <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part</u>, 77 Fed. Reg. 63791 (Oct. 17,

Consol. Court No. 17-00199

different determination in this segment of the proceeding. Although Plaintiff SolarWorld implies that the record of the underlying review is different than prior administrative proceedings addressing this issue,[5] Plaintiff did not cite or explain any changed facts.  As such, Plaintiff's request for relief must be denied.  Nevertheless, we briefly address the key deficiencies in Plaintiff's argument.

Plaintiff contends that the "aluminum solar frames in question are not uniform in cross section along their entire length" and thus not "profiles."[6]  Furthermore, Plaintiff asserts that Commerce appears to have recognized that the aluminum frames are not uniform in cross section along their entire length, but that they disregarded this purported fact.  Plaintiff is simply wrong. Commerce did not disregard or ignore the consideration of whether the aluminum frames possess a uniform cross section along their entire length.  Rather, as Commerce had done in numerous prior administrative proceedings, Commerce concluded that "while certain aluminum frames purchased by the respondents contain corners, the Department does not believe that this would necessarily change their classification as aluminum profiles."[7]  Thus, even though the aluminum profiles have cut corners at the ends, Commerce concluded that these profiles still possess a uniform cross section along their entire length. Thus, having considered the evidence on the record including schematics and pictures of the aluminum frames, Commerce concluded that these inputs are aluminum profiles properly classified under tariff subheading 7604.29.

---

2012), Issues and Decision Memorandum , Comment 16 ("Solar1-LTFV-Final"); and Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 79 Fed. Reg. 76970 (Dec. 23, 2014), Issues and Decision Memorandum, Comment 9, ("Solar2-LTFV-Final").

[5] SolarWorld Brief, at 10.

[6] Id., at 17.

[7] Decision Memorandum, at 17, (Comment 5) PD 259

Plaintiff also contends that the aluminum frames have been further processed beyond the extrusion process and have lost their character as aluminum extrusions and have instead become fabricated aluminum goods.[8]  Commerce has already considered the amount of finishing that aluminum profiles undergo to become aluminum frames in selecting an appropriate surrogate value for aluminum frames.[9]  This Court has already sustained Commerce's determination that aluminum profiles used as aluminum frames have undergone further processing and are properly regarded as profiles classified under the 7604 HTS subheading.[10]

The Petitioner has not and cannot assert that the facts in this administrative review are different from the facts in the numerous prior segments where Commerce rejected Petitioner's argument or the four decisions by this Court sustaining Commerce's selection of subheading 7604.29 to value aluminum frames.  This issue is well settled.  Commerce's determination is supported by substantial evidence and in accordance with  law and should be sustained.

**B.**     **Commerce's Decision Not to Value Trina's Solar Glass Using Thai HTS 7007.29.90 Was Supported by Substantial Evidence**

Plaintiff contends that Commerce erred in valuing Trina's solar glass using Thai imports of tempered glass classified under HTS category 7007.19.9000.[11]  Plaintiff contends that

---

[8] See e.g., SolarWorld Brief, at 13.

[9] Decision Memorandum, at 16, (Comment 5) PD 259

[10] Id., citing, Jiangsu, 28 F. Supp. 3d at 1337; and Jinko Solar Co. v. United States, Slip Op. 17-62 (CIT May 18, 2017) at *25-34.

[11] SolarWorld Brief, at 18.

Commerce should have valued Trina's solar glass using Thai imports of laminated glass classified under HTS category 7007.29.90.[12]  Plaintiff's assertion lacks merit.

The Thai tariff schedule and the WCO explanatory note regarding heading 7007 make clear that 7007 covers tempered or laminated glass.[13]  Tempered safety glass is classified in either 7007.11 or 7007.19 and laminated safety glass is classified in either 7007.21 or 7007.29.[14]  The WCO explanatory note defines laminated glass as "made in sandwich form, with one or more interlayers of plastics between two or more sheets of glass."[15]  The specification sheets provided by Trina demonstrate that neither its tempered glass factor nor its coated glass factor are "sandwich glass" (i.e., laminated glass) having the interlayered film sandwiched between the two or more panes of glass.[16] Thus, Commerce properly rejected SolarWorld's argument to use a classification that is dissimilar to the glass consumed by Trina. The classification suggested by SolarWorld to value Trina's solar glass is clearly inaccurate and Commerce properly declined to accept SolarWorld's request.  In addition, SolarWorld's assertion that Commerce undervalued Trinas solar glass lacks any support in the record.  SolarWorld's request that Commerce rely on the wrong HTS classification to value Trina's solar glass must be denied.

### C. Commerce's Decision Not to Rely on the Financial Statements of Ekarat Engineering to Calculate Surrogate Financial Ratios Is Supported by Substantial Evidence

---

[12] Id., at 19.

[13] Trina's Rebuttal Information, page 4, Exhibit C-1 and C-2 (January 30, 2017).

[14] Id.

[15] Id.

[16] Trina's Section D response, Exhibit D (May 25, 2016), and Trina C Supplemental Response, Exhibit SC-20 (June 21, 2016).

Consol. Court No. 17-00199

In the *Final Results*, Commerce did not rely on the financial statements of Ekarat

Engineering Public Company Limited ("Ekarat Engineering") to calculate surrogate financial

ratios to determine respondents' overhead, selling, general and administrative (SG&A) expenses,

and profit because Commerce determined the Ekarat Engineering's financial statements could not

provide a reliable basis for calculating surrogate financial ratios.  Commerce's decision is

supported by substantial evidence and should be sustained.

SolarWorld argues that Commerce should have used the consolidated financial statements

contained in Ekarat Engineering's 2015 annual report to calculate surrogate financial ratios.[17]

Plaintiff's main reason for regarding the financial statement of Ekarat Engineering as the

best available information for calculating the surrogate financial ratios is that Ekarat Engineering

is, purportedly, a producer of merchandise identical to the merchandise subject to this

administrative review.[18]  However, Commerce concluded based on record evidence that Ekarat

Engineering is not a producer of identical merchandise.

In the Final Results, Commerce determined that Ekarat Engineering is "primarily a

manufacturer and distributor of transformers" and that transformers are not comparable to the

merchandise subject to review.[19]  As explained below, the facts referenced by Plaintiff in support

of its contention that Ekarat Engineering is a producer of identical merchandise are not

compelling.  Furthermore, Plaintiff's contentions that Commerce misunderstood or misinterpreted

the record also lack support.

---

[17] SolarWorld's Brief, at 20-24.

[18] Id.

[19] Decision Memorandum, at 36 (Comment 11).

In general, Plaintiff's basis for asserting that Ekarat Engineering is a producer of identical merchandise is based on general statements unrelated to specific financial data in the company's financial statement.  Or, where Plaintiff cites specific financial or accounting data, the data are misconstrued to assert that Ekarat Engineering produced solar cells or solar modules.  On the other hand, Commerce's conclusion that Ekarat Engineering is not a producer of identical merchandise is based on financial information reported in Ekarat Engineering's financial statement and is supported in the record as a whole.

On pages 20-21 of its brief, Plaintiff cites four pages of the Ekarat Engineering financial statement.  Plaintiff cites the Products and Services section of the annual report at page 11 wherein the report states that company is a manufacturer of solar module and that it can also produce solar cell.[20]  However, this same page asserts that Ekarat Engineering's three main activities include Distribution Transformer, Services, and Solar Farm.[21]  Plaintiff also cites the Market Conditions and Competition section on page 13 of the annual report, which describes the company as a manufacturer and distributor or solar module.[22]  Like the statement on page 11, the statement on page 13 is not linked to financial data in the report expressing actual operations or manufacturing relating to solar modules or solar cells.  These general statements untethered to any objective expression of Ekarat Engineering's operations during the period are not compelling evidence that Ekarat actually produced solar cells or solar modules during the period – especially

---

[20] SolarWorld Brief, at 20.

[21] Petitioner's August 15, 2016 Surrogate Value Submission, Exhibit 10, Financial Statement, page 11, PD 146.

[22] SolarWorld Brief, at 20.

considering that annual report indicates that none of the company's revenues came from the production of solar cells or solar modules.

Plaintiff cites page 88 of the financial statement and a "non-monetary transaction" disclosure wherein the company stated that 2.12 million baht of raw materials and solar cell where transferred "to be construction in progress." [23]  Plaintiff boldly characterizes this information as "related to solar cell manufacturing."[24]  First, a transfer from inventory to "construction in progress" is not evidence that Ekarat Engineering is a producer of anything, let alone a producer of solar modules or solar cells.  Construction in progress ("CIP") entries capture the costs of construction for capital assets, not work in process ("WIP") which captures the costs of production of goods.   The Ekarat depreciation schedule confirms this understanding wherein in the "Transfer In" for 2015 for "Work under construction" was 2,119,539.96 baht (or, 2.12 million baht as cited on page 88).[25]  So, it seems that this entry might be expressing the transfer of solar cells or modules and other raw materials to a solar farm or some other construction project that is a capital asset of Ekarat Engineering.  Moreover, that the company is transferring solar products from inventory to CIP does not indicate that Ekarat was the producer of the solar product. Assuming *in arguendo* that the raw material and solar cell transfer to CIP is somehow evidence of solar product production by Ekarat, the amount transferred, 2.12 million baht, was only one tenth of one percent of Ekarat Engineering's total Revenue from sales and services in 2015.[26]  This fact

---

[23] SolarWorld Brief, at 21, citing, Petitioner's August 15, 2016 Surrogate Value Submission, Exhibit 10, Financial Statement, page 88, PD 147.

[24] SolarWorld Brief, at 21.

[25] Petitioner's August 15, 2016 Surrogate Value Submission, Exhibit 10, Financial Statement, page 97, PD 147.

[26] Id., at 112, (2.12 million/2094.96 million baht = 0.00101).

supports the conclusion that even if Ekarat Engineering produced solar cells or solar modules, such operations represented a meaningless portion of Ekarat Engineering's operations and experience during the period.

Finally, Plaintiff cites page 113 noting that the reported fixed assets for cell manufacturing exceed the fixed assets for transformer sales and service.[27]  Still, this fact, considered with other information on the record explained below, is insufficient to establish that Ekarat Engineering is a producer of solar cells or solar modules.  First, possession of the assets does not establish that Ekarat Engineering produced solar products during the period.  The assets may not have been utilized for the production of solar products during the period.  The assets may have been used to toll produce goods on a contract basis whereby Ekarat Engineering would not be considered the producer from an accounting or legal standpoint and would have only provided a service.  Most importantly, the reference to solar cell assets does not establish that the company actually produced solar products considering that none of Ekarat Engineering's revenues came from the sale of solar cells or solar modules.

Next, Plaintiff challenges Commerce's finding that 99 percent of Ekarat Engineering's revenue came from the sale and distribution of transformers and services.[28]  Plaintiff's misunderstanding of the basis for Commerce's conclusion might have been the result of a typographical error in Commerce's citation in the Decision Memorandum.  Commerce concluded that Ekarat Engineering's financial statements indicate that 99 percent of Ekarat Engineering's revenue came from the sale and distribution of transformers and services.  Commerce cited page

---

[27] SolarWorld Brief, at 21.

[28] SolarWorld Brief, at 21.

113 of Ekarat Engineering's annual report as support for this assertion.[29]  However, Trina

explained in its rebuttal brief that notes on page 18 establish that at least 99 percent of Ekarat's

revenue comes from sales and services relating to transformers.[30]  Page 18 of Ekarat's annual

report indicates that the company's sales of transformers and transformer services to the

government of 267.60 million baht in 2015 represented 12.92% of total transformer revenue, and

that total 2015 revenue from all sources was 2,092.12 million baht.[31]  Thus, simple math shows

that total sales of transformers and transformer services were 2,071.21 million baht (i.e., 267.60 /

12.92%), thus representing 99% of the company's total 2015 revenue.  Even though Commerce's

citation in the Decision Memorandum may have been incomplete, the records nevertheless

establishes that at least 99 percent of Ekarat's sales were from transformers, which are not

comparable to solar cells or solar modules.

Plaintiff also asserts that the record contains no support for Commerce's conclusion that

Ekarat Solar Co. Ltd ("Ekarat Solar"), a subsidiary of Ekarat Engineering, operated at a loss in

2015.[32] Plaintiff is wrong.  Plaintiff states that "both the consolidated financial statement and the

separate financial statement show sizable profits in 2015."[33]  However, the "separate" financial

statement referenced by Plaintiff is that of Ekarat Engineering on a non-consolidated basis and not

the financial statement of Ekarat Solar.  Thus, Plaintiff's cited facts do not support its contention

that Ekarat Solar was profitable.  The record indicates that Ekarat Solar was not profitable in

---

[29] Decision Memorandum, at 36-37 (Comment 11).

[30] Trina Rebuttal Brief, at 4-5, PD 250 (Barcode 3565047-01).

[31] Petitioner's August 15, 2016 Surrogate Value Submission, Exhibit 10, Financial Statement, page 18, PD 146.

[32] SolarWorld Brief, at 22.

[33] Id.

Consol. Court No. 17-00199

2015.  The annual report of Ekarat did not provide full financial statements separately for each

subsidiary.  But page 17 of the annual report provided a listing of Significant Revenues and

Expenses for each subsidiary and are summarized for Ekarat Solar as follows:

**Significant revenues and Expenses - Ekarat Solar - Page 17**

| | | |
|---|---|---|
| Acquire of goods | 1,988,898.95 | $a$ |
| Acquire of other assets | 1,695 | $b$ |
| Other income | 27,162 | $c$ |
| Interest income | 10,545,411.14 | $d$ |
| Doubtful accounts of loans and accrued interest income | -10,545,411.14 | $e$ |
| Net income (loss) | (1,963,431.95) | $f=c+d+e-a-b$ |

Thus, with the significant revenues and expenses provided, one can calculate that Ekarat

Solar experienced a net loss in 2015.   That Ekarat Solar, the subsidiary of Ekarat Engineering

appears to be the company potentially related to solar products, experienced a loss in 2015

provides even more reason for Commerce to have declined to rely on Ekarat Engineering's

financial data for calculating financial ratios.

With virtually all of Ekarat Engineering's sales and costs related to transformers,

transformer maintenance, and electricity – and no evidence at all that any sales on the income

statement reflect solar products – the Ekarat Engineering financial data do not reflect the financial

experience of a producer of comparable merchandise.  As such, even if Ekarat Engineering were

not disqualified from use as a surrogate financial producer because of subsidization, the company

still would not qualify as an appropriate surrogate producer because it does not produce

comparable merchandise. [34]

---

[34] Having sufficient reasons for declining to use the Ekarat Engineering financial statements, Commerce
did not address in the Decision Memorandum other deficiencies to the Ekarat Engineering statements

Consol. Court No. 17-00199

Commerce properly concluded that Ekarat Engineering was not a producer of identical

merchandise and that its production of transformers did not reflect the production of comparable

merchandise.  Thus, whether expressed on a consolidated or unconsolidated basis, Ekarat

Engineering's financial statements are not the best available information and Commerce properly

relied on the financial statement of Styromatic (Thailand) Co., Ltd ("Styromatic"), a producer of

comparable merchandise.

## III.    CONCLUSION

For the reasons set forth above, we respectfully request that the Court deny Plaintiff

SolarWorld's motion for judgment upon the agency record and enter judgment with respect to

the issues contested by SolarWorld in favor of the United States.

Respectfully submitted,

/s/ Jonathan M. Freed
Robert G. Gosselink
Jonathan M. Freed

**TRADE PACIFIC PLLC**
660 Pennsylvania Avenue, SE, Suite 401
Washington, D.C.  20003
(202) 223-3760

Counsel to Defendant-Intervenor
Changzhou Trina Solar Energy Co., Ltd.

Dated:  June 7, 2017

---

raised by Trina.  In Trina' Rebuttal Brief, Trina explained that the Ekarat Engineering financial
statements lacked information to accurately calculate financial ratios.  See Trina's Rebuttal Brief, at 2-3,
(April 20, 2017), PD 250.  The Ekarat Engineering statements did not sufficiently breakdown costs and
SolarWorld arbitrarily calculated expense line-items in order to "calculate" surrogate financial ratios of
the company.  Id.  In addition, certain cost elements in the Ekarat Engineering statements were
commingled into one line item of financial data (thus making impossible the segregation of direct
materials and overhead materials).  Id.  Although Commerce did not need to acknowledge these
deficiencies, these deficiencies establish even further that the Ekarat Engineering financial statements are
not the best available information and that Commerce's decision to not rely on them was prudent and
reasonable.