Slip Op. 19-12

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CHANGZHOU TRINA SOLAR ENERGY CO., LTD. ET AL.,** | |
| **Plaintiffs and Consolidated Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Consol. Court No. 17-00199** |
| **and** | **PUBLIC VERSION** |
| **SOLARWORLD AMERICAS, INC. and CHANGZHOU TRINA SOLAR ENERGY CO., LTD.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenor.** | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the administrative review of crystalline silicon photovoltaic products from the People's Republic of China.]

Dated: January 25, 2019

<u>Jonathan Michael Freed</u>, Trade Pacific, PLLC, of Washington, DC, argued for plaintiff, defendant-intervenor, and consolidated defendant-intervenor Changzhou Trina Solar Energy Co., Ltd., and plaintiffs Trina Solar (Changzhou) Science & Technology Co., Ltd. and Trina Solar (U.S.) Inc.  With him on the brief was <u>Robert George Gosselink</u>.

<u>Timothy C. Brightbill</u>, Wiley Rein, LLP, of Washington, DC, argued for consolidated plaintiff and defendant-intervenor SolarWorld Americas, Inc.  With him on the brief were <u>Laura El-Sabaawi</u> and <u>Usha Neelakantan</u>.

<u>Justin Reinhart Miller</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were <u>Reginald T. Blades, Jr.</u>, Assistant Director, <u>Jeanne E. Davidson</u>, Director, and <u>Joseph H. Hunt</u>, Assistant Attorney General.  Of Counsel on the brief was <u>James Henry Ahrens, II</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge: This consolidated action is before the court on motions for judgment on the agency record filed by Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science and Technology Co., Ltd., and Trina Solar (U.S.) Inc. (collectively "Trina") and SolarWorld Americas, Inc. ("SolarWorld").[1]  <u>See</u> [Trina] Pls.' Rule 56.2 Mot. J. Agency R., Feb. 2, 2018, ECF No. 29; SolarWorld's Mot. J. Agency R., Feb. 2, 2018, ECF No. 30.  Trina and SolarWorld challenge various aspects of the U.S. Department of Commerce's ("Department" or "Commerce") final determination in the administrative review of the antidumping duty ("ADD") order covering certain crystalline silicon photovoltaic products from the People's Republic of China ("PRC").[2]  <u>See</u> Mem. Supp. Mot. [Trina] J. Agency R. at 4–14, Feb. 2, 2018, ECF No. 29-3 ("Trina Pls.' Br."); Pl. [SolarWorld's] Mem. Supp. Rule 56.2 Mot. J. Agency R. at 10–27, Feb. 5, 2018, ECF No. 33 ("Pl. SolarWorld's Br."); <u>see also</u> <u>Certain Crystalline Silicon Photovoltaic Prods. from the [PRC]</u>, 82 Fed. Reg. 32,170 (Dep't Commerce July 12, 2017) (final results of [ADD] administrative review and final determination of no shipments; 2014–2016) ("<u>Final</u>

---

[1] Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science and Technology Co., Ltd., and Trina Solar (U.S.) Inc. and SolarWorld Americas, Inc. also appear as defendant-intervenors in this consolidated action.

[2] On November 1, 2017, the court consolidated Changzhou Trina Solar Energy Co. Ltd. v. United States, Ct. No. 17-00199 (USCIT filed July 27, 2017) and SolarWorld Americas, Inc. v. United States, Ct. No. 17-00217 (USCIT filed Aug. 11, 2017).  Order [Granting Consent Mots. Consolidate], Nov. 1, 2017, ECF No. 24.

Results") and accompanying Issues & Decision Mem. for the Final Results of [ADD]

Admin. [Review]: Certain Crystalline Silicon Photovoltaic Prods. from the [PRC]; 2014–

2016 at 9–10, A-570-010, (July 5, 2017), ECF No. 19-3 ("Final Decision Memo"); Certain

Crystalline Silicon Photovoltaic Prods. from the [PRC], 80 Fed. Reg. 8,592, 8,593–95

(Dep't Commerce Feb. 18, 2015) ([ADD] order).

For the reasons that follow, the court sustains Commerce's selection of surrogate

values for aluminum frames, module glass,[3] and financial ratios.  The court also sustains

Commerce's decisions to include import data with reported quantities of zero in the

surrogate value calculations and to deny offsetting respondent's U.S. indirect selling

expenses by the debt restructuring income reported by its U.S. sales affiliate.  However,

the court finds that Commerce's decision not to offset the Ex-Im Bank Export Buyer's

Credit Program is contrary to law and Commerce is directed to recalculate Trina's U.S.

selling prices to account for the offset on remand.

## BACKGROUND

This administrative review covers subject imports entered during the period of July

31, 2014, through January 31, 2016.  See Initiation of Antidumping and Countervailing

Duty Admin. Reviews, 81 Fed. Reg. 20,324, 20,335 (Dep't Commerce Apr. 7, 2016).

Commerce selected Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou)

---

[3] The final determination and the parties' briefs use a variety of terms to refer to this input, e.g., module glass, tempered and coated glass, solar glass, and solar module glass.  See, e.g., Final Decision Memo at 27–28; Def.'s Resp. Br. at 18; Pl. SolarWorld's Br. at 18.  The court refers to the input as "module glass" because it is how Commerce identifies the input in the title of the comment addressing this issue.  Final Decision Memo at 27 (Comment titled, "Surrogate Value for Module Glass").

Science & Technology Co., Ltd. as the sole mandatory respondent for individual review.

See Resp't Selection Mem. [for 2014–2016 ADD Admin. Review] at 5, PD 94, bar code

3472551-01 (May 24, 2016).[4]  Aside from Commerce's decisions to exclude Trina Solar

(U.S.) Inc.'s ("TUS") debt restructuring income from its calculation of respondent's indirect

selling expenses and to use a simple average to calculate the financial ratios,

Commerce's conclusions regarding the other issues challenged before this Court did not

change from the preliminary to the final determination.  For the final results, Commerce

calculated a weighted-average dumping margin of 9.61% for the sole mandatory

respondent.  Final Results, 82 Fed. Reg. at 32,171.

SolarWorld challenges as not in accordance with law and unsupported by

substantial evidence three aspects of Commerce's final determination.  See Pl.

SolarWorld's Br. at 10–27.  Specifically, SolarWorld challenges Commerce's selection of

surrogate value data sources to value respondent's aluminum frames, see id. at 10–18,

and module glass, see id. at 18–19, and Commerce's selection of Styromatic (Thailand)

Co., Ltd.'s ("Styromatic") 2015 financial statements to value respondent's selling, general,

and administrative expenses.  See id. at 20–27.

Trina challenges three other aspects of Commerce's final determination.  See

Trina Pls.' Br. at 4–14.  Specifically, Trina challenges as not in accordance with law and

unsupported by substantial evidence Commerce's decision not to adjust respondent's net

---

[4] On September 20, 2017, Defendant submitted indices to the public and confidential
administrative records underlying Commerce's final determination.  These indices are located on
the docket at ECF No. 19-4–5.  Citations to administrative record documents in this opinion will
be to the numbers assigned to the individual documents by Commerce in these indices.

**PUBLIC VERSION**

U.S. selling prices by the amount countervailed in a parallel countervailing duty ("CVD")

investigation.  See id. at 4–9.  Trina also challenges as unsupported by substantial

evidence Commerce's decision to use zero import quantities to calculate surrogate

values.  See id. at 9–11.  Finally, Trina challenges as not in accordance with law,

unsupported by substantial evidence, and arbitrary Commerce's decision to exclude, as

an offset, the debt restructuring income reported by TUS.  See id. at 11–14.  On October

16, 2018, the court held oral argument.  Oral Ar., Oct. 16, 2018, ECF No. 56.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012)[5] and

28 U.S.C. § 1581(c) (2012), which grant the Court authority to review actions contesting

the final determination in an administrative review of an ADD order.  The court will uphold

Commerce's determination unless it is "unsupported by substantial evidence on the

record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.  Surrogate Values**

SolarWorld challenges Commerce's surrogate value data selections for aluminum

frames, module glass, and financial statements to calculate surrogate financial ratios.

See Pl. SolarWorld's Br. at 10–27.  Defendant refutes all these challenges and argues

that Commerce's final determination should be sustained in all respects.  See Def.'s

Resp. Br. Opp'n [Trina's & SolarWorld's] Rule 56.2 Mots. J. Agency R. at 12–23, June 7,

---

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19
of the U.S. Code, 2012 edition.

2018, ECF No. 38 ("Def.'s Resp. Br.").  For the reasons that follow, the court sustains

Commerce's surrogate value selections for aluminum frames, module glass, and financial

ratios.

### A.  Legal Framework

In antidumping proceedings involving non-market economies, Commerce

generally calculates normal value using the factors of production used to produce the

subject merchandise and other costs and expenses.   19 U.S.C. § 1677b(c)(1).

Commerce will value respondents' factors of production using the "best available

information regarding the values of such factors in a market economy country or countries

considered to be appropriate by [Commerce]."  19 U.S.C. § 1677b(c)(1)(B).  As the term

"best available information" is not statutorily defined, Commerce has broad discretion in

deciding what constitutes the best available information.  See QVD Food Co. v. United

States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  However, the agency must ground its

selection in the overall purpose of the statute, which is to calculate accurate dumping

margins.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir.

1990); see also Parkdale Int'l. v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007).  To

the extent possible, Commerce uses factors of production from market economy

countries that are: "(A) at a level of economic development comparable to that of the

nonmarket economy country, and (B) significant producers of comparable merchandise."

19 U.S.C. § 1677b(c)(4).  Commerce's regulatory preference is to "value all factors in a

single surrogate country."  19 C.F.R. § 351.408(c)(2) (2016).[6]

Commerce's methodology for selecting the best available information evaluates

data sources based upon their: (1) specificity to the input; (2) tax and import duty

exclusivity; (3) contemporaneity with the period of review; (4) representativeness of a

broad market average; and (5) public availability.  See Import Admin., U.S. Dep't

Commerce, Non-Market Econ. Surrogate Country Selection Process, Policy Bulletin 04.1

(Mar. 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (last visited Jan. 18,

2019); Decision Mem. for Prelim. Results of [ADD] Admin. Review: Certain Crystalline

Silicon Photovoltaic Prods. from the [PRC]; 2014–2016 at 15, PD 223, bar code 3547659-

01 (Feb. 28, 2017) ("Prelim. Decision Memo").

**B.  Aluminum Frames**

SolarWorld challenges Commerce's valuation of respondent's aluminum frames

using Thai Harmonized Tariff Schedule ("HTS") subheading 7604.29.90001, covering

"Aluminum bars, rods and profiles: Of aluminum alloys: Other," as not in accordance with

law and unsupported by substantial evidence.  See Pl. SolarWorld's Br. at 10–18.

Specifically, SolarWorld argues that evidence on this record demonstrates that

respondent's frames were processed into a form beyond the simple aluminum extrusions

covered by HTS subheading 7604.29.90001.  Id. at 12–14.  Defendant responds that

Commerce    reasonably    concluded    that    import    data    under    HTS    subheading

---

[6] Further citations to Title 19 of the Code of Federal Regulations are to the 2016 edition.

7604.29.90001 is the best available information to value respondent's non-hollow

aluminum profiles.   See Def.'s Resp. Br. at 12–18.   For the reasons that follow,

Commerce's determination is sustained.

Commerce's determination that, on this record, import data under HTS

7604.29.90001 constitutes the best available information with which to value respondent's

frames is reasonable.   In the final determination, Commerce explains that respondent

demonstrated that its frames are "non-hollow, aluminum profiles" and that nothing on the

record contradicts that characterization.   See Final Decision Memo at 16–19.   It further

explains that "profiles" under HTS 7604 include products that are further processed and

do not have a uniform cross section across their entire length.   Id. at 16–17.[7]   In support,

Commerce highlights the explanatory notes to HTS Chapter 76 that indicate that profiles

include products that "have been subsequently worked after production."   Id. at 16

(quoting Notes to Chapter 76 of the HTS).   Commerce also references the International

Trade Commission's ("ITC") definition of aluminum profiles that allows for profiles to be

"cast, sintered, and worked after production[,]" to explain that profiles with corners, i.e.,

not uniform across the entirety of their length, are not necessarily excluded from HTS

7604.   Id. at 17.   Commerce explains that SolarWorld's proposed alternative, HTS

subheading 7616.99, is an "other" category and HTS 7616 includes articles dissimilar to

---

[7] SolarWorld contends that Commerce's determination is not in accordance with law because Commerce construes the word "profile" in HTS 7604 beyond its statutory definition.   See Pl. SolarWorld's Br. at 10–12, 17–18.   Commerce's task is not to classify the solar frame inputs used for customs purposes, but to select the best available data to value the factors in production in question.   See SolarWorld Americas, Inc. v. United States, 910 F.3d 1216, 1223–24 (Fed. Cir. 2018) ("SolarWorld I").

aluminum frames such as "nails, tacks, staples, screws, bolts, nuts, screw hooks, rivets, cotters, cotter pins, washers, knitting needles, bodkins, crochet hooks, embroidery stilettos, safety pins, other pins and chains, and cloth, grill and netting of aluminum wire." Id. at 18.

Nonetheless, SolarWorld argues that respondent's profiles are finished aluminum goods and can no longer be considered profiles.  Pl. SolarWorld's Br. at 12–14. Specifically, SolarWorld claims that evidence on this record demonstrates that respondent's aluminum profiles are no longer extrusions, but aluminum frames that have been so further processed and manufactured as to constitute a product ready for immediate incorporation into solar modules.  See id. (citing e.g., [Changzhou Trina Solar Energy Co., Ltd. & TUS's] First Suppl. Questionnaire Resp. at Ex. 19, CD 171, bar code 3502007-05 (Aug. 29, 2016); [Changzhou Trina Solar Energy Co., Ltd. & TUS's] Section C & D Questionnaire Resp. at Exs. D-13, D-15, CD 124, bar code 3488926-12 (July 19, 2016); [SolarWorld Americas, Inc.'s] Submission of Info. to Rebut, Clarify, or Correct Info. Pertaining to Surrogate Values at Ex. 4, PD 157, bar code 3500966-01 (Aug. 23, 2016); [Changzhou Trina Solar Energy Co., Ltd. & TUS's] Third Suppl. Questionnaire Resp. at Ex. 6, PD 176, bar code 3534067-01 (Jan. 4, 2017)).  In the final determination, Commerce explains that because HTS 7604 does not necessarily cover only unfinished aluminum profiles, the degree of finishing is not dispositive of whether HTS 7604 is the best available information for valuing respondent's frames.  See Final Decision Memo at 16–17 (incorporating by reference its reasoning from the investigation and prior reviews that because HTS 7604 does not specify whether the profiles are finished or unfinished,

HTS 7604 does not necessarily exclude finished aluminum profiles and noting that the ITC's definition for profiles allows for the profiles to be worked on after production).  It is reasonably discernable that Commerce did not find that the mechanical features added to Trina's frames were sufficient to make the profiles more similar to the products enumerated in HTS 7616.  See id. at 18–19.[8]  Commerce's determination is supported by substantial evidence.

### C.  Module Glass

SolarWorld challenges Commerce's valuation of respondent's module glass using Thai HTS subheading 7007.19.90000, covering "toughened (tempered) safety glass, not suitable for incorporation in vehicles, aircraft, spacecraft or vessels; other," as not in accordance with law and unsupported by substantial evidence.  See Pl. SolarWorld's Br. at 6, 18–19.  Specifically, it argues that HTS 7007.19.90000 does not cover tempered glass of "extreme durability" and accordingly undervalues the input.  Id.  Defendant responds that Commerce reasonably concluded that import data under HTS subheading 7007.19.90000 is the best available information to value respondent's module glass.  See Def.'s Resp. Br. at 18–19.  For the reasons that follow, Commerce's determination is sustained.

---

[8] SolarWorld also argues that Commerce did not accord proper weight to Customs and Border Protection rulings classifying the merchandise in question and did not address the rulings which detract from its determination.  See Pl. SolarWorld's Br. at 14–17.  Commerce reasonably explained why the rulings placed on the record do not undermine its determination that HTS 7604 represents the best available information for valuing respondent's frames, see Final Decision Memo at 18, and the court will not reweigh record evidence.

Commerce reasonably determined that import data under HTS subheading 7007.19.90000 constitutes the best available information with which to value this input. In the final determination, Commerce explains that respondent's characterization of the module glass as "tempered" is supported by record evidence and that HTS subheading 7007.19.90000 plainly covers tempered glass. <u>See</u> Final Decision Memo at 29. SolarWorld does not dispute that respondent's module glass is tempered. <u>See</u> Pl. SolarWorld's Br. at 18. Instead, it argues that record evidence demonstrates that respondent's module glass was strengthened through various surface treatments, that HTS 7007.19.90000 does not account for such treatments, and that HTS 7007.29.90, which covers "Laminated safety glass; Other; Other," does. <u>See</u> <u>id.</u> at 18–19. Relying on an explanatory note from the World Customs Organization, Commerce explains that laminated safety glass is created by sandwiching of multiple layers of glass and plastic. <u>See</u> Final Decision Memo at 29–30 (citing [Trina's] Info. for the Department's Consideration in Prelim. Results at Ex. C-2, PD 205–07, bar codes 3539773-01–03 (Jan. 30, 2017)). It further explains that evidence on this record does not support the conclusion that respondent's module glass was made in such a fashion or that the additional processing it underwent "result[ed] in glass comparable to laminated glass[.]" <u>Id.</u> at 30. Commerce has explained why record evidence supports its determination and addressed the evidence SolarWorld claims detracts from its determination. Therefore, its determination is reasonable.

### D. Financial Ratios

SolarWorld challenges Commerce's reliance on Styromatic's 2015 financial statements to calculate respondent's surrogate financial ratios as contrary to law and unsupported by substantial evidence.  See Pl. SolarWorld's Br. at 20–27.  For the reasons that follow, Commerce's determination is sustained.

As discussed above, Commerce is required to select a surrogate value for each factor of production using "the best available information."  19 U.S.C. § 1677b(c)(1).  In selecting a data source to value a respondent's surrogate financial ratios, Commerce's preference is to use financial statements from producers of identical or comparable merchandise.  19 C.F.R. § 351.408(c)(4).  Where the record lacks data from a producer of identical merchandise, Commerce prefers statements from a producer of comparable over non-comparable subject merchandise and from companies that did not receive subsidies Commerce found to be countervailable.  Final Decision Memo at 37–38 (citing e.g., Certain New Pneumatic Off-the-Road Tires From the [PRC]: Issues & Decision Mem. Final Results 2010–2011 Admin. Review of [ADD] Order at Cmt. 6, A-570-912, (Apr. 9, 2013), available at http://ia.ita.doc.gov/frn/summary/prc/2013-08894-1.pdf (last visited Jan. 18, 2019)).

Commerce explains that Styromatic's 2015 financial statements constitute the best available information because these statements are audited, contemporaneous, and from a company in the primary surrogate country that produced comparable merchandise.  See Final Decision Memo at 36–39; Prelim. Decision Memo at 24.  SolarWorld contends that Commerce erred in its selection because the record contained the financial statement of

Ekarat Engineering (Public) Co., Ltd.'s ("Ekarat"), a producer of identical merchandise in the primary surrogate country.  See Pl. SolarWorld's Br. at 20–23.  Commerce explains that during the period of review ("POR") Ekarat sold distribution transformers which are not comparable merchandise.  Final Decision Memo at 35–36 (citing [SolarWorld's] Submission of Surrogate Values at Ex. 10 at 66, PD 146, bar code 3498792-03–04 (Aug. 15, 2016) ("Ekarat's 2015 Annual Report")).  Commerce points to record evidence demonstrating that 99% of Ekarat's revenue was derived from "sales of distribution transformers and services[.]"[9] Id. at 36.  Commerce also explains that although Ekarat's financial statement shows that the company produced some solar modules and derived one percent of its revenue from such business, the record did not support a conclusion that Ekarat's experience was comparable to that of a seller or manufacturer of solar modules and cells.  Id. at 37.  SolarWorld presents no evidence that undermines Commerce's determinations.  Therefore, Commerce's conclusion is reasonable on this record.

## II. Decision Not to Offset the Countervailed Ex-Im Bank Export Buyer's Credit Program

Trina argues that Commerce's decision to deny an offset for the export buyer's credit program that was countervailed in the parallel CVD investigation is contrary to law.

---

[9] SolarWorld contends that Commerce's conclusion regarding Ekarat's primary source of revenue is not supported by the record because the page Commerce cites to in support does not discuss revenue.  Pl. SolarWorld's Br. at 21.  Defendant responds that the cite in the final determination is the result of inadvertent error and that another page of the same report supports Commerce's conclusion.  Def.'s Resp. Br. at 22.  At oral argument counsel for SolarWorld agreed that the page Defendant cites supports Commerce's conclusion.  Oral Arg. at 01:25:20–01:25:25.  It is reasonable to presume that Commerce reviewed Ekarat's 2015 Annual Report in its entirety in reaching its final determination.

See Trina Pls.' Br. at 4–9.  Defendant responds that Commerce acted in accordance with

its practice and should be given deference in interpreting ambiguous statutory language.

See Def.'s Resp. Br. at 23–27.  Commerce's refusal to offset the CVDs imposed is

contrary to law because Commerce necessarily determined that the export buyer's credit

program was an export subsidy in the parallel CVD investigation.

To impose a CVD, Commerce must find that an exporter benefited from a

countervailable subsidy.   19 U.S.C. § 1671(a)(1).   A "countervailable subsidy" is a

financial contribution, price support, or funding mechanism, provided by an "authority,"

that confers a benefit to its recipient.[10]  19 U.S.C. § 1677(5)(B).  A countervailable subsidy

must be specific, meaning it is an (i) import substitution subsidy, (ii) export subsidy, or (iii)

domestic subsidy that is specific, in law or fact, to an enterprise or industry within the

---

[10] (5) Countervailable subsidy

    (A) In general

    Except as provided in paragraph (5B), a countervailable subsidy is a subsidy
    described in this paragraph which is specific as described in paragraph (5A).

    (B) Subsidy described

    A subsidy is described in this paragraph in the case in which an authority--

        (i) provides a financial contribution,

        (ii) provides any form of income or price support within the meaning of
        Article XVI of the [General Agreement on Tariffs and Trade] 1994, or

        (iii) makes a payment to a funding mechanism to provide a financial
        contribution, or entrusts or directs a private entity to make a financial
        contribution, if providing the contribution would normally be vested in the
        government and the practice does not differ in substance from practices
        normally followed by governments, to a person and a benefit is thereby
        conferred. For purposes of this paragraph and paragraphs (5A) and (5B),
        the term "authority" means a government of a country or any public entity
        within the territory of the country.

19 U.S.C. § 1677(5)(A)–(B).

jurisdiction of the authority providing it.  19 U.S.C. § 1677(5)(A); 19 U.S.C. § 1677(5A)(A)–

(D).[11]  Thus, to impose a CVD, Commerce must find that an exporter both benefited from

a subsidy and that the subsidy was specific.  19 U.S.C. § 1677(5).

---

[11] In general, a subsidy is countervailable if it "is specific as described in paragraph (5A)."  19 U.S.C. § 1677(5)(A).  According to paragraph (5A), "[a] subsidy is specific if it is an export subsidy described in subparagraph (B) or an import substitution subsidy described in subparagraph (C), or if it is determined to be specific pursuant to subparagraph (D)."  19 U.S.C. § 1677(5A)(A).  The statute provides the following definitions for such subsidies:

(B) Export subsidy

An export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions.

(C) Import substitution subsidy

An import substitution subsidy is a subsidy that is contingent upon the use of domestic goods over imported goods, alone or as 1 of 2 or more conditions.

(D) Domestic subsidy

In determining whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy, the following guidelines shall apply:

(i) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law.

(ii) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if—

(I) eligibility is automatic,

(II) the criteria or conditions for eligibility are strictly followed, and

(III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification. . . .

19 U.S.C. § 1677(5A)(B)–(D).

During the course of an investigation or review, Commerce may have difficulty accessing and verifying the information it needs to satisfy the statutory elements for imposing a CVD.  Subject to 19 U.S.C. § 1677m(d), Commerce shall use facts otherwise available to reach its final determination when "necessary information is not available on the record," a party "withholds information that has been requested by [Commerce]," fails to provide the information timely or in the manner requested, "significantly impedes a proceeding," or provides information Commerce is unable to verify.  19 U.S.C. § 1677e(a). Further, under certain circumstances, such as a party's failure to comply to the best of its ability with a request for information, Commerce may "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."   19 U.S.C. § 1677e(b).  Commerce and parties generally refer to this two-step process by the shorthand "AFA" or "adverse facts available."

Regardless of the shorthand used, AFA is a two-step process that does not obviate the need for Commerce to affirmatively find that the elements of the statute have been satisfied.  Accordingly, to impose a CVD, Commerce must find that an exporter benefited from a specific subsidy.  19 U.S.C. § 1671; 19 U.S.C. § 1677(5), (5A).  That Commerce resorts to facts available and/or imposes an adverse inference under 19 U.S.C. § 1677e to make those findings, does not mean that the required findings have not been made.

Pursuant to 19 U.S.C. § 1677a(c)(1)(C), where goods are subject to both antidumping and countervailing duties, "[t]he price used to establish export price and constructed export price shall be—(1) increased by . . . (C) the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to

offset an export subsidy[.]"   An export subsidy is defined as "a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions."   19 U.S.C. § 1677(5A)(B).

Commerce's decision to deny an offset for the countervailing duties imposed is contrary to law because in the parallel CVD investigation Commerce necessarily found that the export buyer's credit program was an export subsidy.  See [CVD] Investigation of Certain Crystalline Silicon Photovoltaic Products From the [PRC], 79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23, 2014) (final affirmative [CVD] determination) and accompanying Issues & Decision Mem. for the Final Determination in the [CVD] Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC] at 30, C-570-011, (Dec. 15, 2014) ("CVD Investigation Final Decision Memo") (finding that through the export buyer's credit program the "Export-Import Bank of China (Ex-Im Bank) provides loans at preferential rates for the purchase of exported goods from the PRC") available at http://ia.ita.doc.gov/frn/summary/prc/2014-30071-1.pdf (last visited Jan. 18, 2019).   It is reasonably discernible from Commerce's description of the export buyer's credit program that Commerce found the program to be specific under the statute because the benefits it provided were contingent upon export.  See CVD Investigation Final Decision Memo at 30, 91–94.  Commerce did not resort to facts available or adverse inferences when describing the export buyer's credit program.   Commerce did not describe any aspect of the export buyer's credit program in a manner that could lead to the conclusion that the program was considered anything other than an export subsidy.   Further,

Commerce explicitly states that it is relying on AFA to determine that respondents used the export buyer's credit program, not that the program was specific.  See id. at 91–94.

Here, Commerce asserts that it denied the offset because in the parallel CVD investigation it did not make a finding as to whether the export buyer's credit program was contingent on export performance and countervailed the program on the basis of AFA.  See Final Decision Memo at 9–10.  Commerce's assertion here contradicts its assertion in the first administrative review of the CVD Order where it explicitly states that the "program is specific because it is contingent upon export performance, within the meaning of section 771(5A)(A)–(B) of the [Tariff] Act [of 1930, as amended, 19 U.S.C. § 1677(5A)(A)–(B)]."  Issues & Decision Mem. for the Final Results of the [CVD] Admin. Review: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the [PRC] at 33, C-570-980, (July 7, 2015) available at http://ia.ita.doc.gov/frn/summary/prc/2015-17241-1.pdf (last visited Jan. 18, 2019); see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) ([CVD] order) ("CVD Order").  To the extent that Commerce's decision here implicitly disavows the conclusion it reached in the first administrative review and marks the crafting of a new position, that position rests on Commerce's conflation of 19 U.S.C. § 1677e(a) and (b).

Commerce's invocation of AFA implies that instead of using adverse facts to support specific findings, as 19 U.S.C. § 1677e(a) and (b) require, respondents are simply saddled with an adverse result by the combined operation of subsections 1677e(a) and (b).  Commerce states that "[its] determination to countervail the program was based on

Consol. Court No. 17-00199                                                      Page 19
**PUBLIC VERSION**

facts otherwise available with an adverse inference, as a result of non-cooperation by the

Government of China."  Final Decision Memo at 9.  That statement conflates subsections

1677e(a) and (b) and obfuscates the findings Commerce had to, and did, make to impose

a CVD.  Specifically, in the parallel CVD investigation, Commerce based its determination

that the respondents used the export buyer's credit program, i.e., that respondents

benefited from the specific subsidy, in order to satisfy one of the statutory elements

necessary to impose CVDs.  <u>See</u> CVD Investigation Final Decision Memo at 30, 91–94.

The statute does not authorize Commerce to impose CVDs because a party fails to

cooperate.  Subsections 1677e(a) and (b) allow Commerce to resort to facts available

and to apply adverse inferences in making its findings.  Neither subsection, however,

relieves Commerce from relying on some facts to make the requisite determinations to

satisfy the elements of 19 U.S.C. § 1677(5), (5A).[12]  If Commerce could simply declare

the statute satisfied without resorting to actual facts, Congress would have had no need

---

[12] Although it is not clear from Commerce's decision, or Defendant's brief, Commerce may be trying to argue that the CVD at issue here was determined to be "specific" more generally by virtue of an adverse inference, i.e., it was not found to be an import substitution subsidy, a domestic subsidy, or an export subsidy.  Presumably, Commerce would then argue it could impose a CVD without identifying the particular type of specific subsidy at issue.  If this is Commerce's argument, it must fail.  First, Commerce's CVD determination does not support that position.  More importantly, the statute would not support that position.  A subsidy is countervailable if it "is specific as described in paragraph (5A)."  19 U.S.C. § 1677(5)(A).  According to paragraph (5A), "[a] subsidy is specific if it is an export subsidy described in subparagraph (B) or an import substitution subsidy described in subparagraph (C), or if it is determined to be specific pursuant to subparagraph (D)."  19 U.S.C. § 1677(5A)(A).  Subsection 1677e(a) requires Commerce to identify facts available prior to imposing an adverse inference.  Commerce must therefore rely upon facts to demonstrate specificity.  Congress, by identifying the types of specificity, cabined the choices available to Commerce.  There is no provision for some sort of generalized specificity.

to provide potential sources of information for adverse inferences, as it did in 19 U.S.C. § 1677e(b)(2)(A)–(D).[13]

Further, while it is conceivable that Commerce could use subsections 1677e(a) and (b) to make a finding that a particular program is an export subsidy, there is no reasonable reading of Commerce's final decision memorandum for the parallel CVD investigation that Commerce used an adverse inference to make such a finding here. Therefore, Commerce cannot now say that it did not make a finding of an export subsidy, because (i) it had to have made a finding of specificity to satisfy the statute, (ii) it is reasonably discernible that it found that the export buyer's credit program was contingent upon exports, see CVD Investigation Final Decision Memo at 30, and (iii) it only invoked an adverse inference to find that the respondents used, i.e., benefited from, the program. Id. 90–94.

Defendant's argument that Commerce changed its practice with respect to offsetting CVDs calculated on the basis of AFA also relies upon its conflation of subsections 1677e(a) and (b).  See Def.'s Resp. Br. at 24–27.  Defendant argues that "[i]n past proceedings, Commerce has determined that the term 'export subsidy' within the meaning of 19 U.S.C. § 1677(5A)(B) encompasses certain subsidy programs for

---

[13] Listing the petition, a final determination in the investigation under 19 U.S.C. § 1677, any previous review under 19 U.S.C. § 1675 or determination under 19 U.S.C. § 1675b, or any other information placed on the record, among the potential sources of information from which Commerce can derive an adverse inference.  19 U.S.C. § 1677e(b)(2)(A)–(D).

which specificity was determined on the basis of AFA."[14] Id. at 24.  Defendant's argument

posits that the term "export subsidy" is ambiguous and therefore Commerce is free to

interpret the term as either including or excluding subsidies determined to be specific as

a result of facts available with an adverse inference.  See id. at 24–26.  Again, Defendant

starts with the premise that Commerce may impose CVDs simply as an adverse

inference.  However, Commerce does not impose a CVD as a result of an adverse

inference.  Commerce derives an adverse inference from a set of facts relevant to the

proceeding and those facts may lead to Commerce concluding that the necessary

elements of the statute are satisfied and a finding that a CVD is appropriate.

Further, there is no ambiguity with respect to the term "export subsidy" because

Congress has defined it.  "An export subsidy is a subsidy that is, in law or in fact,

contingent upon export performance, alone or as 1 of 2 or more conditions."  19 U.S.C.

§ 1677(5A)(B).  That Commerce might have used AFA to find that a subsidy was

contingent upon export performance does not render the term ambiguous.  Even if one

could argue that the term "export subsidy" is ambiguous because it may or may not

---

[14] Defendant invokes Jinko Solar Co., Ltd. v. United States, 41 CIT __, __, 229 F. Supp. 3d 1333,1359–61 (2017) as discussing and affirming Commerce's prior practice of interpreting the term "export subsidy" as including "subsidy programs for which specificity was determined on the basis of AFA."  Def.'s Resp. Br. at 24.  Defendant's characterization of Jinko as affirming Commerce's prior practice with respect to the term "export subsidy" is incorrect. Jinko addressed Commerce's practice of offsetting a respondent's ADD cash deposit rate by an export subsidy amount calculated in a parallel CVD investigation on the basis of AFA.  Jinko specifically referenced the lack of statutory and regulatory guidance on how Commerce should calculate a cash deposit rate, as compared to antidumping administrative reviews where the statute requires that "the price used to establish export price and constructed export price must be increased by "'the amount of any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy.'"  Jinko, 41 CIT at __, 229 F. Supp. 3d at 1359, n.30 (quoting 19 U.S.C. § 1677a(c)(1)(C)).

Consol. Court No. 17-00199 Page 22
**PUBLIC VERSION**

include subsidies that Commerce cannot verify as contingent upon export,[15] here, Commerce never questioned whether the export buyer's credit program was a subsidy contingent upon export.[16]

Given that 19 U.S.C. § 1677a(c)(1)(C) uses the mandatory "shall" to direct Commerce's actions as to offsets when a countervailing duty is imposed and here Commerce imposed such a duty, on remand Commerce must increase Trina's U.S. selling prices by the amount countervailed to offset the export subsidy.

---

[15] If Commerce is unable to verify information, the statute directs Commerce to rely on facts otherwise available. 19 U.S.C. § 1677e(a)(2)(D). Commerce clearly explains that the issue on verification during the CVD investigation was whether respondents used the export buyer's credit program. See CVD Investigation Final Decision Memo at 91–94. There is no indication that Commerce could not verify whether the export buyer's credit program was, in law or in fact, continent upon export during the CVD investigation.

[16] Finally, even if Commerce used an adverse inference to determine that the export buyer's credit program was an export subsidy and the term could be construed as ambiguous, Commerce failed to explain why its current practice is a reasonable interpretation of the statute. Where goods are subject to both antidumping duties and countervailing duties, the statute requires Commerce to increase the export or constructed export price by "the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy[.]" 19 U.S.C. § 1677a(c)(1)(C). The statutory language focuses on the purpose of the CVD, i.e., whether it was imposed to offset an export subsidy. If Commerce determines that a program is an export subsidy after resorting to AFA, it would not change the fact that it was imposed for the purpose of offsetting the export subsidy. It is not apparent to the court why a practice of not offsetting a CVD imposed on an export subsidy after a determination based on AFA would be reasonable and Commerce has not explained why it would be reasonable. Defendant contends that Commerce explained the change in its practice in prior determinations and that Trina was on notice of the change starting approximately a year prior to the issuance of the Final Results. See Def.'s Resp. Br. at 24–27 (citing Decision Mem. for the Prelim. Determination in the [ADD] Investigation of Stainless Steel Sheet & Strip from the [PRC] at 13, A-570-042, (Sept. 9, 2016), available at http://ia.ita.doc.gov/frn/summary/prc/2016-22397-1.pdf (last visited Jan. 18, 2019); Circular Welded Carbon-Quality Steel Pipe from Pakistan: Affirmative Prelim. Less Than Fair Value Determination Decision Mem. at 13, A-535-903, (May 31, 2016), available at http://ia.ita.doc.gov/frn/summary/pakistan/2016-13481-1.pdf (last visited Jan. 18, 2019)). The determinations Commerce cites in support of its change in practice do not provide an explanation for why the change in practice is reasonable. Each of these determinations simply asserts that a change in practice has occurred.

### III. The Use of Zero-Quantity Import Data

Trina argues that Commerce erred by including values for import data with reported quantities of zero in the surrogate value calculations.  See Trina Pls.' Br. at 9–11.  Trina emphasizes that there are more zero values than other low-quantity values in the data and that inclusion of these zero-quantity values resulted in distorted surrogate values.  Id. at 10–11.  Defendant argues that it was reasonable for Commerce to determine that the values were reliable because record evidence does not show that the zero-quantities are the result of errors.  See Def.'s Resp. Br. at 27–29.  For the following reasons, Commerce's decision is sustained.

In the final determination, Commerce explains that the zero-quantities in the data are the result of small import quantities being rounded down to zero.  See Final Decision Memo at 12.  Commerce also explains that had the zero-quantities been the result of error, there would be an effect on the reported value, but that here, "there are no imports in the data with a zero value."  Id.  Trina argues that if the zero-quantities were tied to rounding, it would expect the data to contain double the amount of import entries rounded to the quantity of 1 than those rounded to 0.  See Trina Pls.' Br. at 10–11.  As Commerce explains, record evidence does not support the underlying assumption of this argument, i.e., that every 0.5 interval unit of measure will have the same number of imports

associated with it as those with zero-quantities.  Final Decision Memo at 12.[17]  Trina has

not shown that Commerce's determination is unreasonable.

### IV. Decision Not to Offset Trina's Net U.S. Selling Expenses by Debt Restructuring Income

Trina challenges Commerce's decision to exclude a debt restructuring line item in

calculating TUS's indirect selling expense ratio as not in accordance with law,

unsupported by substantial evidence, and arbitrary.  See Trina Pls.' Br. at 11–14; Pl.

Trina's Submission Suppl. Authority Supp. Mot. J. Agency R. at 1–2, Oct. 30, 2018, ECF

No. 60 ("Trina Pls.' Suppl. Br.").  Defendant argues that Commerce's decision to exclude

debt restructuring gains as an offset to respondent's U.S. indirect selling expenses is in

accordance with law and supported by substantial evidence.  Def.'s Resp. Br. at 29–32;

Def.'s Suppl. Br. at 1–3, Nov. 30, 2018, ECF No. 66.  For the following reasons,

Commerce's determination is sustained.

Commerce's decision to deny the offset was reasonable.  The party seeking a

favorable adjustment on an expense carries the burden of "demonstrat[ing] to the

Secretary's satisfaction that the allocation is calculated on as specific a basis as is

feasible, and must explain why the allocation methodology used does not cause

inaccuracies or distortions."  19 C.F.R. § 351.401(g)(2); see also QVD Food Co. v. United

States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (explaining that it is the respondent's burden

to populate the record with all relevant information).  Commerce's practice is to offset only

---

[17] Trina also argues that the risk of introducing error by including the reported zero-quantities outweighs the possibility that the zero-quantities can be explained by rounding.  This argument is not supported by record evidence.

the "current portion of the debt restructuring gain[,]" as to avoid distortions.  Final Decision

Memo at 26–27 (citing Issues & Decision Mem. for the Final Determination in the [ADD]

Investigation of Light-Walled Pipe & Tube from Mexico at 69–70, A-201-832, (Aug. 26,

2004) available at http://ia.ita.doc.gov/frn/summary/mexico/E4-2045-1.pdf (last visited

Jan. 18, 2019); Issues & Decision Mem. for [the] Final Results of [ADD] Admin. Review

of Certain Preserved Mushroom from India – Feb. 1, 2001, through Jan. 31, 2002 at 19–

21, A-533-813, (July 11, 2003) available at http://ia.ita.doc.gov/frn/summary/india/03-

17627-1.pdf (last visited Jan. 18, 2019); Issues & Decision Mem. for the Final

Determination in the [ADD] Investigation of Structural Steel Beams [ ] from South Korea,

65 ITADOC 41,437, (July 5, 2000) at Cmt. 26).  Here, TUS's 2015 income statements

contained, as a line item, debt restructuring income.  Final Decision Memo at 27 (citing

Trina's Sec. A Resp. at Ex. A-18, CD 34–110, bar codes 3480957-01–77 (June 24,

2016)).  Respondent did not tie the income to the POR by producing, for example, the

debt restructuring agreement or placing on the record information that would explain the

agreement's terms or information about the maturity of the relevant loans.  See Final

Decision Memo at 26–27.  It is reasonable for Commerce to require those seeking an

adjustment to tie the offset to a specific POR or period of investigation ("POI") and it is a

respondent's burden to populate the record with the relevant information.

Trina argues that debt restructuring income is a period expense and is properly attributed in its entirety to the period of review during which it is recorded.[18]  See Trina Pls.' Br. at 12–17; Pl. Trina's Reply Def.'s & Def.-Intervenor's Resps. Trina's Mot. J. Agency R. at 15, July 19, 2018, ECF No. 45 ("Trina's Reply Br."); Trina Pls.' Suppl. Br. at 1–2.  Specifically, Trina contends that because Commerce does not parse out indirect expenses into POR and non-POR components and debt restructuring income is an indirect selling expense, Commerce should not have denied respondent's request for an adjustment based on a failure to submit documents linking the debt restructuring income to the POR.  See Trina Pls.' Suppl. Br. at 1–2 (citing Final Results of Redetermination Pursuant to Court Remand in Liberty Frozen Foods Pvt. Ltd. v. United States, 35 CIT __, 791 F. Supp. 2d 1249 (2011) ("Liberty Remand Results")).  Liberty Remand Results addressed how Commerce treats bad debt write-offs within a POR for the purposes of calculating indirect selling expenses.  See generally Liberty Remand Results at 4–9. Unlike debt restructuring income that can span a prolonged period of time, a bad debt is necessarily tied to a particular fiscal year and therefore Commerce is able to link it to a

---

[18] Trina also contends that the final determinations Commerce cites in support of its practice are incomparable because they address debt restructuring as a financial expense for purposes of calculating the cost of production, and not as part of indirect selling expenses.  See Trina Pls.' Br. at 12–17; Trina's Reply Br. at 15.  It is reasonably discernable that Commerce, to avoid distortions by either overcounting or undercounting, requires parties to demonstrate that the debt restructuring income claimed is tied to a specific POR or POI, notwithstanding what the income offsets.

Consol. Court No. 17-00199                                                    Page 27
**PUBLIC VERSION**

POR or POI.[19]  <u>Liberty Frozen Foods Pvt. Ltd. v. United States</u>, 36 CIT __, __, 819 F.

Supp. 2d 1346, 1349–50 (2012).   The court cannot say Commerce's practice is

unreasonable given the nature of debt restructuring income.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's surrogate value selections for valuing respondent's

aluminum frames, module glass, and financial ratios are sustained; and it is further

**ORDERED** that Commerce's decision to include import data with reported

quantities of zero in the surrogate value calculations is sustained; and it is further

**ORDERED** that Commerce's decision to deny an offset for TUS's debt

restructuring income is sustained; and it is further

**ORDERED** that Commerce's decision not to offset the Ex-Im Bank Export Buyer's

Credit Program is contrary to law and is remanded to the agency to recalculate Trina's

U.S. selling prices; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within

90 days of this date; and it is further

---

[19] Trina contends that Commerce's determination is unsupported by substantial evidence because record evidence does not demonstrate that the debt restructuring income was not tied to the relevant POR.  Trina Pls.' Br. at 13.  Trina's argument misplaces the burden for production of relevant information on Commerce and wrongly presumes that just because debt restructuring income can offset indirect selling expenses it automatically qualifies as an offset.  As Commerce explains, although TUS's debt restructuring income "could be considered an offset to indirect selling expenses," Commerce's practice is to require the party seeking the adjustment to substantiate its request by demonstrating that the income is tied to the relevant POR or POI to avoid distortion.  Final Decision Memo at 27.  The court cannot say that Commerce's practice is unreasonable.

**PUBLIC VERSION**

     **ORDERED** that the parties shall have 30 days thereafter to file comments on the

remand determination; and it is further

     **ORDERED** that the parties shall have 30 days thereafter to file a reply to comments

on the remand determination.


                  /s/ Claire R. Kelly
                 Claire R. Kelly, Judge


Dated: January 25, 2019
      New York, New York